FILED
U.S. DIST. COURT
MIDDLE DIST. OF LA.

98 SEP 24 PM 4:00

SIGN_____
RICHARD T. MARTIN
CLERK

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

HAYES WILLIAMS, ET AL         CIVIL ACTION NO. 71-98-B

VERSUS

JOHN J. MCKEITHEN ET AL


HAYES WILLIAMS, ET AL         CIVIL ACTION NO. 92-1-B

VERSUS

RICHARD STALDER, ET AL


### JOINT MOTION TO DISMISS ACTION AND TERMINATE CONSENT DECREE AND SUPERVISION OVER LOUISIANA STATE PENITENTIARY

This joint motion is submitted on behalf of the Plaintiffs and the State as defined below, in the civil action entitled Hayes Williams, et al v. John J. McKeithen, et al, No. 71-98-B ("Hayes Williams 1") and in the civil action entitled Hayes Williams, et al v. Richard Stalder et al, 92-1 ("Hayes Williams II"). Both actions are pending on the docket of this Court. These two actions sometimes are collectively referred to as the "Williams Lawsuits." This joint motion is submitted with the express purpose of resolving the differences between the Plaintiffs and the State and finally and forever terminating Hayes Williams II and for the purpose of dismissing and terminating all claims and orders as related to LSP. It is further the purpose of this agreement to dismiss all claims in Hayes Williams I except those claims regarding the Juvenile Facilities. The Juvenile Facilities are not included in this settlement and remain on the Court's docket for resolution and are subject to all prior orders and judgments rendered by this Court.



# ARTICLE I
## Definitions

The "State" refers collectively to the officers and agencies of the State of Louisiana, including specifically the Governor of the State of Louisiana, the Secretary of the Department of Public Safety and Corrections ("DPSC"), the Warden of the Louisiana State Penitentiary, and "Defendants" refers to all named defendants in either of the Williams Lawsuits and specifically includes the State.

"Plaintiffs" includes all inmates who are members of the class of inmates represented by Nordyke & Denlinger, counsel for the plaintiff class in this action.

"LSP" refers to the Louisiana State Penitentiary at Angola.

"Juvenile Facilities" refers collectively to the Swanson Correctional Center for Youth (formerly the Louisiana Training Institute - Monroe), the Louisiana Training Institute - Bridge City, the Jetson Correctional Center for Youth and the Tallulah Correctional Center for Youth (formerly A.Z. Young Correctional Center).

"Parties" collectively refers to the State and the Plaintiffs.

# ARTICLE II
## Hayes Williams I- Basis of Lawsuit and Scope of Settlement

2.1     **LSP**. In 1971, inmates at LSP filed suit (Hayes Williams I) alleging unconstitutional conditions of confinement at that institution. Litigation in the 1970's culminated in a consent decree entered on December 7, 1983 (the "1983 Consent Decree") that addressed conditions of confinement in adult DPSC facilities. Since 1983, there have been a number of modifications and amendments to the 1983 Consent Decree.

2.2     **Juvenile Facilities.** Although facilities housing juveniles were not part of the 1983

Consent Decree, a later consent decree was entered in Hayes Williams I on December 17, 1984 (the "Juvenile Consent Decree") that addressed conditions of confinement in DPSC facilities housing juveniles. Since 1984, there have been a number of modifications and amendments to the Juvenile Consent Decree affecting one or more of the Juvenile Facilities. In 1997, separate actions were opened for each of the Juvenile Facilities, as follows: In Re: Juvenile Facilities, No. 97-0001-B-1; In Re: Tallulah Correctional Center for Youth, No. 97-0665-B-1; In Re: the Louisiana Training Institute - Bridge City, No, 97-0668-B-1; In Re Swanson Correctional Center for Youth., No. 97-0667-B-1; and In Re: Jetson Correctional Center for Youth, No. 97-0666-B-1. These actions sometimes are collectively referred to as the "Juvenile Actions".

