71-98

**LOUISIANA STATE UNIVERSITY MEDICAL CENTER**

**School of Medicine in New Orleans**
1542 Tulane Avenue
New Orleans, LA 70112-2822
Telephone: (504) 568-6001
FAX: (504) 568-8647

Department of Psychiatry

cb file w/ record

LSUMC

FILED U.S. DIST. COURT
FEB -8 AM 8:43
RICHARD T. HAIGHT CLERK

RECEIVED
JAN 29 1999
CHIEF JUDGE FRANK J. POLOZOLA
U.S. DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA

January 26, 1999

Warden Burl Cain
Louisiana State Penitentiary
Angola, LA 70712

Frank J. Polozola, Chief Judge
Middle District of Louisiana
United States District Court
707 Florida Street
Baton Rouge, LA 70801-1712

Dear Warden Cain and Judge Polozola,

Since our last report, Dr. Greenleaf and I have each made regular visits to the Louisiana State Penitentiary (LSP) continuing our review of mental health facilities, personnel, policies and procedures, and programs. As part of our work, we have attempted to review and monitor all suicide gestures and attempts and to help implement policies that will hopefully contribute to a decrease both in gestures and attempts. We have continued in efforts to provide more coherent policies and procedures related to transfer of inmates from LSP to Hunt Correctional Center (HCC) and return of inmates from HCC to LSP. We are currently helping to implement needed and effective transitional and step-down programs. We are also assisting Mr. Clay Williams in his efforts to develop a series of training modules for security related to mental health issues. We have been monitoring inmate follow-up appointments in the individual camps and plan to add monitoring of psychiatric diagnosis, medication management and laboratory tests in the near future. We also plan to develop a brief annual update form that focuses on diagnosis and treatment issues in order to be of help in emergencies and provide succinct information for new treaters and consultants. During this time interval, we also met with Dr. George Bishop, who is conducting an independent evaluation for the court. This meeting included a useful and thoughtful discussion, and I believe that each of us found it to be worthwhile. In the remainder of this report, I will attempt to summarize the results to date.

**Suicide Gestures and Attempts**

At the meeting in Judge Polozola's chambers, Dr. Greenleaf expressed the belief that some of the current policies were inadvertently contributing to an increased number of suicide gestures. At that time, I recommended that inmates not automatically perceive that a suicide gesture would lead to a transfer to HCC. Especially for inmates in Camp J, where circumstances are especially difficult, inmates might prefer to make a suicide gesture in the belief that HCC would be less restrictive and easier. I also recommended that inmates who were being transferred to HCC know that at the conclusion of their evaluation and treatment that they would be returned to LSP and that transfer to HCC did not preclude appropriate disciplinary action. Since then I have discussed with the warden at Camp J and the social workers, the question of whether mental health evaluations should take



3:71-cv-00098 10662 - 1
DATE: 02/05/99 DEPUTY CLERK: hj

place before or at the time of transfer to Camp J in order to assure that the behaviors in question were not secondary to mental health problems. The warden was especially interested in this proposal and felt that it would be helpful, and we are currently looking into a greater mental health role in this process.

In order to assess the overall pattern and progress, we have constructed a summary of suicidal behaviors. As the table indicates, the number of suicidal attempts and gestures peaked in September, with a total of 17 for that month.

**Suicidal Behaviors**

| | Total | Attempts | Gestures | Death |
|---|---|---|---|---|
| July | 4 | 2 | 2 | |
| August | 5 | 0 | 5 | |
| September | 17 | 2 | 15 | |
| October | 3 | 1 | 2 | 1 |
| November | 1 | 0 | 1 | |
| December | 5 | 0 | 5 | |

Obviously, October was marked by the successful suicide which we have previously discussed. With that exception, the number of gestures and attempts has remained at a lower level. I am attaching, as an appendix, a review of the charts related to suicide attempts during the month of December. One of the 5 charts was unavailable at the time of review. From the social worker's description, it appears likely that the behaviors involved constituted a suicide gesture; however, we plan to review the chart when it is available in order to confirm this impression.

**Transfers Between LSP and HCC**

Two meetings have taken place since our last report. The first, at Secretary Stalder's office, included representatives from all of the adult state facilities. Warden Lindsay and Deputy Warden Desport of HCC attended this meeting, and there was a very useful interchange among everyone involved. Wardens from the other facilities also agreed about the need for a better and more coherent transfer policy. There was full departmental consensus that inmates would be served better with clearer information being summarized and included at the time of transfer since inmates can have several thick volumes of information. It was further agreed upon that summaries should include appropriate diagnostic and therapeutic information, including treatment plans that have been effective and factors that contribute to exacerbation of symptoms and/or behavioral difficulties.