**2.3** **The September 26, 1996 Settlement.** Pursuant to a settlement entered on September 26, 1996, this Court released all institutions from further supervision effective April 1, 1997 <u>other than</u> LSP and the Juvenile Facilities.

**2.4** **Scope of This Settlement.** The Parties acknowledge that significant improvements have been realized in conditions of confinement in LSP over the last several years. The Parties ask the Court to enter an order that will terminate Hayes Williams II and for the purpose of dismissing and terminating all claims and orders as related to LSP. It is further the purpose of this agreement to dismiss all claims in Hayes Williams I except those claims regarding the Juvenile Facilities. The Juvenile Facilities are not included in this settlement and remain on the court's docket for resolution and are subject to all prior orders and judgments rendered by this Court. The Parties acknowledge that this Settlement does not affect the Juvenile Facilities or terminate the Juvenile Consent Decree or dismiss the Juvenile Actions. Except as modified by paragraph 8.3, Class counsel shall continue to serve as class counsel under the same terms and conditions and with the same rate and method of payment as has existed heretofore.

## ARTICLE III
## Hayes Williams II - Basis of Lawsuit and Scope of Settlement

3.1     **Background and Status.**  In 1992, inmates at LSP filed suit (Hayes Williams II) alleging that medical care delivery at LSP violated their civil rights under the Eighth and Fourteenth Amendments to the United States Constitution.  Among other things, Plaintiffs alleged inadequate medical staffing, inadequate and outdated facilities, deficiencies in access to medical care, deficiencies in surgical care, deficiencies in the treatment of the chronically ill, deficiencies in physical therapy and deficiencies in dental care.  A three week evidentiary hearing was held before the Magistrate Judge during September, 1994, but no proposed findings of fact or conclusions of law were entered following that hearing.

3.2     **Scope of this Settlement.**  The Parties acknowledge that significant improvements have been realized in the delivery of medical care at LSP since Hayes Williams II was filed.  Among the more significant improvements in the delivery of medical care are the following:

> DPSC has entered a contractual relationship with the LSU School of Medicine, and, pursuant to this relationship, the LSU School of Medicine is providing extensive medical services and oversight at LSP.

> LSP, in conjunction with LSU and Earl K. Long Medical Center(EKL), has instituted telemedicine clinics in the following specialty areas:

>> Dermatology
>> Pulmonary
>> Diabetes
>> Hypertension
>> HIV/AIDS
>> Asthma
>> Orthopaedics

> There have been a number of significant improvements to the physical facility, including installation of a new roof, completion of a new laundry facility, pharmacy, and central supply, and the installation of a morgue refrigerator.

Sick call now is performed by licensed staff who receive special training to perform sick call. Sick call staff wear uniforms identifying them as medical personnel. The time of day during which sick call is conducted has been changed. Inmates now sign up directly for sick call. Inmates may make sick call directly to sick call personnel and no security staff may prevent or unreasonably restrict an inmate's ability to make sick call.

All or virtually all nurse positions have been filled since mid - 1993

The backlog in surgeries has been minimized since mid - 1992. Currently there are no backlogs in surgery, ENT, optometry and radiology.

A number of chronically ill patients have been moved from LSP to other DPSC facilities, thereby greatly reducing the population housed at the Barrow Treatment Center.

A large number of mental health patients have been moved from LSP to a special program at Hunt Correctional Center.

Delivery of the most common psychotropic drugs was changed from pill form to liquids.

The contract dental prosthesis lab was changed in mid-1993, thereby greatly reducing the backlog for dental prosthesis.

The pharmacy was expanded and moved, and pharmacy procedures have been revised.

Laboratory equipment has been extensively updated.

Negative pressure rooms have been installed at the Barrow Treatment Center for the housing of inmates with active tuberculosis.

Defendants shall install and bring on line a medical record automation system. The medical records department shall continue to be under the direction of a full time health information consultant who is an accredited records technician. Records will be available on weekends, nights and holidays. A quality assurance program will be instituted in the medical records department. LSP will complete installation of the medical information system and will provide the Information Systems manager adequate clinical direction for development and use. Features that will be implemented are chronic disease problem list and integration of medication summaries from the pharmacy.