At the time of that meeting, I agreed to review the Forced Medication Policy for the state facilities. The current policies are stricter and more cumbersome than those required by Washington v. Harper. I have prepared a draft for consideration, will discuss it with Dr. Soong at HCC and then submit a proposal to Secretary Stalder. Any change in the current policy would require legislative approval, but all were in agreement that such a change could assist in more effective treatment.

Dr. Greenleaf has met with administrative and medical officials at HCC and a draft of a transfer procedure was written at that time. That policy continues to be in the process of development, and when completed, will be reviewed for approval by Warden Cain and Warden Lindsay. As

mentioned, the other facilities in the state have expressed a wish that the policy be the same or similar for their facilities. HCC has already begun sending a discharge summary upon return of inmates to LSP, and LSP is providing additional information to HCC at the time of transfer. We plan to review these summaries and help both facilities determine what additional information will be of most use to the mental health professionals receiving the inmates after transfer.

**Sick Call and Follow-up Visits**

The computerized Management Information System at LSP appears to be functioning well in relationship to sick calls and follow-up visits. In our reviews, we have found that inmates are seen at the times appropriate for their level of difficulty and that sick call requests and/or acute problems are responded to in an efficient manner. This is especially impressive given the limited number of mental health staff and the number of inmates requiring regular mental health appointments and special additional evaluations. As mentioned above, we plan to monitor charts to ascertain more fully the relationship between psychiatric diagnosis, medication management, laboratory tests, and treatment plans in general. As noted previously, the mental health staff in general, and Dr. Abad in particular, appear to be spread relatively thin. We have already made recommendations for the additional staff that will be needed, especially when the transitional and step-down programs are implemented. We believe that these requests were included within the budgetary process and hope that they have not been impacted adversely by the Governor's recent freeze on hiring.

**Transition and Step-Down Programs**

We have previously described the need for and the importance of transition and step-down programs. At the meeting in Secretary Stalder's office, wardens and representatives of other state penal institutions similarly expressed the benefit of such programs. For inmates returning to LSP from HCC, the transition program would allow for continuation of the treatment plan that was felt to be appropriate at HCC, reassessment and stabilization of the inmate at LSP, and provision and monitoring of structure and activities that would enhance the likelihood of the inmate being returned to General Population and avoiding severe exacerbations. Similarly, the step-down program would allow care for inmates who, at various times, could not function fully in General Population -- and indeed would be more likely to be taken advantage of by other inmates. The program would also give another level of intervention which LSP could use in response to suicide gestures rather than a transfer to HCC.

Some inmates require a step-down program for extended periods of time. Others need it for transient periods related to temporary exacerbations (which might be nipped in the bud), problems that trigger a worsening of symptoms and periodic, biologically-driven cycling of symptoms. I have spent considerable time touring a tier that has been proposed as a possible site for the transition and step-down program. It formerly housed mental health inmates, and even now a number of the inmates have varying mental health and developmental difficulties. One of the inmates whom I interviewed had been transferred to this tier from death row because of severe mental health problems and his being taken advantage of by other inmates. If LSP officials decide to utilize this tier, it would be appropriate. However, some of the facilities that in the past have been used for counseling, group treatment and activity therapies that are currently being used for other medically oriented functions. Provision would need to be made either for return of these facilities or for other appropriate space that could be utilized for various treatment needs. As mentioned, in the previous

report and in discussions with Warden Ranatza, we outlined additional staffing needs that will be required for the extended care and step-down programs.

**Telemedicine and Teleconferencing**

LSP is already hooked up via telemedicine with LSU Medical Center in Baton Rouge. I have spoken both with Warden Ranatza and with appropriate administrative officials at LSUMC regarding extension of telemedicine links to New Orleans. With the system that is in place, there should be no difficulty in providing this link for mental health. In turn, this would allow us to provide consultations both for acute problems and for individual cases where the psychiatrist or other mental health professionals have specific concerns. These concerns could range from diagnostic questions, therapeutic considerations, issues of unresponsiveness to current medication regimens, and other questions that may be helpful in planning treatment. In addition, the hookup could allow for teleconferencing, further enhancing abilities of the mental health professionals and supplementing planned video educational efforts for the security staff. I will be pleased to assist in developing the necessary hook ups and in providing not only my personal services, but also those of other experts in our department at LSU Medical Center (for example, in areas of specific types of psycho-pharmacology).

In closing, I would again like to stress the cooperativeness that I have experienced to date. Clay Williams frequently has worked at implementing areas that have been raised in our meetings. Warden Cain has emphasized his desire to improve conditions as necessary. Commissioner Stalder has echoed Warden Cain's sentiments and expressed the commitment of the Department of Corrections. Warden Ranatza has been supportive and helpful, as have other wardens, related to questions of prevention of suicide, evaluation and treatment at Camp J, and other important issues. Although much remains to be done, I believe that considerable progress has already been made.