Physician clinics are operational at Camps C, D and RC resulting in reduced need for transportation and reducing crowding at Barrow Treatment Center. LSP maintains a staff of eight full time physicians.

The medical record filing backlog has been reduced and the backlog is at minimal levels.

LSP has implemented a policy to provide annual physicals for all inmates over fifty years of age.

Smoking policies have been revised.

Each inmate has been assigned a primary care physician

Insulin dependant diabetics are being monitored (accu-check) daily by medical staff (normally EMTs).

Diabetics on oral medication are checked twice a week.

Arrangements are being made to have a dietician inspect and review diabetic diets.

Primary care physicians perform spot checks of dining areas and diets monthly to confirm that approved diets are in place.

Tuberculosis tests are performed on an annual basis for all inmates.

Inmates will be informed of the availability of a telemedicine clinic in which they can have direct dialogue with the dietician.

A full time employee has been assigned to coordinate retrieval of records from outside facilities.

Plans are underway to install computer terminals that permit immediate communication of diagnoses, medication, and follow up orders with EKL.

A computer system has been developed to generate a chronological listing of diagnostic information, current medications and the medication expiration date.

LSP's computer system is capable of identifying and tracking inmates with various chronic conditions.

A policy has been drafted and implemented to insure that orders by specialist physicians supercede orders of a generalist physician unless there is a documented reason to not follow the specialist orders.

Since March 5, 1998, a computer generated problem list has been maintained for each inmate identified as suffering a chronic condition containing diagnosis, allergies, medications, health maintenance screening information and the name of the inmate's primary care physician. A treatment plan is developed for the inmate in conjunction with the LSU physicians.

Pill call personnel will be provided at least 4 hours of training per year.

All inmates who are medically indicated for protease inhibitors will be provided these medications if they maintain compliance with the regimen.

Prescriptions are now timely reaching inmates that change housing assignments. LSP will continue to ensure that prescribed medications are provided to those inmates who are re-assigned to different housing areas in the prison.

Every employee is trained in CPR at least annually.

The dental clinic randomly interviews inmates treated during the previous month and insures that the treatment is accurately reflected in the chart.

All newly admitted inmates are seen within two weeks and all inmates are seen at least once a year by the dentist.

EMTs are authorized to give or extend a duty status.

A hospice program has been instituted for the terminally ill.

An infection control department has been created and staffed.

LSP was accredited by the American Corrections Association on January 17, 1994 and has maintained accreditation since that date.

Plaintiffs contend that some or all of these improvements resulted from Hayes Williams II. Defendants contend that these improvements and others were made by the DPSC as part of its ongoing efforts to improve conditions at LSP. Defendants contend that these improvements would have been made regardless of Hayes Williams II. Despite this disagreement, the Parties desire to terminate and dismiss Hayes Williams II, and the parties desire to settle all issues relating to medical care delivery at LSP. The DPSC will not make any changes to significantly decrease the manner and extent of the current delivery of medical care as outlined in part above during the pendency of this agreement without the prior approval of counsel for the Plaintiffs or the prior approval of the Court.

LSP additionally has agreed to implement the following improvements:

When an inmate accesses the medical care system on at least three occasions during a sixty day period, then the inmate will be referred to a physician from the LSU School of Medicine. The LSU physician will review the inmate's record and determine whether a physical examination of the inmate or other action is warranted. Based on their experience with this referral process, the LSU physician may modify the number of sick calls, emergencies and other events accessing medical care that will trigger review by the LSU physician.

After the review by the LSU physician has been completed, a decision may be made to initiate a malingering or work offense write-up. Correctional staff - and not LSP or LSU medical personnel (including EMT's) - will actually initiate and prepare any writeup for malingering or work offense. No inmate will be disciplined or written up for malingering or aggravated work offense based on an inmate's access to the medical care system through sick call, regularly scheduled clinics or physicians clinics until after the LSU physician has evaluated the patient and determined that the inmate's complaint or complaints had little or no merit. Although the LSU physician may not overrule any subsequent write up nor participate in the disciplinary process, all malingering write ups will be reviewed by the LSP physician as a step in the quality assurance process.