If there is any additional information that you need at this time, please do not hesitate to let me know.

Sincerely,

Howard Osofsky

Howard J. Osofsky, M.D., Ph.D.
Professor and Head

cc Wayne Greenleaf, Ph.D., MBA
Clay Williams, MSW

HJO:rc

Attachments

## APPENDIX A

During the month of December, there were 5 incidents in which inmates engaged in suicidal behaviors or gestures. All of these have been classified as gestures by the mental health staff. We have been able to review four of the five cases. One of the charts was unavailable at the time of the review, but the clinical information supplied to us indicated that the incident was likely a gesture.

Folder 113076 - Inmate WJ:
We have previously done an in-depth review of this inmate's mental health record and have conducted an interview with him. On December 17, inmate WJ put his hand to his mouth and make a swallowing gesture in the presence of guards. He then told the guards that he had taken pills of an unknown quantity and type. There were contradictory statements related to the number of pills taken; at one time he stated that it was 10 pills and at another time, at Earl K. Long, indicated that it was 20 to 30. When he was transferred to the LSP-Barrow Treatment Center, he denied that he had taken any pills and his vital signs remained within normal limits. After transfer to Earl K. Long, as a precautionary measure, the inmate refused treatment. He was returned to LSP and was placed under an extreme watch with a recommendation that he be evaluated by the psychiatrist. Dr. Abad had evaluated the inmate prior to the incident and had been unable to document a significant psychiatric diagnosis. On December 28, the inmate went before the Camp J court and claimed that he had not taken any pills; he was sentenced in accordance with the Behavior Program approved by the court. All of the data in Dr. Greenleaf's review indicated that the inmate had engaged in manipulative gestures and that the incident under question was a suicide gesture rather than a suicide attempt.

Folder 11605 - Inmate WD:
Dr. Greenleaf's review of this inmate's chart indicated that the inmate had received good mental health care prior to the most recent incident. The most recent incident concerned a "hanging." It seemed clear that the inmate's concern was with security and that the "hanging" was related to "behaviors that were an attempt to get moved from the tier upon which he was currently placed." According to one note, he was found standing flatfooted with his shackles around his neck. All vital signs were within normal limits and stable during the period of observation. All of the indications were that this episode could be classified appropriately as a manipulative gesture.

Folder 131403 - Inmate FB
This inmate had previously been classified as level-of-care 5 with no prior watches -- indicating no previous mental health treatment. On December 1, 1998, because of some difficulties, the inmate was scheduled to be moved to another unit. On December 2, he began cursing at security and at staff who approached his cell, including the social worker, and he held a sheet around his neck -- but tied to the bars with no pressure on the sheet. Consultation with the physician on duty indicated low lethality potential, and the incident was classified as a manipulative gesture to control the tier move. Later the same day, in an interview with the social worker, he strongly

denied any suicidal intent or ideation. Of some note, prior mental health records indicate that Dr. Abad evaluated the inmate prior to the incident and was unable to identify a specific psychiatric diagnosis. When the inmate was seen at Camp J court on December 28, he denied attempting to hang himself or that he had taken pills, and he was sentenced in accordance with the Behavior Program approved by the court. Dr. Greenleaf's evaluation indicated that the inmate's suicidal behaviors were consistent with manipulative gestures and did not suggest more worrisome psychiatric diagnoses.

Folder 106353 - Inmate SAS:
This chart was unavailable for review on December 28. In checking the computer records and in reviewing the case with the social workers, it was clear that the inmate was provided with a psychiatric evaluation by Dr. Abad on September 9, 1998. At that time, Dr. Abad diagnosed him as suffering from a major depressive episode. The inmate refused to take medications and was not exhibiting behavior which would constitute an emergency. (Within the current DOC policies, only mental health personnel at Hunt Correctional Center may force psychotropic medication.) Dr. Abad initiated transfer to Hunt Correctional Center (HCC) for treatment. By verbal report from the Assistant Mental Health Director, the inmate was returned from HCC early in December. After a couple of days, he again cut his arm and was transferred back to HCC. Although the psychiatric team clearly indicated reasons to classify his behaviors as a suicidal gesture, because of the absence of the chart and because of the inmate's having been transferred to HCC, it is not possible to verify this diagnosis completely.

The 5th inmate could not be evaluated at our monitoring visit on December 28. His chart was not available at that time. This was not indicative of poor mental health treatment; rather, it was indicative of the difficulties in obtaining charts when inmates have been transferred within the facility or to HCC. We plan to give a more complete assessment at the time of our next report.

It should be noted that Dr. Greenleaf and I have interviewed a number of inmates during this time interval. Those inmates who were interviewed related to a suicide attempt or gesture, clearly presented material consistent with the diagnoses already elaborated. A number of inmates presented issues which can be dealt with more appropriately when the proposed new services and facilities are implemented.