Physical therapy will be provided for those inmates for whom physical therapy is indicated to either restore or keep function or for rehabilitative purposes.

Quality assurance of both LSP staff physicians and sick call personnel will be instituted by utilizing a review process by LSU Medical School physicians. Although LSU and LSP may develop any system of Quality Assurance that is effective, random chart reviews and random reviews of ARPs relating to medical care will be components of the program.

Orthopaedic and Neurology backlogs will be reduced to levels deemed acceptable by Dr. Karam and Dr. Puisis.

The computer interface between EKL and LSP will be completed allowing filling of EKL generated prescriptions by LSP pharmacy as well as real time transmission of EKL physician orders and test results to LSP.

A decision to override or not follow the outside orders are reviewed by the medical director at LSP, documented in the patient record and communicated promptly to the outside provider.

The Defendants agree to implement the above changes by October 1, 1998

## ARTICLE IV
### Release of LSP

**4.1** <u>**LSP-Hayes Williams I.**</u> The Parties agree that LSP shall be fully released from any further court supervision, effective February 12, 1999, with a maximum population capacity of 5108, subject to any further limitations or restrictions that may be imposed by the Louisiana State Fire Marshal and the Louisiana State Health Officer. This maximum capacity is for existing structures and additional capacity that may be added by new construction and new housing subject to capacities that may be set by Louisiana regulatory authorities. The maximum capacities and allocations of beds within LSP may be adjusted to reflect good correctional management practices, security concerns, operational needs of the institution and demands of Louisiana sentencing practices. Through February 12, 1999, the DPSC shall seek leave of Court to change or modify the overall population capacity at LSP. On motion of any party on or after February 12, 1999, the Court shall enter an order dismissing all claims and orders as related to LSP. It is further the purpose of this agreement to dismiss all claims in Hayes Williams I except those claims regarding the Juvenile Facilities. The Juvenile Facilities are not included in this settlement and remain on the court's docket for resolution and are subject to all prior orders and judgments rendered by this Court.

**4.2** <u>**LSP-Hayes Williams II.**</u> DPSC covenants that it has no plans or intent to terminate or withdraw its support or funding for any significant element of the medical care delivery currently in place at LSP. DPSC shall notify counsel for plaintiffs and the Court of any major change in the delivery of medical care at LSP. Additionally, Defendants agree to continue providing the Court, the Court's expert and counsel for plaintiff with the same information on provision of medical care as is currently being provided. The Parties further acknowledge that the DPSC has

contracted with the LSU Medical School to provide medical services to LSP. The Defendants shall take all reasonable steps to maintain funding adequate for current staffing positions and to preserve the LSU Medical School contract.

## ARTICLE V
## Release of Juvenile Facilities

The Parties agree that the Juvenile Facilities remain subject to court supervision. The Juvenile Consent Decree is not released. The Juvenile Actions including those that may still be extant in Civil Action 71-98, are not dismissed by this joint motion. Nothing in this agreement is designed to operate for or against the pending motion filed by Wackenhut Corrections Corporation regarding the Jena facility.

## ARTICLE VI
## Inspections, Monitoring and Reporting

**6.1** **Access of Expert.** DPSC agrees to allow the Court's expert, John Whitley, continued access to LSP through February 12, 1999, provided, however, that nothing discovered in these inspections shall cause LSP to be subjected to supervision of the Court after February 12, 1999. The DPSC agrees to allow the Plaintiffs' Counsel, Court's expert or experts designated by any of the Parties to have reasonable access to LSP medical facilities and records through February 12, 1999. If any reports generated by the experts contain or reference confidential or sensitive information (particularly records or information relating to inmate medical records, personnel records, records that could prejudice security, or juvenile records), then such reports shall not be distributed to anyone other than the Court and the DPSC without first affording the DPSC advance notice and reasonable

opportunity to object to such disclosure.

**6.2    Reporting Requirements.** Through January 15, 1999, the DPSC shall continue to submit to the Court, Counsel for plaintiff and the Court's expert a monthly report stating whether LSP is in compliance with the population capacity limitations and minimum medical, security and other staffing requirements applicable under the 1983 Consent Decree, or other orders or consent decrees governing LSP. The reports for each month shall be submitted by the 15th of the following month, through January 15, 1999. Through February 12, 1999, the DPSC also shall report escapes, deaths and other occurrences that are significant and unusual, and any emergency situations at LSP that may require changes in the population of the facility (such as floods). These events shall be reported within ten days of their occurrence.

**6.3    ACA.** Through February 12, 1999, ACA accreditation shall be maintained at LSP. The DPSC shall report loss of ACA accreditation within ten days of receipt of notification.

### ARTICLE VII
### State and Federal Enforcement.

**7.1    Ongoing Enforcement.** The Parties acknowledge that the Louisiana State Fire Marshal and the Health Officer shall continue to monitor LSP in accordance with their applicable Codes and Louisiana law. Nothing herein shall prevent the Fire Marshal and Health Officer from filing actions in state court for the purpose of enforcing these codes and laws.

**7.2    Ongoing Federal Enforcement.** The Parties acknowledge that nothing in this agreement shall prevent the U.S. District Court, Middle District of Louisiana, from issuing orders, upon notice and hearing, necessary to secure compliance with the terms of this stipulated order, provided that no such order shall have effect beyond February 12, 1999. The Parties also acknowledge that the Court has historically facilitated informal discussions between the parties in

an effort to achieve agreement regarding controversies which demand resolution. The Court will continue to the extent possible to facilitate informal resolution to such controversies prior to the issuing of formal orders. Nothing in this agreement shall serve to limit the independent authority of investigative and law enforcement agencies to perform their own inspection, investigation, discovery and/or prosecution responsibilities with regard to existing or future civil or criminal matters which may arise.

## ARTICLE VIII
### Plaintiff's Counsel

**8.1** **Informal Resolution of Disputes**. The Parties agree that every effort will be made to resolve problems and complaints relating to issues involved in the Williams Lawsuits prior to filing any new litigation. The Parties agree that, if any such issues cannot be resolved and necessitate further litigation, then such further litigation shall be asserted only in a new civil action and not in this action. This agreement shall not be construed to create an obligation to any individual inmate, and failure to comply with this agreement shall not be deemed a per se breach of a civil duty to an inmate.

**8.2** **Continuation Of Plaintiffs' Counsel for LSP Inmates in Hayes Williams I**. Until February 28, 1999, counsel for Plaintiffs shall continue to serve as counsel for DPSC inmates incarcerated at LSP. Counsel shall endeavor to close out completely the files and correspondence incidental to the Williams Lawsuits within that time period except for files and correspondence pertaining to the Juvenile Facilities or the Juvenile Actions. The DPSC agrees to continue to pay counsel's reasonable fees upon the same terms and conditions as heretofore existed upon submission of statements up to and through February 28, 1999. In the event of a dispute regarding Plaintiffs' counsel fees in Hayes Williams I, the parties may submit the dispute to the Court for resolution.

With respect to the Juvenile Facilities, class counsel will continue to serve as counsel and DPSC agrees to continue to pay counsel's reasonable fees upon the same terms and conditions as heretofore existed until further ordered by the Court. The DPSC, however, reserves the right to contest any claim for attorney's fees incurred in connection with new claims or actions that may be asserted in the Williams lawsuits or the Juvenile Actions.

**8.3** **Compensation of Plaintiff Counsel - Hayes Williams-II**. Counsel for Plaintiffs shall, on or before December 31, 1998, submit a statement for reasonable fees and expenses incurred in the Hayes Williams II lawsuit. Within fifteen (15) days of receipt of this statement, Defendants will submit to plaintiffs a statement of their objections, if any, to the reasonableness of the fees and expenses claimed. If the Defendants do not dispute the fees and expenses claimed by Plaintiffs, and if Hayes Williams II is dismissed on or after February 12, 1999, then Defendants shall pay such fees and expenses within fifteen (15) days of the entry of a final judgment dismissing Hayes Williams II pursuant to paragraph 9.2 of this agreement. In the event of a dispute regarding fees or expenses claimed by Plaintiffs' counsel in Hayes Williams II, then the parties may submit the dispute to the Court for resolution. If Hayes Williams II is reopened for litigation pursuant to Paragraph 9.2, below, or for any other reason except extensions that may be agreed to by the parties, then the Defendants shall have no obligation to pay any of Plaintiffs' attorney fees and expenses, unless and until ordered to do so following contradictory motion at the conclusion of that litigation. If Williams II is extended, counsel will be paid reasonable fees and expenses incurred during the extension until further order of the court. An extension to allow remediation of an obligation shall not operate to negate this paragraph and the final statement of fees and expenses will be submitted at or after final dismissal of the action. It is the intent of the parties that the Defendants' obligation to pay the final statement of attorneys fees' and expenses, and any agreement as to the reasonableness of those fees

and expenses, are contingent on the entry of a final judgment of dismissal pursuant to paragraph 9.2 of this joint motion. If a final judgment of dismissal is not entered pursuant to paragraph 9.2 of this joint motion, then Defendants' agreement and obligation under this paragraph are rescinded and of no effect.

ARTICLE IX
Litigation

9.1    The Parties agree to entry of a joint order dismissing all claims and orders as related to LSP and all claims in Hayes Williams I except those claims regarding the Juvenile Facilities with prejudice on motion of any party on or after February 12, 1999. It is the intent of the Parties that all further court supervision of LSP will be terminated effective February 12, 1999. Without limiting the generality of the foregoing, the parties agree that the 1983 Consent Decree and all modifications and amendments of that decree that affect LSP shall be terminated and shall have no further effect after February 12, 1999 except claims regarding the Juvenile Facilities. The Juvenile Facilities are not included in this settlement and remain on the Court's docket for resolution and are subject to all prior orders and judgments rendered by this Court. The only remaining reporting and monitoring requirements for LSP are those identified in this joint motion, and all of those requirements will expire on or before February 12, 1999.

9.2    The Parties agree to the immediate administrative closure of Hayes Williams II. On motion of Plaintiffs filed at any time prior to January 22, 1999, or within two weeks of the reports to be filed by Dr. Puisis and Dr. Karam, whichever is later, Hayes Williams II may be returned to the Court's active docket. If plaintiffs do not move to reactivate Hayes Williams II by January 22, 1999 or within two weeks of the reports to be filed by Dr. Puisis and Dr. Karam, whichever is later, then Hayes Williams II shall be dismissed with prejudice on or after February 12, 1999 on motion of any party. This agreement shall have no effect on the agreement reached between the Department

of Justice and the Department of Public Safety and Corrections in Civil Action 92-1.

**WHEREFORE** the Parties jointly move the Court for an order implementing the provisions of this agreement.

RESPECTFULLY SUBMITTED:

_____
Keith B. Nordyke Bar Roll 8556
June Denlinger Bar Roll 1823
**NORDYKE & DENLINGER**
427 Mayflower Street
Baton Rouge, Louisiana 70802
Telephone: 225-383-1601
*Attorneys for Plaintiff Class*

_____
Richard A. Curry - Bar Roll #4671
**McGLINCHEY STAFFORD**
**A Professional Limited Liability Company**
Ninth Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone 225-383-9000
*Special Assistant Attorney General Attorneys for Secretary Richard L. Stalder and Governor Mike Foster*

_____
Richard P. Ieyoub Bar Roll #2217
Box 94095
Baton Rouge, Louisiana 70804
Telephone: 225 - 342-7013
*Attorney General for the State of Louisiana*