IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

FILED IN OPEN COURT

SEP 0 7 2000    KC

U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| HAYES WILLIAMS, <u>et</u> <u>al</u>.<br>    Plaintiffs, | ) |
| | ) |
| v. | )    Civ. No. 71-98-B |
| | ) |
| JOHN McKEITHEN, <u>et</u> <u>al</u>.<br>    Defendants, | ) |
| | ) |
| UNITED STATES OF AMERICA,<br>    Amicus Curiae. | ) |
| | ) |
| IN RE: JUVENILE FACILITIES | )    Civ. No. CH 97-MS-001-B |
| | ) |
| IN RE: TALLULAH CORRECTIONAL<br>    CENTER FOR YOUTH | )    Civ. No. CH 97-0665-B-M1 |
| | ) |
| IN RE: JETSON CORRECTIONAL<br>    CENTER FOR YOUTH | )    Civ. No. CH 97-0666-B-M1 |
| | ) |
| IN RE: SWANSON CORRECTIONAL<br>    CENTER FOR YOUTH | )    Civ. No. CH 97-0667-B-M1 |
| | ) |
| IN RE: LOUISIANA TRAINING<br>    INSTITUTE - BRIDGE CITY | )    Civ. No. CH 97-0668-B-M1 |
| | ) |
| IN RE: JENA JUVENILE JUSTICE<br>    CENTER | )    Civ. No. CH 98-0804-B-M1 |
| | ) |
| BRIAN B., <u>et</u> <u>al</u>.<br>    Plaintiffs, | )    Civ. No. 98-886-B-M1 |
| | ) |
| v. | ) |
| | ) |
| RICHARD STALDER, <u>et</u> <u>al</u>.,<br>    Defendants. | ) |



| ACTION | INITIALS | DOCKET# |
|---|---|---|
| PROCESSED |  |  |
| CHARGED | BP | 10911 |

THE UNITED STATES OF AMERICA, )     Civ. No. 98-947-B-1
    Plaintiff,             )
                             )
    v.                    )
                             )
THE STATE OF LOUISIANA,     )
    <u>et al</u>.,              )
    Defendants.         )
_____ )
                             )
A.A., <u>et al</u>.,        )
    Plaintiffs,        )     Civ. No. 00-246-C-M1
                             )
    v.                    )
                             )
WACKENHUT CORRECTIONS CORP.,  )
    <u>et al</u>.,              )
    Defendants.         )
_____)

## TABLE OF CONTENTS

I.   Introduction (¶1 - ¶9). . . . . . . . . . . . . . 3

II.  Definitions (¶10 - ¶19) . . . . . . . . . . . . . 9

III. Juvenile Justice (¶20 - ¶75)  . . . . . . . . . . 12

IV.  Medical, Dental and Mental Health (¶76 - ¶116) . . .  60

V.   Quality Assurance (¶117 - ¶121) . . . . . . . . . . 77

VI.  Compliance and Monitoring (¶122 - ¶141) . . . . . . . 87

## SETTLEMENT AGREEMENT FOR MEDICAL, DENTAL, MENTAL HEALTH, REHABILITATION AND JUVENILE JUSTICE ISSUES

### I.  INTRODUCTION

1.   This Agreement is entered among the following: the United
States Department of Justice as identified in ¶ 10 (the
"DOJ"), the private plaintiffs as identified in ¶ 14 (the
"Plaintiffs"), and the State, as defined in ¶ 19 below.
This Agreement settles and resolves four lawsuits (the
"Lawsuits") concerning the juvenile justice, medical,
dental, mental health, and rehabilitative services in the
State of Louisiana's secure juvenile facilities.  The four
Lawsuits settled by this Agreement are: (1) Williams v.
McKeithen, Civ. No. 71-98 (including the following sub-
dockets opened in that action:  In Re: Juvenile Facilities,
Civ. No. CH 97-MS-001-B; In Re: Tallulah Correctional Center
for Youth, Civ. No. CH 97-0665-B-M1; In Re: Jetson
Correctional Center for Youth, Civ. No. CH 97-0666-B-M1; In
Re: Swanson Correctional Center for Youth, Civ. No. CH 97-
0667-B-M1; In Re: Louisiana Training Institute - Bridge
City, Civ. No. CH 97-0668-B-M1; and In Re: Jena Juvenile
Justice Center, Civ. No. CH 98-0804-B-M1);(2) Brian B. v.
Stalder, Civ. No. 98-0886-B-1; (3) A.A. v. Wackenhut
Corrections Corporation, Civ. No. 00-246-CMI; and (4) United
States v. Louisiana, Civ. No. 98-0947-B-1.  In order to

resolve the juvenile justice, medical, dental, mental
health, and rehabilitation issues in this litigation, the
parties have entered into this Agreement, which, if complied
with within the time frames specified below, will result in
the dismissal of the Lawsuits, except as provided in ¶ 9
below.    The terms of this Agreement shall apply to the
secure juvenile facilities operated by or on behalf of the
State and any other secure juvenile facility opened during
the life of the Agreement.    All parties agree and recognize
that the obligations contained in this Agreement and any
remedies flowing therefrom are limited to conditions within
the secure juvenile facilities and do not follow the
juvenile after his/her final discharge from the facility.
This provision shall not prevent the DPSC from continuing
its current practice of providing short-term medications.
This Agreement shall not increase or decrease any rights
that juveniles held in secure facilities, on parole, or on
probation supervision may or may not have upon their release
from secure facilities.

2.    As part of this Agreement, the Department of Public Safety
and Corrections ("DPSC") shall revise as necessary its
policies and procedures to ensure that they are consistent
with the provisions of this Agreement.

3.    The State denies any allegations upon which the Lawsuits are
based.    The State has entered this Agreement in order to

avoid the cost and uncertainty of litigation.

4.    The United States' Jena Agreement and the Private
Plaintiffs' Jena Agreement, both entered on or about April
13, 2000, are terminated and are of no further effect.    The
State agrees not to house juveniles at the Jena Juvenile
Justice Center in Jena, Louisiana during the term of this
Agreement.

5.    Immediately upon execution of this Agreement, the parties
shall jointly move the Court for an Order to conditionally
dismiss the Lawsuits except as provided in ¶ 9 below.
Immediately upon execution of this Agreement, the parties
shall jointly move the Court for an Order terminating and
rescinding all existing, orders, judgments or decrees that
purport to address conditions of confinement in Louisiana's
secure juvenile facilities, except as set forth in this
paragraph:

a.    <u>Consent orders</u>.   The effect of the following consent
orders is stayed until either: (a) final dismissal of
these actions, at which time all consent orders shall
be terminated and shall have no prospective effect; or
(b) 120 days following entry of an order reopening
these actions:

April, 1996 Order (Bridge City Correctional
Center),

November 14, 1996 Order (Swanson Correctional
Center for Youth-Monroe),

April, 1998 Order (Jetson Correctional Center for Youth), and

November 15, 1994 Order (Tallulah Correctional Center for Youth), as modified by orders dated February 21, 1995, November 19, 1996, December 22, 1995, November 12, 1997, November 20, 1997, December 16, 1997, December 23, 1997 and March 10, 1998.

b.  <u>Jurisdictional orders</u>.  The substantive effect of the following orders may have been superceded, modified or rescinded; however, these orders may continue to be cited and relied upon by the parties solely for the purpose of establishing this Court's jurisdiction, for the purpose of establishing class counsel or prevailing party status, and for the purpose of supporting the "Attorney Fee Claims":

| | |
|---|---|
| June 10, 1975 | Judgment adopting Special Master's report |
| August 6, 1980 | Original judgment on attorney's fees/prevailing parties |
| January 24, 1983 | Injunction to stop accepting juvenile until population limits set |
| February 7, 1983 | Motion to set population limits on juvenile facilities |
| December 7, 1983 | Stipulation and Consent Decree for adult facilities |
| April 24, 1984 | Juvenile consent decree |
| November 26, 1986 | Extension of consent decree |
| January 6, 1988 | Extension of consent decree |
| October 27, 1988 | Extension of consent decree |

| | |
|---|---|
| January 30, 1991 | Class certification order |
| June 25, 1990 | Original appointment of Nordyke and Denlinger |
| June 25, 1991 | Ruling setting attorney fee rates |
| June 30, 1993 | Extension of Consent Decrees and other Judgments |
| December 22, 1994 | Order concerning TCCY |
| June 23, 1995 | Order denying Motion by Transamerica Development |
| September 26, 1996 | Order granting motion to terminate consent decrees for adult facilities except LSP and the Juvenile Facilities |
| April 1, 1997 | Order granting motion by to release adult institutions except LSP and the juvenile facilities |
| September 24, 1998 | Motion and Order Approving Settlement and terminating consent decree and supervision over  LSP but preserving claims regarding  Juvenile Facilities |
| December 9, 1998 | Minute Entry concerning class certification in <u>Brian B.</u> |
| April 21, 1999 | Order granting motion for partial dismissal of LSP |

c.    <u>Surviving Orders</u>.  The following surviving orders are
not stayed; however, all surviving orders shall
automatically terminate upon final dismissal of these
actions (unless previously modified or terminated):

| | |
|---|---|
| June 21, 1989 | Original appointment of Court expert |
| August 19, 1994 | Order pertaining to the |

                                    appointment of the Court
                                    Expert

                September 26, 1996    Order appointing Expert John
                Whitley

        The Court shall retain jurisdiction over the claims in

    the Lawsuits until the final judgment of dismissal is

    entered.

6.    The Motion to Conditionally Dismiss shall include a request

      for the Court to order a "fairness" hearing under Rule 23 of

      the Federal Rules of Civil Procedure as soon as notice can

      be given, pursuant to that Rule.  This Agreement shall be

      void if the Court does not approve the settlement at that

      fairness hearing.  The parties agree to ask the Court to

      hold in abeyance Plaintiffs' motion to certify a class in

      Brian B. v. Stalder and A.A. v. Wackenhut.  If the Lawsuits

      are reopened, Plaintiffs may reurge these motions.  In

      connection with the re-urging of these motions, the State

      agrees to permit Plaintiffs to name replacement class

      representatives in Williams, Brian B. and/or A.A. and to

      waive the requirements for exhaustion of administrative

      remedies, provided that Plaintiffs have given the State

      written notice of the claims to be asserted, at least ten

      days prior to reurging of the motion.

7.    The Motion to Conditionally Dismiss shall include a request

      that the Court preserve the substance of any unasserted

      cross claims and third party demands that the State may have

against other defendants in any of the Lawsuits until such
time as a final judgment of dismissal is entered.

8.  This Agreement shall be effective on September 1, 2000.  The
State's obligations under this Agreement shall arise on June
1, 2001, except to the extent specific provisions establish
a different deadline.

9.  This Agreement compromises and settles all claims asserted
in the Lawsuits except:

  a.  Claims pertaining to the validity, applicability and
  constitutionality of the administrative remedy
  procedure (ARP).  Plaintiffs stipulate to the entry of
  an order dismissing all claims and allegations related
  to ARPs in the Lawsuits, without prejudice to their
  right to reassert those claims either in new actions or
  in the Lawsuits if the Lawsuits are reopened in
  accordance with this Agreement.

  b.  Claims pertaining to education issues.  Claims relating
  to education issues are the subject of a separate
  Settlement Agreement entered on or about November 1,
  1999.

  c.  Claims for attorneys fees.  This Agreement does not
  purport to address Plaintiffs' claims for attorneys
  fees in the Lawsuits.

## II.  DEFINITIONS

10. The term "DOJ" shall refer to the United States Department

of Justice.

11.    The terms "facilities" and "secure juvenile facilities"
       refer to the Jetson Correctional Center for Youth (JCCY),
       the Swanson Correctional Center for Youth - Monroe (SCCY),
       the Bridge City Correctional Center for Youth (BCCY), the
       Swanson Correctional Center for Youth - Madison (SCCY-M)
       (formerly known as the Tallulah Correctional Center for
       Youth), the Juvenile Reception and Diagnostic Center
       ("JRDC"), and any other facility used for the housing of
       juveniles owned or operated on behalf of the State during
       the operation of this Agreement, but excluding juvenile
       detention facilities.

12.    The term "intake" refers to the day that the individual
       arrives at the reception and diagnostic center for admission
       into the secure juvenile facilities.

13.    The term "juvenile" refers to any juvenile who has been
       adjudicated delinquent and is residing at any facility
       during the operation of this Agreement.

14.    The term "Plaintiffs" refers to the non-governmental agency
       private plaintiffs in Williams v. McKeithen, Civ. No. 71-98
       (M.D. La.); Brian B. v. Stalder, Civ. No. 98-0886-B-1; A.A.
       v. Wackenhut Corrections Corporation, Civ. No. 00-246-C-M1;
       and the suits entitled In Re: Juvenile Facilities, Civ. No.
       CH 97-MS-001-B; In Re: Tallulah Correctional Center for
       Youth, Civ. No. CH 97-0665-B-M1; In Re: Jetson Correctional
       Center for Youth, Civ. No. CH 97-0666-B-M1; In Re: Swanson

Correctional Center for Youth, Civ. No. CH 97-0667-B-M1; In Re: Louisiana Training Institute - Bridge City, Civ. No. CH 97-0668-B-M1; and In Re: Jena Juvenile Justice Center, Civ. No. CH 98-0804-B-M1.

15. The term "serious mental illness" shall include disorders of mood and cognition (with the exception of mental retardation) that significantly interfere with functioning in at least one essential sphere of the juvenile's life, e.g.: psychotic disorders, mood disorders, the aggressively mentally-ill, and juveniles who exhibit self-mutilating or suicidal behavior.

16. The term "mental retardation" refers to significant sub-average intellectual functioning with an Intelligence Quotient (IQ) of 70 or below with concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety, with onset before age eighteen.

17. The term "Provider" shall refer to a department, agency or division of Louisiana state government with particular expertise in the provision of medical, dental, and mental health care contracted by DPSC to provide medical, dental, and mental health care to juveniles.

18. The term "serious injury" means any injury that threatens a juvenile's life or limb, or one that requires urgent

treatment by a doctor, or severely restricts the juvenile's usual activities, or requires follow-up by a doctor.

19. The term "State" shall refer to the Governor, the Secretary of the DPSC, the Secretary of the Department of Health and Hospitals and all Departments and Agencies of the State of Louisiana, and their employees, agents, contractors, and successors, who are wholly or partially responsible for the care of juveniles confined in the juvenile facilities, with the understanding that the Governor's obligations under this Agreement have been delegated to the Secretary of the DPSC.

As used in this Agreement, the term "State" shall not include or mean the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU") or any of the institutions under its management or supervision. Notwithstanding any other language or provision contained in this Agreement, this Agreement shall not be construed to create any obligations flowing from Provider or LSU to Plaintiffs or DOJ. As used in this Agreement, the "State" shall not include the City of Tallulah or LaSalle Parish Hospital District Number 2.

III  **JUVENILE JUSTICE**

A.  Protection from Abuse and Violence

20. The State shall establish and implement policies and procedures for the purposes of providing juveniles with safe and humane living conditions, protection from physical,

sexual, and mental abuse by facility staff, and from
juvenile-on-juvenile violence and sexual abuse, and other
forms of victimization (such as "strong-arming").

21.  The State shall continue to advise all staff and juveniles
on a regular basis that violence will not be tolerated and
that the following conduct by either staff or juveniles is
strictly prohibited in all of the facilities and will result
in disciplinary sanctions and referral for criminal
prosecution, where warranted:  (a) sexual abuse, (b)
physical abuse, (c) emotional abuse, (d) corporal
punishment, and (e) staff permitting, enticing, or inducing
juveniles to assault each other.  The State shall also
immediately inform juveniles and staff that those who report
alleged abuse will be protected from retaliation.

22.  Within two months of the effective date of this Agreement,
the State shall require all mandatory child abuse reporters
at the facility to acknowledge their obligation in
accordance with State law to report suspected child abuse
and inform all mandatory reporters of the office and
telephone number to which such suspected abuse should be
reported.  The State's obligation under this section will be
discharged upon obtaining employees' signatures
acknowledging their understanding.  "Acknowledgment"
training will be provided annually to all mandatory child
abuse reporters.

     If the Louisiana Department of Social Services contacts

the State regarding an allegation of abuse, the State will
insure that the allegation has been, or is being,
investigated.

23. The State shall ensure immediately that all juveniles have
adequate means to report abuse, including at a minimum,
providing the juveniles with direct and confidential access
to the Project Zero Tolerance ("PZT") Hotline.  The State
shall ensure that all calls to the hotline are reviewed at a
minimum twice daily by supervisory investigators.

Within two months of the effective date of this
Agreement, the State shall ensure that there are at least
two fully operational telephones in each of the housing
units, at least one operational telephone in each
counselor's office, and at least one operational telephone
in the infirmary that juveniles may use to place a PZT call.
The State shall ensure that a maintenance order is placed
within one business work day for every juvenile telephone
that is in need of repair and will make best efforts to
ensure that the phone is repaired as soon as possible.

24. Within one month of the effective date of this Agreement,
the State shall ensure that:  (a) every juvenile who reports
to a facility infirmary with an injury or pain shall be
questioned by a health care staff, outside the hearing of
officers or other juveniles, regarding the cause of the
injury or pain; and (b) if in the course of the juvenile's
infirmary visit abuse is alleged or health care staff

suspects abuse, the health care staff shall call the PZT
Hotline following delivery of necessary medical care and
adequately document the matter in the juvenile's medical
record, fill out an incident report, and log the PZT call in
the infirmary log.

25. Within three months of the effective date of this Agreement,
the State shall ensure that any allegation or incident
involving neglect, abuse, excessive use of force, use of any
type of chemical restraint, or incident/accident resulting
in serious injury is adequately reviewed, investigated, and
documented in a timely manner.  If a full investigation (see
¶ 26 a - i) is not warranted, then the reasons why a full
investigation is not conducted shall be documented in
writing.  In cases where a juvenile withdraws an allegation,
the investigators shall record the investigation on the log,
conduct a preliminary investigation to determine the
circumstances and reasons for the withdrawal, and in cases
where it is warranted, complete the investigation of the
abuse allegation.  In no case shall an investigator do an
investigation on an incident in which he or she was
personally involved.  Whenever practicable, PZT
Investigators will interview juveniles outside of school
hours; however, a juvenile may be removed from school by a
PZT investigator as part of a PZT investigation, and the
State shall not be required to comply with all academic and

vocational program participation requirements for that
juvenile for that day.

A letter confirming the outcome of the investigation
shall be sent to parents/guardians or other close family
members when those persons have identified themselves at the
time of referral and have provided a mailing address.

26. The State shall promulgate and implement system-wide
policies for the investigation of allegations of neglect,
abuse, excessive use of force, and incidents and/or
accidents resulting in serious injury.  The policies shall
identify the types of actions that normally would be taken
in such an investigation including:

a.    Taking photographs of all visible injuries;

b.    Securing, examining and photographing all physical
      evidence;

c.    Interviewing the alleged victim and perpetrator in
      individual, private, in-person interviews with a record
      made of the substance of the interview (written
      statements by staff or juveniles shall not be
      substituted for personal interviews);

d.    Identifying and interviewing privately, separately and
      in-person, all possible witnesses, including other
      juveniles and staff in the building or unit at the time
      of the incident;

e.    Examining the juvenile's and staff member's

institutional, personnel and other records, including
any prior allegations of abuse against the staff person
whether substantiated or not;

f.    Staff and juvenile witnesses to the alleged abuse are
not, at any time after an incident, questioned or
interviewed by staff who due to their assignments
and/or relationship with the alleged perpetrator have
or appear to have a conflict of interest in
investigating the allegation;

g.    Whenever there is reason to believe that a juvenile may
have been subjected to physical sexual abuse, the
juvenile is examined by non-DPSC health care personnel
with special training and experience in conducting such
assessments;

h.    For all investigations not completed within ten working
days, notification detailing the need for additional
time and an estimate of the additional time needed
shall be provided to the supervisory investigators; and

i.    The investigation makes an explicit determination of
whether any facility staff knew of, but did not report,
the alleged abuse or provided false information during
the investigation.

27.    Every PZT investigation shall result in a written report.
The report contents will be appropriate to the extent of
investigation required to issue a finding.    The report shall
explicitly and separately set forth the following as

appropriate to the investigation:

a.    each allegation of wrongdoing investigated;

b.    the name(s) of all alleged victims and perpetrators;

c.    the names of all witnesses;

d.    the names of all persons interviewed during the investigation;

e.    all documents reviewed during the investigation;

f.    whether videotapes were examined and, if not, why not;

g.    all other sources of evidence considered;

h.    all PZT investigations and their results, involving the alleged victim(s) and perpetrator(s);

i.    the investigator's findings;

j.    the investigator's reasons for his or her conclusion.

A copy of the summary/conclusion of the investigation of a substantiated allegation will be placed into the file of the juvenile who is the subject of the investigation.

28.   The State shall employ trained, independent investigators at each facility with adequate experience and training in investigations to accomplish these tasks. The investigators shall prepare comprehensive written investigation reports, setting forth their complete investigative findings and the basis of their findings. The reports shall be simultaneously forwarded to the facilities' wardens and supervising PZT investigators at Headquarters. These investigators shall report to the wardens of the facilities.

If the warden is personally involved in a particular
incident, then a PZT investigator assigned from DPSC
Headquarters shall conduct the investigation.

29. The State shall employ at least the following number of FTE
investigators within 12 months of the effective date of the
Agreement:

JCCY      3

SCCY      2

BCCY      1.5

SCCY-M    3

In addition, the State shall employ two supervisory
investigators who shall supervise and assist the
investigators and who shall monitor all calls made to the
PZT Hotline.  The supervisory investigators shall report to
the Office of the Secretary and shall implement policies and
procedures for the investigation of allegations of neglect,
abuse, violence, excessive use of force, and serious injury
system-wide.

30. Within three months of the effective date of this Agreement,
the State shall ensure that:

a.    all employees or contractors against whom physical
      abuse or sexual misconduct is substantiated shall be
      appropriately processed through a performance appraisal
      action or disciplinary action.

      Where significant physical abuse or sexual

misconduct is substantiated, or where there is a
pattern of substantiated abusive behavior, the employee
or contractor shall be terminated and shall not
knowingly be employed at another secure juvenile
facility;

b.    allegations of criminal sexual misconduct and physical
abuse by staff resulting in lacerations requiring
sutures, fractures, serious injuries, or death are
referred for evaluation of the appropriateness of
criminal prosecution to state authorities, the United
States Attorney's Office in the district in which the
facility is located, and the Criminal Section of the
Civil Rights Division of the Department of Justice; and

c.    Any staff member under investigation for physical abuse
or sexual misconduct shall be separated from any
contact with juveniles or placed on leave if the State
has a reasonable basis to believe that abuse or sexual
misconduct warranting termination of employment may
have occurred.

31.    The State shall keep records of the results of every PZT
investigation at the facility and in a central registry
maintained by the State.  These records shall be maintained
in a manner that permits investigators and other appropriate
personnel to easily access every PZT investigation involving
a particular staff member or juvenile.  A copy of the

summary/conclusion portion of every PZT investigation
substantiating misconduct by staff shall be permanently
placed in the staff member's personnel record.

32. Within nine months of effective date of this Agreement, the
State shall establish the Multiple Allegation Database
(MAD). This database will be used to screen for staff with
multiple allegations to determine those whose behavior may
need to be modified.

   a. The MAD shall collect and record the staff's complete
      name, the date of each allegation of abuse or
      misconduct against the staff, the date each alleged
      event occurred, the name of the staff or juvenile
      making the allegation of abuse or misconduct against
      the staff, the identifying number of the investigation
      done in response to the allegation, the outcome of the
      investigation, and the discipline, training, or
      counseling imposed or mandated as a result of the
      investigation, if any.

   b. The MAD shall be maintained during the staff's
      employment and for five years after the staff leaves
      employment.

   c. The Youth Programs Compliance Division shall review
      staff with three or more allegations of abuse or
      misconduct relating to safety or welfare of juveniles
      within a two-year period and, if warranted, take

appropriate follow-up action (such as meeting with the staff, recommending remedial training, counseling, transfer, re-assignment, or disciplinary action).

33. As part of each PZT investigation, investigators shall examine the PZT investigation history of the parties involved in the current investigation. This shall include reference to the central PZT registry maintained by the State.

34. The State shall document in the personnel record of every person hired after the entry of this Agreement that the facility has consulted the facility records and the central PZT registry to determine whether the candidate has ever been the subject of a substantiated PZT investigation at any facility in the State and to review any other complaint history.

35. No facility may knowingly hire any individual who has had an allegation of abuse substantiated against him or her that resulted in termination of employment or resignation to avoid termination. In addition, the MAD shall be checked as part of the pre-employment review process. And, to the extent possible, the MAD shall be updated within 180 days of creation to include all cases of substantiated abuse that resulted in termination or resignation to avoid disciplinary action within the previous 365 days.

36. Within four months of the effective date of this Agreement,

the State shall confirm that criminal background checks, as described herein, have been completed on all existing staff and the State will complete criminal background checks on all prospective employees and existing employees whose background check does not conform to the requirements of this paragraph.  A background check shall include checking with the National Crime Information Center and the Louisiana Computerized Criminal History system.  The State shall complete the above checks on all prospective employees before they have any contact with juveniles.  Additionally, finger prints of all employees, existing and prospective, shall be submitted to the State Police in accordance with the Louisiana Child Protection Act.  The State shall take appropriate action to protect the welfare and safety of the juveniles based upon the information obtained from the checks.  By April 1, 2002, the State shall provide the United States with information identifying all correctional officers employed on March 15, 2002 in a manner sufficient for the United States to review each officer's arrest and conviction records through the National Crime Information Center.  During the Private Plaintiffs' and the United States' compliance tour, the State shall provide to the United States evidence of the specific personnel action taken regarding any employees identified by the United States with criminal convictions or arrest records.

37.  Within 12 months of the effective date of this Agreement,
     the State shall install round-the-clock closed circuit video
     cameras in the following areas of Louisiana's juvenile
     facilities:  common areas of administrative
     segregation/single cell housing units, common areas of
     medical care areas, dining halls, dormitory sleeping areas,
     and dormitory day rooms.  Cameras will be positioned in
     order to eliminate and/or reduce blind spots.  The system
     shall record video from each camera at a rate of not less
     than 7.5 frames per second.  All tapes shall be retained for
     a period of 50 days, except that any tape recording of an
     incident that is the subject of a (1) PZT investigation, (2)
     referral for prosecution or actual criminal prosecution, (3)
     civil lawsuit, or (4) request by counsel for an
     investigation to be conducted or for the tape to be retained
     shall be maintained indefinitely.  PZT investigators shall
     review at least 12 hours of random videotape footage per
     month per institution.

38.  The State shall not use corporal punishment on juveniles.

     B.   Staffing/Capacity

39.  The State agrees that the juvenile facilities shall be
     subject to the following population limitations as of the
     effective date of this Agreement:

     Swanson Correctional Center for Youth - Madison Unit   512

     Jetson Correctional Center for Youth                   600

Swanson Correctional Center for Youth - Monroe          370*

Bridge City Correctional Center for Youth               180

\* This capacity may be temporarily exceeded if needed to accommodate the closure of the Jena Juvenile Justice Center.

a.   The State agrees that, within 3 months of the effective date of this Agreement, the capacity of the individual housing units within each of the juvenile facilities will be limited in accordance with the schedule in ¶¶ 40-43.

b.   The State may exceed the capacities of residential dorms by two float beds on a temporary basis (up to four days) in order to accommodate transfers or other movements of juveniles within the facility.  The State will not, however, increase the capacity of a residential dormitory - even on a temporary basis - if such an increase would violate good correctional practice or would violate State Fire Code limitations. The use of float beds under this provision shall not result in an increase of the overall population limit for any facility, as previously set forth in this paragraph.

c.   Within 12 months of the effective date of this Agreement, the State shall post correctional officers and/or other direct care workers in housing units as set forth in ¶¶ 40-43.  Correctional officers assigned to residential units shall accompany the juveniles

housed in those units on a roughly proportional basis throughout the day.

   d.   Whenever three direct care staff are assigned to a residential unit, at least two of those staff members must be correctional officers.

40. Swanson Correctional Center for Youth - Madison

| Dormitory or Cellblock | Capacity | Staff 24-hour | Staff 3 to 11 |
|---|---|---|---|
| Alpha | 36 | 2 | 1 |
| Bravo | 36 | 2 | 1 |
| Charlie | 36 | 2 | 1 |
| Delta | 36 | 2 | 1 |
| Echo | - | - | - |
| Foxtrot | 36 | 2 | 1 |
| Golf | 36 | 2 | 1 |
| Hotel | 36 | 2 | 1 |
| India | 36 | 2 | 1 |
| Montana A | 32 | 2 | 1 |
| Montana B | 32 | 2 | 1 |
| Java A | 20 | 2* | |
| Java B | 20 | 2* | |
| Java C | 20 | 2* | |
| Java D | 20 | 2* | |
| Kentucky A | 20** | 2* | |
| Kentucky B | 20** | 2* | |
| Kentucky C | 20** | 2* | |
| Kentucky D | 20** | 2* | |

| Dormitory or Cellblock | Capacity | Staff 24-hour | Staff 3 to 11 |
|---|---|---|---|
| Louisiana A | 20 | 2* | |
| Louisiana B | 20 | 2* | |
| Louisiana C | 20 | 2* | |
| Louisiana D | 20 | 2* | |
| | | | |
| TOTAL | 512 | | |

* Except 10 p.m. - 6 a.m., then 1 correctional officer per quad with 1 rover per building.

** Administrative Segregation beds - not included in total capacity

    a. No staffing is required for individual quads of Java, Kentucky or Louisiana if quad is not occupied.

    b. Echo is removed from the capacity count and will be a recreational building.

    c. If the population of any dormitory is reduced to 25 or below, then the 3 p.m. - 11 p.m. swing shift may be eliminated.

    d. On weekends, one full-time staff member (from the above chart) who will receive training appropriate to his or her duties will structure leisure activities for each dorm or cellblock.

41. Swanson Correctional Center for Youth - Monroe

| Dormitory or Cellblock | Capacity | Staff 24 hour | Staff 3 to 11 |
|---|---|---|---|
| Holly A | 36 | 2 | 1/3 |
| Holly B | 36 | 2 | 1/3 |
| Holly C | 36 | 2 | 1 |
| Holly D | 36 | 2 | 1/3 |
| Cypress A | 16* | 1** | |
| Cypress B | 16 | 2** | |
| APD | 30 | 3 | |
| Mimosa | 36 | 2 | 1 |
| Pecan | 36 | 2 | 1 |
| Willow | 36 | 2 | 1 |
| Red Bud | 36 | 2 | 1 |
| McKoin | 36 | 2 | 1 |
| | | | |
| TOTAL | 370 | | |

* Administrative Segregation beds - not included in total capacity.

** Cypress A & B share an additional rover 16 hours per day.

  a.  If the population of any dormitory except the APD is reduced to 25 or below, then the 3 p.m. - 11 p.m. swing shift may be eliminated.

  b.  On weekends, one full-time staff member (from the above chart) who will receive training appropriate to his or her duties will structure leisure activities for each dorm or cellblock except that Holly A, B, and D shall

be considered one housing unit for purposes of this
paragraph.

c.    When Cypress A converts to the mental health unit, an
additional 24-hour post will be added and the 16 hour
rover post will be eliminated.  The overall capacity
will then increase from 370 to 386 beds.

42.   Bridge City Correctional Center for Youth

| Dormitory or Cellblock | Capacity | Staff 24 hour | Staff 3 to 11 |
|---|---|---|---|
| Open Dorm | 20 | 2 | |
| Brown | 50 | 3 | |
| Kennedy | 30 | 2 | 1 |
| Lincoln | 40 | 2 | 1 |
| King | 40 | 2 | 1 |
| | | | |
| TOTAL | 180 | | |

a.    If Brown Dormitory is reduced to 36 or below, staffing
may be reduced to two 24-hour posts and one 3 p.m. - 11
p.m. post.

b.    On weekends, one full-time staff member (from the above
chart) who will receive training appropriate to his or
her duties will structure leisure activities for each
dorm.

43.   Jetson Correctional Center for Youth

| Dormitory or Cellblock | Capacity | Staff 24 hour | Staff 3 to 11 |
|---|---|---|---|
| Rosebud | 52 | 3 | |
| Ivy Leaf | 52 | 3 | |
| Ivy Leaf | 8 ** | 1 | |
| Oakwood | 40 | 2 | 1 |
| Willowwood | 40 | 2 | 1 |
| Maplewood | 40 | 2 | 1 |
| Elmwood | 40 | 2 | 1 |
| Magnolia | 40 | 2 | 1 |
| Evergreen | 40 | 2 | 1 |
| Walnut | 42 | 2 | 1 |
| Pinecrest | 40 | 2 | 1 |
| Alpha | 50 | 3 | |
| Bravo | 50 | 3 | |
| Hunt | 50 | 3 | |
| Delta A | 12** | 1* | |
| Delta B | 12 | 1* | |
| Delta C | 12 | 1* | |
| | | | |
| TOTAL | 600 | | |

\*      Plus 2 rovers 6 a.m. - 10 p.m.

        Plus 1 rover 10 p.m. - 6 a.m.

\*\* Administrative Segregation beds- not included in total capacity.

        a.    If the population of any dormitory is reduced to 25 or

below, then the 3 p.m. - 11 p.m. swing shift may be
eliminated.

b.    If the population of Rosebud or Ivyleaf is reduced to
36, then one of the three 24-hour posts may be
eliminated but one 3 p.m. - 11 p.m. staff member shall
be added.

c.    On weekends one full-time staff member (from the above
chart) who will receive training appropriate to his or
her duties will structure leisure activities for each
dorm and cellblock.

44.    Except as provided below, the State shall not permit
correctional officers working in juvenile housing units to
work more than 120 hours in any 14-day period, nor more than
5 consecutive days.    During an emergency, the Warden may
initiate a variance to this paragraph.    The definition of
emergency shall not include problems associated with under-
staffing.

45.    Within three months of the effective date of this Agreement,
the State shall develop a plan, timetable and performance
objectives for reducing turnover and vacancy rates for
direct care staff.    The State shall make their best efforts
to reduce the annualized turnover rate of direct care staff
in each facility to below 100%, and the State shall make
their best efforts to maintain the number of vacant
positions in each facility at no more than 15% of budgeted

positions within six months of the effective date of this
Agreement.  The State shall make their best efforts to
reduce the annualized turnover rate of direct care staff in
each facility to below 50%, and the State shall make their
best efforts to maintain the number of vacant positions in
each facility to no more than 5% of the budgeted positions,
within one year of the effective date of this Agreement.

A.    Direct Care Staff Training

46.    Within 23 months of the effective date this Agreement, the
State shall ensure that all staff who have direct contact
with juveniles are adequately trained and can demonstrate
competence in the following areas:

a.    stages of adolescent development;

b.    communication skills, including specific instruction on
verbal de-escalation techniques;

c.    behavior management and the management of aggressive
behavior;

d.    basic training relating to juveniles with mental health
issues, including recognizing signs of mental
retardation, developmental disabilities and mental
illness and appropriate methods of interaction with
such juveniles; grief and loss among juveniles; and
measuring and monitoring behavior changes;

e.    crisis prevention and intervention, including the
prevention and intervention in suicidal behavior and
self-mutilation;

    f.    basic Constitutional and legal rights of juveniles in juvenile facilities;

    g.    report writing;

    h.    basic training relating to medical care, including basic medical terminology; recognizing and responding to seizure disorders; common side effects of prescription and non-prescription medication; and confidentiality of medical information;

    i.    the physical and emotional needs of pregnant residents (for staff working with female juveniles);

    j.    universal precautions to prevent infection with TB and AIDS;

    k.    certification in first aid and cardiopulmonary resuscitation;

    l.    accommodations needed for mentally ill and physically or developmentally disabled juveniles;

    m.    fire safety and evacuation procedures and conducting of regular emergency evacuation drills;

    n.    use of force policy; and

    o.    Project Zero Tolerance and the grievance system.

47.    Within 23 months of the effective date of this Agreement, all direct care staff and all case workers shall be taught effective, non-punitive ways to manage juveniles. Case workers shall have a working knowledge of the rehabilitative and/or mental health treatment plans of the juveniles in their care. Direct care staff shall be provided enough

information by caseworkers regarding treatment and/or rehabilitative issues of the juveniles in their caseload to facilitate the direct care staff's supervision of the juveniles.

48. Within 23 months of the effective date of this Agreement, the State shall ensure that all staff who have regular and routine contact with juveniles are adequately trained concerning the standards for physical management of juveniles and what constitutes abuse.

    a.  Employees will take all reasonable steps to minimize situations requiring a use of force and to minimize the amount of force used in those situations. When possible, actions other than use of force, such as staff presence, verbal directions and warning, crisis intervention techniques, and passively removing a juvenile from an area of group activity without the use of physical handling, will be used;

    b.  Force will be used only as a last resort to control the juveniles;

    c.  The amount of force used will be proportional to the threat to which it is a response and cease when the resistance ceases;

    d.  Force may be used only:

        i.  To prevent an escape;

        ii.  To prevent an act which could result in death or

severe bodily harm to the juvenile or another
person;

iii. To defend one's self or others against a physical
assault;

iv. To separate participants in a fight;

v. To prevent substantial damage to property; and

vi. When necessary, to enforce legal orders and
instructions.

e. Whenever possible, force will not be used against
juveniles with mental illness or mental retardation
before appropriate medical, mental health, or
counseling personnel can be called to the scene.

f. The first action taken to gain control will be direct,
verbal instructions to cease the behavior, unless the
employee perceives that life or health will be
jeopardized, or that there is a substantial threat to
security.

g. When determining the need to use force, factors to be
considered include but are not limited to:  lack of
appropriate response to repeated direct orders and
other efforts to temper the situation, severity of the
situation and/or behavior, threat to self or others,
and disruption to the unit or program.

The State shall ensure that within twenty-three months
of the effective date of this Agreement and presentation to
the Plaintiffs, the DOJ and the Court Expert of the training

course material, all staff who have contact with juveniles shall attend a competency-based training course in restraint methods that will include passive restraint methods. Failure of existing staff to successfully complete the program will result in adverse performance appraisal action and the training will be rescheduled. The State will use the performance appraisal to remove staff who repeatedly fail to meet the requirements of this paragraph. Newly recruited or hired staff must successfully complete the training prior to having any contact with juveniles. The training program shall be tailored to adolescent correctional populations, rather than adult correctional populations, and will include communication techniques, basic counseling, conflict resolution, therapeutic interventions, and the physical and emotional needs of adolescents in addition to other accepted physical management techniques. The material for the course shall be presented to the Court Expert, the DOJ and Plaintiffs for review prior to adoption.

49. All new correctional officers shall receive a minimum of 120 hours of pre-service training. All other new staff shall receive a minimum of 40 hours of pre-service training. All staff with regular or daily contact with juveniles, including correctional officers, shall receive an additional 40 hours of training each year. Staff with minimal contact

with juveniles such as clerical/office staff shall receive an additional 16 hours of training each year. Pre-service training and annual training will include topics as described in ¶ 46. Under no circumstances shall newly recruited or hired direct care workers be assigned to supervise juveniles until they have successfully completed competency based testing in all of the areas of training set forth in ¶ 48. This shall not apply to supervised on-the-job training. Correctional officers who transfer from adult institutions to juvenile institutions must complete the components of training related to juveniles prior to assuming their duties. Failure of existing staff to successfully complete the program will result in adverse performance appraisal action and the training will be rescheduled. The State will use the performance appraisal system to remove staff who repeatedly fail to meet the requirements of this paragraph. The State shall meet the requirements of this paragraph within twenty-three (23) months of the effective date of this Agreement.

B.    Positive Behavior Management/Discipline

50.    The State shall develop and implement within 23 months of the effective date of this Agreement a uniform positive behavior management system for juveniles in the facilities. The system shall be designed to provide incentives for positive behaviors and shall define specific disciplinary consequences for specific negative behaviors. The system

shall be explained orally and in writing to all juveniles
during the intake and orientation process.  The explanation
will include discussion of the adverse effects on early
release consideration that Schedule B disciplinary reports
can have.

51.  Within 23 months of the effective date of this Agreement,
staff shall be instructed and trained to address minor
behavior problems through informal counseling and the use of
the positive behavior management system (including through
the withdrawal of privileges).

52.  Upon receipt of a Schedule B disciplinary report, a juvenile
shall have an opportunity to meet with a designated staff
member to discuss the disciplinary report.  The designated
staff member shall offer to aid the juvenile in any
disciplinary hearing on the disciplinary report and shall
provide such assistance if asked.

53.  Every juvenile who receives a Schedule B disciplinary report
shall receive a disciplinary hearing pursuant to
disciplinary procedures as promulgated by the DISCIPLINARY
RULES AND PROCEDURES FOR JUVENILE OFFENDERS, First Edition,
1993 as amended by memo of November 19, 1996, except as
modified by this document.  The polices and procedures shall
include:

a.   Written notice describing the alleged violation(s);

b.   Impartial hearings before a disciplinary committee

consisting of two employees representing different
programs of the institution.   The disciplinary
committee shall not include any staff person who was
involved in the issuance of the disciplinary report.
The entire hearing shall be held in private and tape
recorded and shall result in written findings of fact
and disposition.   The tape shall be kept indefinitely;

c.   Right to an appeal.

C.   Classification

54.   The State shall issue and enforce classification criteria
regarding housing assignments.   The criteria shall include
applicable risk factors based on age, gender, maturity,
size, offense history, institutional behavior and/or program
participation, offense, education, mental health history and
any special needs of the juveniles.

55.   Staffings shall be used to develop reports to courts of
continuing jurisdiction, updating of the case plan, and
(except for STOP/LITE/juveniles and juveniles sentenced
under provisions of Louisiana Children's Code Article 897.1)
determining if a juvenile has met the guidelines for or
should otherwise be considered for a recommendation for
reassignment, release, or discharge from a secure setting.

Staffing determinations/recommendations shall be based upon
guidelines which primarily consider treatment protocols
and/or continued treatment provided through community/non

secure programs, custody level, progress in institutional educational, vocational treatment programs and/or approved educational/vocational and exit plans.

Staffings shall be held in private and shall normally be attended only by those staff involved in the staffing. Other staff such as the case worker's supervisor, Warden or other administrators may attend as deemed necessary for supervision/observation purposes. Each staffing shall be attended by the case worker and at least two of the following individuals: one of the juvenile's teachers (who shall be the juvenile's special education teacher if the juvenile is receiving special education services), the school's guidance counselor/school psychologist/school social worker, a security staff member who supervises the juvenile in the juvenile's living unit; a mental health professional providing individualized services to the juvenile; or a member of the medical staff who is familiar with the juvenile's medical care if the juvenile is receiving on-going medical treatment (e.g., for chronic health care needs). If not represented at the staffing, written comments or reports shall to be used in the staffing to ensure that education, medical, mental health and security activities are considered. The juvenile shall be encouraged to attend and participate in the discussion. If a juvenile is not making progress, the treatment team shall

discuss strategies for addressing the impediments to
progress and shall modify the treatment plan accordingly.

56. Any decision that results in an extension of time a juvenile
must spend in a short term program or results in removal
from a short term program shall be personally reviewed by
the facility warden, deputy warden or assistant warden who
shall review the relevant documentation prior to determining
whether to approve the decision for the extension.  Notice
and reasons for the extension will be provided to the court
of jurisdiction and the juvenile's last known attorney of
record.

57. Within 23 months of the effective date of this Agreement,
the DPSC shall develop and implement guidelines for the
placement of juveniles in specialized behavior management
units and such guidelines shall take into account the
medical and mental health status of the juvenile, and shall
provide, at a minimum:

    a.    For the criteria by which a juvenile can be initially
        transferred to such a unit, which shall include a
        hearing;

    b.    For documentation of all reasonable less restrictive
        alternatives attempted before the decision was made to
        place a juvenile in such a unit, unless the severity of
        the offense indicates otherwise;

    c.    For the development of a written, individualized and

detailed program plan that shall set forth measurable short-term goals and concrete criteria for the juvenile's removal from the unit and be provided to the juvenile.  The State shall attempt to complete the program plan within 72 hours of placement, exclusive of weekends and holidays;

d.    Appropriate programming for special needs juveniles placed in these units;

e.    That the warden of a facility approve the decision to transfer a juvenile to such a unit.  Where such assignment results in a transfer to a different facility, it must be approved by both wardens, where applicable, or by the Assistant Secretary of the Office of Youth Development if the wardens do not agree.

f.    DPSC shall provide to the Provider a list of juveniles transferred to a specialized behavior unit.

D.    Access to Courts

58.  The State shall establish and implement policies and procedures to assure that:

a.    juveniles have meaningful access to telephones for privileged communications with their attorneys.

b.    juveniles have meaningful and confidential attorney-client communications through the mail.  No privileged mail shall be opened except by the intended recipient - except that correspondence may be opened for contraband

if it is opened in the presence of the juvenile.

c.     The State shall provide adequate paper, pens/pencils, envelopes and postage to indigent juveniles for legal communications.

d.     A juvenile's right to confidential communications with attorneys is protected.

59.    Within four months of the effective date of this Agreement, the State shall fund three new staff attorney positions and three new paralegal positions for the Louisiana Indigent Defense Assistance Board, which positions shall be dedicated to representing juveniles in secure custody in connection with appeals of their adjudications and modifications of their disposition.  These attorneys and paralegals may also assist juveniles in secure facilities by referring those juveniles to other attorneys for possible representation in pursuing claims arising out of their conditions of confinement.

60.    The State shall cooperate with attorneys representing juveniles in secure facilities in making those juveniles' institutional records available in connection with any appeal or modification of their dispositions.

    E.    Chemical Agents

61.    Upon execution of this Agreement, the only chemical agent that may be kept or used shall be 100% OC spray.  Only the Warden, Deputy Warden or Assistant Warden, or when they are

not present at the facility, the highest ranking officer at the facility, shall be permitted to authorize the use of the spray. The authorizing Warden or officer must be present at the use of the spray. They may not delegate this authority to any other person. Only employees specifically trained in the use of chemical spray shall be permitted to use the spray. The chemical spray shall not be intentionally sprayed in the face of any juvenile. Employees shall be trained to not intentionally spray juveniles in the face. The State shall ensure that the Warden, Deputy Warden or Assistant Wardens are trained in the correct use of these sprays to prevent excessive exposure, the hazards associated with such sprays, and the first aid response to exposure situations. Within two months of the effective date of the Agreement, all use of chemical agents shall be videotaped, with sound recording, and the tape of the incident shall be maintained for the duration of this Agreement for inspection by the Plaintiffs, the DOJ, and the Court Expert. The State shall ensure that the chemical spray is only used under the following terms:

a.   Chemical agents shall not be used except under the conditions set forth below and with prior approval, after personal observation of the situation, from the Warden, Deputy Warden or Assistant Warden if one of these officials is at the facility. If the Warden,

Deputy or Assistant Warden is not at the facility,
prior approval may be given, after personal observation
of the situation, by the highest ranking security
officer on duty at the facility.  However, such
approval shall not be required in the case of a large-
scale disturbance (such as an attempted mass escape)
that poses an imminent danger to the public, staff or
other juveniles, so long as in such an event the
Warden, Deputy or Assistant Warden is notified as soon
as practicable;

b.    Chemical agents shall not be carried on the person of
any individual.  Chemical agents shall not be stored in
any cellblock or living area, but shall be securely
stored in a separate location.  Chemical agents shall
not be removed from this secure storage area unless (1)
for use in staff training (2) for product disposal or
(3) as authorized pursuant to subsection (a) in
response to a situation described in subsection (c),
provided however that the authorizing official need not
make a personal observation of the situation prior to
authorizing the removal of the chemical agents from the
secure area.

c.    Chemical agents shall only be authorized when:

    i.    A juvenile is posing a direct and immediate threat
          of injury to staff or another juvenile;

    ii.   The juvenile is creating a sustained disturbance

that jeopardizes the effective monitoring and supervision of the unit to the extent that the safety of juveniles or staff is endangered, which persists despite efforts to de-escalate without the use of chemical agents, and the use of chemical agents is the only means to avoid a physical confrontation that would likely result in injury to juveniles or staff; or

iii. The use is necessary to prevent an escape.

The State shall ensure that exposed juveniles are seen by medical staff whenever spray is used. The State shall ensure that juveniles with known chronic respiratory conditions (including asthma) are not subjected to chemical spray. However, this shall not prohibit the use of chemical spray when it is necessary to prevent or quell a large scale disturbance where such juveniles are present. In no event shall staff use a chemical spray as punishment, discipline, retaliation, for the purpose of inflicting pain, for staff's convenience, or after handcuffs have been applied.

62. Every usage of chemical spray shall be documented in a chemical agent report and every removal shall be documented in a log maintained for this purpose. The chemical agent report shall describe the behavior of the juvenile with sufficient particularity to enable a reviewer to determine independently whether the above requirements of ¶ 61 have

been complied with (i.e., the documentation shall not simply restate, paraphrase or refer to the above conditions warranting use of chemical spray).

63. A copy of the Accident and Injury Report ("A&I") and UOR shall be placed in the file of the juvenile against whom the chemical restraint was used.

G. Mechanical Restraints

64. Within two months of the effective date of this Agreement, the State shall not use mechanical restraints except under the following circumstances. The use of mechanical restraints shall be limited to the minimum period of time necessary to enable the juvenile to gain control of his behavior. When a handcuff belt is not used, handcuffs shall be applied behind the back in a manner to minimize the risk of injury to the juvenile and the staff person responsible for supervising the juvenile.

The State shall not use mechanical restraints except under the conditions set forth below:

a. For transportation of juveniles outside the facility, the State may use handcuffs, leg irons, and/or handcuff belts;

b. For movement of juveniles within the facility, no mechanical restraints shall be used except under the following conditions. Handcuffs and/or a handcuff belt may be used if the facility has

documented that the juvenile poses a current
escape risk or has engaged in a recent pattern of
assaultive behavior toward staff or other
juveniles, as determined and authorized by a
ranking security shift supervisor. Leg irons may
only be used for transportation within the
facility if the conditions of subparagraph (d) are
met;

c.   For movement of juveniles within the facility
to transport a juvenile from general
population to a restrictive housing area
after a fight or other serious incident,
handcuffs and/or a handcuff belt may be used;

d.   For control of a juvenile who, after less
restrictive measures have not been
successful, continues to engage in aggressive
or assaultive behavior that is a clear and
present danger to the juvenile, another
juvenile, staff, or the security of the
facility, a handcuff belt, and/or leg irons
may be used. In this instance, such use of
mechanical restraints shall require
continuous one-on-one physical supervision
and must be approved by the ranking
supervisor (Captain or higher) on duty at the
facility. The staff person shall ensure that

the physical needs of the juvenile are met
promptly;

e.      For intra-facility movement of juveniles in
administrative segregation for disciplinary
reasons, handcuffs and/or a handcuff belt,
may be used.

Although a routine medical examination after the use of
mechanical restraint is not required, immediate medical
treatment shall be provided if there is a visual indication
of an injury or if the juvenile identifies a specific
medical complaint.

No other forms of mechanical restraints may be used
(including 4 or 5 point restraints and the handcuff "black-
box").  This, however, does not apply to medical or mental
health restraints ordered by a medical or mental health
professional.

65.  Every use of a mechanical restraint, other than as
authorized under ¶ 64(a) and (e), shall be documented.  The
use of mechanical restraints shall be documented on a UOR or
in a log maintained for this purpose.  Documentation to
reflect compliance with ¶ 64 shall describe the behavior of
the juvenile with sufficient particularity to enable a
reviewer to determine independently whether the above
requirements of ¶ 64 have been complied with (i.e., the
documentation shall not simply restate, paraphrase or refer

to the above conditions warranting use of mechanical restraints).

66. The State shall promulgate a policy setting forth which staff are permitted to carry mechanical restraints and where all other mechanical restraints are to be stored.

67. Every facility shall maintain inventory log books for all mechanical restraints. One log book shall be kept at each location where mechanical restraints are stored. The log book shall contain the following information for mechanical restraint devices in the facility:

    a.    A unique identifying number recorded in the log book and on the device (such as a serial number);

    b.    For every time the device is removed from its storage location:

        i.    The date and time of its removal;

        ii.    The name of the person removing the device;

        iii. The name of the person authorizing its removal and a brief statement of the reason (e.g., transportation outside the facility);

        iv.    The date and time the device was returned; and

        v.    A statement of whether the mechanical restraint was used while the device was checked out.

G.   Living Conditions

68. The State shall establish and implement policies and procedures assuring adequate sanitation in the kitchen and eating areas, as well as all living areas. Such policies

and procedures shall include:

a.    The provision of cleaning supplies on a daily basis in order that the living and sleeping areas may be cleaned;

b.    Regular, daily cleaning of the shower and toilet area of each dormitory and cellblock;

c.    Thorough daily cleaning, using accepted institutional methods, of the kitchen and eating areas.

69.    Within twelve months of the effective date of this Agreement, female staff shall not regularly or routinely view male juveniles toileting or showering and male staff shall not regularly or routinely view female juveniles toileting or showering unless the affected shower and toilet areas screen the genital areas of juveniles showering and using the toilet.

70.    The State shall provide adequate personal hygiene items to juveniles, including sufficient soap, shampoo, hair brushes or combs, toothbrushes, toothpaste and deodorant for daily hygiene needs.

71.    The State shall establish and implement policies and procedures assuring that each juvenile has sufficient and appropriately cleaned clothing.

72.    The State shall make best efforts to insure that all living units at SCCY-M are climate controlled by October 31, 2000, and will give notice with an explanation if the project is not completed on time.

73.   Upon the effective date of the Agreement, the State shall
      provide for at least one hour of outdoor exercise, weather
      permitting, including weekends and holidays to each juvenile
      except when:

      a.    contra-indicated for medical reasons; or

      b.    a juvenile in administrative segregation continues to
            present an immediate danger to others.

            Utilization of provision (b) shall require the approval
            of the Warden/Deputy Warden, or Assistant Warden.    In
            the absence of the Warden/Deputy Warden or Assistant
            Warden, application of provision (b) may be authorized
            only by the highest ranking officer at the institution.

            Within 12 months of the effective date of this
      Agreement, each facility shall provide adequate recreational
      equipment and activities adapted for special needs
      juveniles.

            Each facility shall provide adequate recreational
      equipment.    Adequate indoor recreational opportunities shall
      be provided in the event of inclement weather.

            The State shall maintain information in logbooks in
      dormitories, cellblocks, school and the infirmary to record
      outdoor exercise activities.

      H.    Cell Restriction

74.   Locking a juvenile in a room for prolonged periods of time,
      except during sleeping hours (cell restriction), shall occur

only in three contexts -- administrative segregation, protective custody, and removal from regular programming. Use of cell restriction in these contexts shall be governed by the requirements set forth below, provided, however, that all staff training to fully implement parts (a)(iv), (a)(ix), and c(v), may not be completed until 23 months after the effective date of this Agreement.

a.    Administrative Segregation

     i.    Juveniles can be placed in the administrative segregation unit only when their continued presence in general population poses a threat to the safety of the juvenile, staff or other juveniles or is a substantial threat to the security of the institution.  This includes activities that are destabilizing or highly disruptive to programming.

     ii.   Juveniles living in dormitories may only be placed in administrative segregation pending a hearing on their disciplinary charge.  Juveniles engaging in suicidal or self-mutilating behavior shall not be held in administrative segregation for behaviors resulting from their conditions.

     iii.  The State shall ensure that only a staff member of the rank of Lieutenant or higher places a juvenile in administrative segregation.  The staff placing a juvenile in administrative segregation shall

obtain the approval of the Warden or the Warden's designee as soon as possible.

iv.  Staff shall make visual contact with each juvenile in administrative segregation at least every 15 minutes (or more, depending upon the juvenile's emotional state) and otherwise monitor the condition of each juvenile.  Staff shall record essential information about each juvenile in administrative segregation.  Staff shall alert mental health staff if a juvenile begins to exhibit symptoms of a deterioration in emotional state while in cell restriction in accordance with the guidelines set forth in subparagraph 74(a)(ix).

v.  For juveniles held in administrative segregation, disciplinary hearings shall be held every day.  A juvenile's disciplinary hearing shall be held within 24 hours or at the first scheduled hearing after the disciplinary writeup.  Juveniles may not be subjected to cell restriction as a penalty resulting from a disciplinary hearing.

vi.  Juveniles in administrative segregation may be held in cell restriction until calm.  Staff shall make all efforts to assist juveniles in administrative segregation to regain control of their behavior.  If the juvenile is calm but the

security shift supervisor believes that the
juvenile will likely be disruptive in programming,
he may be excluded from programming.

If a juvenile's stay in administrative segregation
exceeds 24 hours due to the investigation of a
serious incident, the juvenile will be permitted
to participate in the 7 ½ hour programming
schedule unless he is a danger to others.
The daily time out of cells shall not be
contingent upon any planned or scheduled
programming available to the juvenile.

vii. Programming for juveniles in administrative
segregation may only be ended if the juvenile
engages in the behaviors listed in subparagraph
74(c)(iii).

viii. A juvenile in administrative segregation shall be
routinely provided with reading and writing
materials unless his current behavior indicates
that possession of such materials would be a
danger to the health of the juvenile or others.

ix. Juveniles with mental retardation or serious
mental illness shall be assessed and treatment
rendered if clinically indicated within three
hours of being placed in administrative
segregation (if the juvenile remains in

administrative segregation). The assessment shall be conducted by a licensed qualified mental health professional ("QMHP") on-call, on-site at the facility.

After regular business hours, weekends, and holidays, the on-site nurse will be notified immediately, who will perform the assessment and contact the on-call QMHP via telephone. If indicated, the on-call QMHP will go the facility for a face-to-face assessment and, if deemed indicated by the QMHP, confer with the psychiatrist on-call.

Based upon the assessment, clinically indicated treatment will be rendered. On-call nurses will be trained to recognize the signs and symptoms of mental illness. In situations when a juvenile is determined to be seriously mentally ill, and a danger to self or others, the juvenile will be placed in a "crisis" bed designated at each facility. Admission to and discharge from crisis beds are by physician orders only. Respite beds will also be designated for those juveniles in need of immediate supervision and intervention secondary to serious mental health needs, although not a level of danger to self or others. Admission to and discharge from respite beds are

by physician orders only.  In these situations for
mentally retarded juveniles and seriously mentally
ill juveniles, the mental health treatment team
will revise and/or develop a treatment plan, if
needed.  The treatment plan will consist of
written statements which specify a particular
course of therapeutic interventions and the roles
of the qualified health care personnel.

Crisis and respite beds will be established
at each of the juvenile institutions within 23
months of the effective date of this Agreement.

b.  Protective Custody

i.  Juveniles in protective custody shall be visited
at least once each day by a mental health
professional and shall be clinically assessed and
treated as deemed appropriate.  On weekends, these
functions may be performed by a registered nurse
with mental health training.

ii.  Juveniles in protective custody shall be permitted
to be out of their cells for at least nine hours a
day and participate in programming (including
recreation) each day.

iii.  Programming for juveniles in protective custody
may only be ended if the juvenile engages in the
behaviors listed in ¶ 74(c)(iii).

       iv.   Protective custody shall be used as a temporary housing measure in order to allow investigation and/or counseling to determine the factors which resulted in a juvenile's placement in protective custody and shall end when a safe and appropriate housing assignment is available.

c.   Removal from Regular Programming

       i.   The State may not assign a juvenile to cellblock housing without a hearing.

       ii.   A juvenile who is housed in a cellblock may be removed from programming and placed in his assigned cell only in accordance with ¶74(c)(iii) and shall have opportunities to rejoin programming in accordance with ¶74(c)(iv). For juveniles who have not been removed from programming in accordance with ¶74(c)(iii) the daily time out of cells shall be a minimum of 9 hours and shall occur regardless of whether there is any planned or scheduled programming available to the juvenile.

       iii. Program participation may be ended only if the juvenile engages in:

           a)   Repeated failure to follow orders, where the failure to comply is destabilizing;

           b)   Repeated interference with staff or other juveniles' duties;

c)    Improper sexual behaviors;

d)    Fighting;

e)    Substantial destruction of property; or

f)    Violent conduct that creates an imminent danger to other juveniles or staff.

The decision to remove a juvenile from programming shall be approved by a ranking security staff member Lieutenant or higher and documented in a log.

iv.    If a juvenile is removed from programming before noon, the juvenile shall be evaluated by a ranking security shift supervisor before evening recreation to determine whether the juvenile can be permitted to participate in evening recreation. The juvenile shall be permitted to participate in evening recreation unless the ranking security shift supervisor determines that, based on documented interim behavior, the juvenile is likely to engage in conduct described in ¶74(c)(iii) and documents the basis for his belief in a log maintained for this purpose; provided, however, that every juvenile shall be permitted an opportunity to participate in programming at the beginning of each day.

v.    Juveniles with mental retardation or serious mental illness and who are assigned to a

cellblock, who have been removed from regular
programming shall be assessed and treated, when
deemed clinically appropriate, as soon as possible
after they have been denied the opportunity to
participate in three consecutive opportunities for
programming.  For example, a juvenile who is not
permitted to participate in afternoon, evening,
and the following morning's programming shall be
reviewed as soon as possible following the denial
of the juvenile's opportunity to participate in
the morning programming.  Such review shall be in
accordance with the protocols established in
¶74(a)(ix).  Subsequent to such review and
assessment, a licensed QMHP may recommend release
of the juvenile from cell restriction to a respite
bed or another location if the juvenile is not
currently a danger to others.

75. Within three months of the effective of this Agreement, when
a juvenile is placed on cell restriction pending a
disciplinary hearing, a copy of the disciplinary report
reflecting this action will be placed into the juvenile's
file.

IV. **MEDICAL, DENTAL, AND MENTAL HEALTH**

76. To assist the State in achieving compliance with the terms
of this Agreement, effective July 1, 2000, the State shall

enter into a three-year contractual relationship with
Provider.  The Provider shall be agreed to by all parties.
During the first year of the three-year contract, the
Provider will begin to furnish during the first year,
medical, mental health, and dental services for JCCY and
JRDC, and quality assurance and monitoring services for the
other secure juvenile facilities operated in Louisiana.
Provider shall also furnish adolescent behavioral and mental
health training throughout Louisiana's secure juvenile
system, beginning in year two.  The Provider shall also
develop a plan for a comprehensive medical, mental health,
and dental program at all of Louisiana's secure juvenile
facilities.  Provider shall provide comprehensive medical,
mental health, and dental services at all of Louisiana's
secure juvenile facilities by the end of the second year of
the three-year contract.  The contract shall be subject to
cancellation within the three-year term only if the
Legislature fails to approve the necessary funding.

77.  The DPSC, acting with and through the Provider, shall
     develop policies and procedures addressing access to, and
     delivery of, medical, mental health, and dental services for
     the juveniles confined in the secure juvenile facilities.
     These policies and procedures shall meet the standards and
     requirements of Provider and the terms of this Agreement.

78.  The DPSC, acting with and through the Provider, shall assume
     responsibility for the administration of the delivery of

medical, mental health, and dental services at JCCY and JRDC during the first year of the contract. These services shall be provided generally in compliance with the proposal set forth in Attachment A.

79. During year one of the contract, the parties agree that Attachment B would result in medical, mental health, and dental staffing which is adequate for JCCY and JRDC. The parties recognize that Attachment B was designed to reflect a phase-in partial year staffing pattern. If the Provider deviates from Attachment B, the State must nonetheless provide medical, mental health, and dental staffing which is adequate.

The parties agree that Attachment C would result in medical, mental health, and dental staffing which is adequate for JCCY and JRDC. If the Provider deviates from Attachment C, the State must nonetheless provide medical, mental health, and dental staffing which is adequate.

In year one, the current level of medical, mental health and dental services at BCCY, SCCY, and SCCY-M shall not be reduced.

80. Provider shall develop and implement a quality assurance program throughout Louisiana's juvenile facilities which shall comply with the terms of this Agreement. Provider shall develop and implement a quality assurance program that shall continuously evaluate the medical, mental health, and dental services programs at all the facilities, identify

problems, make recommendations for corrective action and, in collaboration with DPSC, determine whether the recommendations have been followed. The program should include but not be limited to establishment of standards, monitoring of performance, and analysis of deficits. The quality assurance program shall use data provided by DPSC and other sources and shall be based on random sampling. All of the functions will be commenced at all secure juvenile facilities by the beginning of year two of the three year contract. Provider's quality assurance program shall include, but not be limited to, the components listed below:

a.  Monitoring compliance with medical, mental health, and dental policies and procedures;

b.  Monitoring compliance with the medical, mental health, and dental components of this Agreement;

c.  Inspecting a random sample of the medical, mental health, and dental records;

d.  Interviewing a random sample of staff, administrators and juveniles at each facility;

e.  Monitoring each facility's efforts to prevent suicide;

f.  Starting during year three, monitoring the behavior modification program (BMP) to: 1) assess the efficacy of the program and make recommendations for enhancements as deemed appropriate and 2) assess the effectiveness of the training provided the correctional

officers including that which is specifically tailored
to managing juveniles with serious mental illness,
mental retardation, or behavior disorders;

g.   Monitoring the treatment of juveniles with serious
mental illness or mental retardation in any high
security unit;

h.   Monitoring the adequacy of medical, mental health and
dental documentation at each facility;

i.   Performing death reviews;

j.   Monitoring serious injuries or hospitalizations
resulting from a serious injury or serious illness;

k.   Monitoring suicide attempts and self-mutilations;

l.   Monitoring medical emergencies;

m.   Monitoring outcomes for juveniles treated by Provider
at JCCY and JRDC during year two of the three year
contract and, in ensuing years, at all facilities; and

n.   Monitoring whether juveniles' individualized
intervention plans are being implemented.

81.  The Provider shall provide all the medical, mental health
and dental care for JCCY and the JRDC.  The parties agree
that Attachment D, E, and F would result in medical, mental
health, and dental care which is adequate for JCCY and JRDC.
If the Provider deviates from Attachment D, E, or F, the
State must nonetheless provide medical, mental health, and
dental care which is adequate.

82. The Provider shall plan and implement a system-wide program
to supplement the training of all DPSC staff who have direct
contact with juveniles, including correctional staff and
counselors. The training shall include instruction in
adolescent behavior and in identification and response to
mental illness and mental retardation. The parties agree
that Attachment G would result in training which is
adequate. If the Provider deviates from Attachment G, the
State must nonetheless provide training in adolescent
behavior and in identification and response to mental
illness and mental retardation which is adequate and the
State shall notify Plaintiffs and the DOJ of all such
deviations. Provider shall also supplement the training of
all facility investigators concerning investigatory
techniques used in child abuse investigations.

83. By August 1, 2001, Provider shall provide adequate medical,
dental, and mental health professionals and staff in order
to comply with all relevant State and Federal laws and
regulations for the juvenile population of JCCY and the
intake operations of JRDC. By July 1, 2002, Provider shall
provide adequate medical, dental, and mental health
professionals and staff in order to comply with all relevant
state and federal laws and regulations for the juvenile
population of all other juvenile facilities.

84. Within 3 months of the effective date of this Agreement,

Provider shall survey the suicide hazards in any area in the juvenile facilities in which juveniles with suicidal or self-mutilating behaviors shall be housed and make recommendations to DPSC to correct the hazards.  The State shall either remove any hazards identified by Provider within one month after the inspection or provide written reasons why the hazards will not be removed.  Copies of the reasons shall be provided to the Court Expert and Plaintiffs, along with a description of alternative safety precautions that DPSC will make, if any.

85. Juveniles identified with serious medical needs shall be transferred to JCCY as soon as possible, unless security concerns prevent such a transfer.  Juveniles with serious mental illnesses shall be transferred to either SCCY or JCCY as soon as possible, unless security concerns prevent such a transfer.  DPSC will provide Provider with information on juveniles who have been prescribed more than one psychotropic medication or who have chronic medical conditions.

86. During year one at JCCY and JRDC only and in ensuing years at all facilities, decisions regarding the medical, mental health, and dental care of a juvenile shall be made by Provider.  If DPSC determines that a decision by Provider cannot be implemented, DPSC shall provide the reason in writing to Provider, the Court Expert, DOJ, and the Plaintiffs.

87.   Provider shall screen and assess all juveniles at intake and
      make recommendations concerning the needs of each juvenile
      to be met by the juvenile's individualized intervention
      plan.   DPSC shall develop an individualized intervention
      plan based, among other things, on Provider's
      recommendations.   Provider's recommendations shall also be
      provided to the State Director of Education if the
      assessment includes indicators for a possible special
      education placement.

88.   Based on the outcomes of the screenings and assessments
      discussed above, within thirty days of intake, Provider
      shall develop a specific, individualized, goal and outcome-
      oriented mental health treatment plan for all seriously
      mentally ill juveniles.   Provider shall begin implementation
      of the treatment plans for these juveniles at JCCY by the
      end of year one and, in ensuing years, at the other secure
      facilities.   The plan shall address all psychiatric and
      psychological needs of the juvenile and shall include
      competency-based treatment goals and objectives.   The
      juvenile's family shall be given the opportunity and shall
      be encouraged to be involved in the treatment, unless the
      facility documents with particularity why such participation
      is likely to be harmful to the juvenile.   Individual
      behavior treatment plans shall be developed and implemented,
      where the Provider deems it appropriate.   The treatment team
      responsible for implementing the treatment plans shall meet

at least every 90 days to assess the efficacy of the plan and make revisions where indicated.

Juveniles removed from school for medical, dental or mental health consultations, examinations or appointments shall be exempt on that day from the provisions of the education settlement regarding specific academic and vocational program participation when applicable.

89. During year one at JCCY and JRDC only and in ensuing years at all facilities, Provider shall develop and ensure implementation of appropriate protocols as referred to in Attachments D, E, and F. During year one, the protocols shall be distributed to other facilities as they are developed.

90. If Provider determines that a juvenile's mental health needs cannot be met in DPSC, Provider shall advise DPSC and DPSC has an affirmative obligation to contact the Court with jurisdiction over the juvenile and provide that information to the Court and last known counsel of record in a timely manner.

91. Medical/mental health restraints shall not be used unless specifically ordered by a physician or psychiatrist. Soft or leather restraints, rather than metal mechanical restraints, shall be utilized for this purpose. There shall be no standing orders for medical/mental health restraints. This does not apply to any order by a physician or

psychiatrist that is issued in response to an individual juvenile's current medical or mental health condition. Medical/mental health restraints shall be used only in the infirmary under constant supervision and conducted according to current accepted professional standards on medical restraints.

92. Suicide watch shall only be conducted with adequate staff supervision. The infirmary will be used on a priority basis for suicide watch unless the medical needs of another juvenile take priority as determined by a physician. The second priority will be individual rooms that are suicide resistant and are equipped with video surveillance cameras. In the event there is a need for additional beds, these will be jointly identified by DPSC and the Provider.

93. Provider shall make best efforts to hire board eligible or board certified child and adolescent psychiatrists to fill psychiatric staffing positions. In the event that board certified and board eligible child and adolescent psychiatrists cannot be found, psychiatrists with adolescent experience shall be hired, whenever possible. These psychiatrists shall be supervised by board certified or board eligible child and adolescent psychiatrists.

94. Within 3 months of the effective date of this Agreement, DPSC and Provider shall develop and implement procedures for reporting to the Warden and to the Youth Programs Compliance

Division any problems with abuse or neglect that they uncover during their duties. Provider staff shall comply with their obligations as mandatory reporters of child abuse as discussed in ¶ 22 of this Agreement.

95. Provider shall not use medical students to fulfill any of their responsibilities under this Agreement. It is not anticipated that Provider will use first-year residents on-site to fulfill any of their responsibilities under this Agreement. Any pediatric second-year resident used on-site shall have on-site staff physician supervision.

96. Juveniles at JRDC who are scheduled for placement in boot camp will be identified to Provider and Provider shall make recommendations to DPSC on the juvenile's suitability for this program, with reference to any physical and mental limitations of the juvenile. DPSC shall implement the recommendations or if they cannot implement the recommendations, DPSC has an affirmative obligation to return to the Court having jurisdiction over the juvenile to inform the Court and the juvenile's last known counsel of record that DPSC cannot implement the recommendations.

97. For all juveniles who are receiving services from Provider and who are being released, Provider shall provide after-care planning relevant to the services provided to that juvenile by Provider. This planning will be provided during year one at JCCY and JRDC only and in ensuing years at all facilities.

98.  By the end of year one at JCCY and JRDC only and by the end
     of year two at all facilities, Provider's nursing staff
     shall perform daily sick call in all high security housing
     units.  Provider shall ensure that access to medical care
     shall not be within the decision-making authority of
     correctional staff.

99.  During year two, Provider shall train all existing and new
     nursing staff concerning when to refer a medical condition
     to the facility physician.

100. During year two, Provider shall train all staff having
     contact with juveniles to recognize and respond
     appropriately to common medical conditions, including, in
     particular, preservation and transportation of avulsed
     teeth.

101. Provider shall provide an assessment and timely treatment,
     when they deem it appropriate, to juveniles who have been
     identified to Provider as having recently experienced
     significant trauma either by being sexually exploited by
     other juveniles or staff or by having physical
     confrontations with other juveniles or staff.  DPSC will
     provide information as agreed upon with Provider to identify
     juveniles who may have suffered such trauma.

102. Provider shall develop a crisis bed and a respite bed at
     each facility in accordance with Provider's facilities plan
     at JCCY and JRDC and by the end of year two of the three-
     year contract at all other secure juvenile facilities.

103. By year three, the training provided by Provider will
     include training for those identified staff who issue
     disciplinary reports and/or who participate in disciplinary
     courts and who, therefore, should be trained to make
     reasonable accommodations for the needs of juveniles with
     serious mental illness and mental retardation.

104. Correctional staff - and not medical staff of either the
     Provider or DPSC (including EMT's) - will actually initiate
     and prepare any disciplinary report for malingering.  No
     juvenile will be disciplined or written up for malingering
     based on the juvenile's access to the medical care system
     through emergency or regular sick call, regularly scheduled
     clinics or physicians' clinics until after the physician has
     evaluated the patient and determined that the juvenile's
     complaint or complaints had little or no merit.  DPSC's
     DISCIPLINARY RULES AND PROCEDURES FOR JUVENILE OFFENDERS,
     First Edition, 1993 shall be revised to be consistent with
     this provision.

105. Juveniles shall not receive disciplinary reports for
     refusing to take mental health tests or for refusing to take
     psychotropic medications.

106. The State shall not discipline juveniles for suicidal
     behaviors.  The State shall not discipline juveniles for
     self-mutilating behaviors, where those behaviors result from
     a mental health disorder, mental illness or anxiety or fear

over the juvenile's safety.  No juvenile shall be
disciplined for self-mutilation unless a psychiatrist or
psychologist diagnoses malingering based on reasons other
than anxiety or fear over the juvenile's safety.  In this
context, self-mutilation does not include tattooing, body
piercing, or similar conduct.  Obvious self-mutilations will
not result in disciplinary writeups.

107. The State shall ensure that each living unit has a Hoffman
911 tool and that all staff are trained on its location and
use.

108. Juveniles shall have a written release plan except in cases
where release cannot be reasonably anticipated.  The plan
must address living arrangements, work or school plans,
other needs relevant to the juvenile, and where applicable,
follow-up care for medical or mental health needs.

109. Based on the outcomes of the screenings and assessments
discussed above or other legitimate sources, juveniles with
the highest need for substance abuse treatment shall either
be scheduled for assignment to a therapeutic environment or
other stand-alone or integrated program designed for
substance abuse counseling and treatment.  All reasonable
efforts shall be made to make assignments to these programs
as soon as possible, once a juvenile is identified.
Parents/legal guardians and family members shall be given
the opportunity and shall be encouraged to be involved in
the treatment, unless the facility documents with

particularity why such participation is likely to be harmful to the juvenile. All other juveniles shall be provided substance abuse education as part of their intervention plan. Substance abuse education and intervention programs shall be modified to accommodate the needs of juveniles with learning or developmental disabilities.

110. Based on the screenings and assessments discussed above, the State shall develop and implement an individualized intervention plan for each juvenile that addresses areas such as education, life skills, medical, and other intervention needs of the juvenile. Implementation of the plan shall begin upon assignment of the juvenile following transfer from JRDC. Under normal circumstances and absent unusual testing or evaluation requirements, transfer should occur by 30 days of intake. The individualized intervention plan shall include meaningful and specific short-term and long-term intervention goals. The juvenile's family shall be given the opportunity and shall be encouraged to be involved in the intervention plan, unless the facility documents with particularity why such participation is likely to be harmful to the juvenile. The intervention team responsible for implementing the intervention plans shall meet at least every third month to assess the efficacy of the plan and make revisions where indicated. DPSC will ensure that counseling services are provided, sufficient to satisfy the requirements of juveniles' individualized

education plans.

111. For each juvenile receiving psychotropic medications, direct
care, counseling, and educational staff shall observe,
monitor and record data that will be available to the
treatment team in order to assess the effect of a particular
medication.  A member of the juveniles's treatment team
shall communicate with direct care, counseling, and
educational staff, and make efforts to communicate with
families to review treatment and intervention progress and
data collected by staff to assess the efficacy of treatment .
and intervention, so that the mental health providers can
make revisions when clinically indicated.

112. Case managers shall be notified of disciplinary infractions,
problem behaviors (including being removed from programming
three consecutive times), and incidents of violence
involving juveniles on their respective caseloads.  The case
managers shall utilize this information to implement
appropriate interventions, to determine that underlying
causes of behavioral problems are being addressed in
counseling, and/or to make referrals to the Provider.

113. Each facility shall develop and implement an adequate
intervention program which shall be determined by the needs
of individual juveniles.  The intervention program shall
provide counseling and programming as needed as recommended
by the treatment team.  Counseling may be provided by

qualified staff with appropriate background and training.

114. Each facility shall create and maintain daily schedules in each assigned housing unit or special program (such as STOP, LITE, etc.) that shall set forth the planned program and operational activities for all juveniles in the assigned unit or program for every hour of every day of the week. Such schedules will include time for permissible leisure activities. Shift supervisors shall document on a UOR the cancellation of any major activity scheduled for that shift.

115. As part of the treatment and intervention plan of each juvenile, the State shall encourage family reunification where reunification is appropriate. Each juvenile shall have:

a. An opportunity to make telephone calls to his or her home as arranged by the juvenile's case worker at State expense when the juvenile's case worker determines that the call promotes the goals of the juvenile's intervention plan. These calls are in addition to the juvenile's opportunities to make collect telephone calls on a daily basis.

b. Access to adequate paper, pen or pencil and envelopes for three letters a week to correspond with their family. Indigent juveniles will be provided postage and other juveniles may purchase stamps in the canteen.

Staff will encourage juveniles to write to their
parents, guardians, and families where appropriate;

c.    Visitation opportunities available a minimum of three
times a month for a minimum of three hours each visit.
Each facility shall advise parents and/or guardians
that special visits may be approved by the Warden on a
case-by-case basis for those who are not able to visit
on regular visiting days.  Visitation shall not be
suspended as a disciplinary sanction unless the
disciplinary infraction occurred during a visit.  When
appropriate, mental health staff shall take advantage
of times before or after visits by families to meet to
discuss juveniles' mental health histories.

Juveniles approved for special visits shall be exempt
on that day from the provisions of the education settlement
regarding specific academic and vocational program
participation when applicable.

116.  Initial institutional assignment will be driven by such
factors as the needs of the juvenile, location of the
program(s) beneficial to the juvenile, location of the
juvenile's home, availability of space, gender, gang
affiliation and other factors.

**V.    QUALITY ASSURANCE**

117.  The State shall create a Youth Programs Compliance Division
(YPCD).  The State shall recruit and hire a Director of the

YPCD, who shall be highly qualified for the position.  The
Director shall begin employment within nine months of the
effective date of this Agreement.  The State shall provide
the Director with staff as outlined in this Agreement and
sufficient resources to perform the tasks required by this
Agreement, including:

a.    Monitoring compliance with DPSC policies in all
      facilities, with emphasis on policies relating to
      issues addressed in this Agreement;

b.    Conducting audits and other quality assurance
      activities as described in ¶ 118;

c.    Monitoring compliance with the juvenile justice
      components of the Agreement;

d.    Coordinating quality assurance activities related to
      this Agreement performed by various DPSC offices to
      prevent unnecessary duplication of efforts;

e.    Monitoring the ARP program;

f.    Monitoring the work of the PZT investigators, required
      by ¶ 29.

118. Within twelve months of the effective date of this
Agreement, the Director of YPCD shall create and implement a
written quality assurance program, as defined in ¶ 117 with
the following elaboration and supplementation:

a.    The comprehensive audits required by ¶ 117(b), shall
      include, at a minimum:

      i.    Inspection of a minimum random sampling of

institutional and educational records, unit logs, accident and incident reports, and use of force reports;

ii.  Random interviews with staff, administrators and juveniles at each facility;

iii. Random contacts with the parents or other care givers of juveniles confined in the facilities;

iv.  Inspection of the physical plant;

v.   Random contacts with juvenile court judges, public defenders and other officials having regular contact with the facility or its residents;

vi.  Review of a sample of the disciplinary hearing tapes and security videotapes.  On-site observation of disciplinary hearings may be conducted in lieu of the tape review;

vii. Determination of compliance with DPSC policies and the requirements of this Agreement relating to: staffing levels and juvenile supervision, use of force, disciplinary practices, positive behavior management programs, grievance procedures, use of chemical and mechanical restraints, fire safety, adequacy of juvenile recreation and exercise, sanitation, juvenile access to hygiene items and clothing, juvenile-on-juvenile violence, implementation of classification criteria,

conditions in special management or other high
security units, and the adequacy of all facility
documentation; and

viii.A written report recording the findings of the
audit.

b.    Additional unannounced, periodic site visits at each
facility.

c.    Review of the reports, UOR's and/or other documentation
of significant incidents (as defined by the Director of
YPCD), which shall include, at a minimum: deaths;
serious injuries; hospitalizations resulting from a
serious illness; suicides and serious suicide attempts;
escapes or other serious breaches of security; and
medical emergencies.  A review that results in
significant findings shall result in an immediate
written report to the Secretary of DPSC (with copies to
the Assistant Secretaries, applicable Warden and PZT
Supervisory Investigators as appropriate) and shall
include a detailed description of the findings and
recommendations;

d.    Policies and procedures for auditing chemical spray
canisters and reliably determining whether the canister
has been discharged.  Facility supervisory staff and
YPCD auditors shall routinely conduct such audits.  If
it appears that a canister has been used without
required documentation, YPCD shall be notified and

shall request that the PZT Investigator conduct an investigation. The YPCD shall notify the Warden and the appropriate PZT Supervisory Investigator of the incident and the investigation request;

e.    Requirements that when, through audits, review of investigations, or other quality assurance activities, the YPCD finds substantial non-compliance with the requirements of DPSC policies or this Agreement, the Secretary of the DPSC, Assistant Secretaries and the Warden shall be advised in writing of the details of the non-compliance and a plan of correction shall be developed by the Warden. The YPCD will monitor the plan and report findings to the Secretary and Assistant Secretaries as appropriate;

f.    Collection and analysis of data, particularly emphasizing detection of patterns of incidents, problems and issues. This shall include, at a minimum, collection and analysis of data regarding:

    i.    allegations of abuse and substantiated abuse, including analysis of whether a disproportionate number of allegations of abuse are related to individual staff members, particular shifts or time periods, particular units or locations within units, or arise during particular activities;

    ii.   the subject matter and quantity of grievances;

    iii.  the number and type of disciplinary reports

issued, in relation to the effectiveness and adequacy of the facility's positive behavior management system; and

iv.   the number and percentage of juveniles who achieve minimum custody level; the number and percentage of juveniles who achieve the requirements for modification of disposition; the number and percentage of juveniles who are recommended for modification of disposition; the number and percentage who receive modification of disposition; the number of juveniles in each short-term program who are held beyond their minimum release date and the amount of time each juvenile is held beyond their minimum release date.

g.   Each institution shall designate staff to perform the following functions:

i.   Designated staff members shall help juveniles informally resolve complaints, file grievances and shall review and record all grievances. If a grievance is filed, the Warden will designate a staff member to conduct fact-finding of all applicable information and return the grievance to the Warden for rendering the institutional response. A designated staff member shall retain

copies of all responses to grievances and shall monitor the grievance procedure to ensure timely responses to all grievances. Designated staff members shall be available to assist juveniles who wish to pursue their grievance to the Secretary's level; and

ii. Designated staff members shall be available to meet with every juvenile receiving a Class B disciplinary report prior to the disciplinary hearing and to assist the juvenile at his request in any disciplinary hearing if the report is contested.

119. YPCD staff shall have complete and unfettered access to all facilities, records, staff and residents. All DPSC and facility staff shall be informed of their obligation to cooperate in all YPCD operations.

120. The State shall provide YPCD staff as follows:

a. four YPCD auditors to perform the on-site audits required by ¶¶ 117-118;

b. two central office YPCD employees to perform data collection and analysis;

c. two administrative support staff for the central YPCD office;

d. facility-based PZT investigators: 3 for JCCY; 2 for SCCY; 3 for SCCY - M; and 1.5 for BCCY; and

e.    at least one facility-based administrative support
      staff for each facility to assist the PZT
      investigators.

      If these numbers should prove to be insufficient to
perform the duties required by this Agreement, the State
shall take reasonable actions to assist the staff of YPCD
and request additional position(s), supplies and/or
equipment through the budgetary process.

121. Within four months of the effective date of this Agreement,
     the State shall appoint two independent auditors, acceptable
     to all parties, to perform quality assurance checks on
     investigations.  If the parties are unable to agree on the
     selection of auditors, then the parties shall solicit the
     participation of the Court in selecting the auditors from
     among the candidates proposed by the parties.  The cost of
     the auditors shall be shared equally (50/50) by the DPSC and
     the DOJ.

     a.    The State shall provide the auditors with full access
           to the files compiled for all completed investigations
           and the Multiple Allegations Database described in ¶
           32.

     b.    The auditors shall sign assurances that they will
           maintain the confidentiality of all records that they
           review.

     c.    The month following appointment of the auditors
           pursuant to this paragraph, the DPSC shall furnish the

auditors a monthly report from the central database of
investigations generated pursuant to ¶ 31 of this
Agreement conducted during the previous month.

i.    For the first monthly audit, the auditors shall
      randomly select up to 30% of the investigations
      completed at each institution during the previous
      month for review and evaluation from the central
      database.

ii.   For the remaining eleven months of audits, the
      auditors shall select up to 30% of the
      investigations completed system wide from the
      executive summaries of all investigations
      completed during the previous month.  As part of
      each month's 30% sample, the auditors may select
      the 30% randomly, or alternatively, the auditors
      have the discretion to select all or some of the
      investigations to be audited solely by the
      following criteria: 1) investigations completed at
      a particular institution, and/or 2) by a
      particular investigator, and/or 3) a particular
      type of investigation (such as all rape
      investigations; all investigations involving
      incidents in which the juvenile was seriously
      injured; all investigations involving incidents
      that were not recorded on videotape etc.).

iii. In auditing their 30% monthly sample, the auditors

may review up to four additional investigations completed during the preceding month to the extent deemed necessary in order to adequately audit any individual investigations, provided however that the auditors may not include these investigations in their questions pursuant to ¶ 121(d).

d.    The DPSC investigators shall comply with any reasonable request for information from the auditors.

e.    The auditors shall issue a monthly report to the parties and to the Court Expert describing their review and analysis.

    i.    If the auditors determine that individual investigations are incomplete or otherwise not in compliance with the requirements of ¶¶ 25, 26, and 27 of this Agreement, the auditor shall identify those investigations. The auditors shall specifically identify the deficiencies and shall provide written instructions for completing the investigations properly. The State shall resubmit completed investigations to the auditors within 30 days.

    ii.   If resubmitted investigations do not address the deficiencies to the satisfaction of the auditors and it was within the capacity of the DPSC to remedy the deficiency, then, in furtherance of this review function, the auditors may conduct

such on-site interviews or review the documents,
including tapes, as the auditors, at their sole
discretion, may deem appropriate. At all times,
the auditors are to serve in an auditing capacity
and are not to substitute themselves as
investigators.

## VI.  COMPLIANCE AND MONITORING

122. Not later than March 1, 2001, the State shall submit to DOJ
and Plaintiffs, a draft comprehensive plan for providing
medical, mental health and dental services at all of the
secure juvenile facilities, including a staffing proposal
for all of the facilities for the two year period beginning
July 1, 2001 (the "Systems Proposal").

123. DOJ and Plaintiffs shall submit any comments on the Systems
Proposal to the State, in writing, not later than April 1,
2001. The parties shall meet promptly thereafter and
attempt in good faith to resolve any disputes regarding the
Systems Proposal not later than May 1, 2001.

   a.   If the parties agree on the substance of the Systems
        Proposal by May 1, 2001, then the DPSC shall request
        that funding for the first year of the Systems Proposal
        be included in the 2001-2002 fiscal year executive
        budget. If funding for the first year of the Systems
        Proposal is not included in the final approved State
        budget as of July 1, 2001, then, on or before August 1,

2001, the Plaintiffs, acting collectively, and/or the DOJ may move to reopen/reactivate the medical/mental health and dental claims in the Lawsuits.

b.    If the DOJ or Plaintiffs do not accept the Systems Proposal, then, the Plaintiffs, acting collectively, or the DOJ shall have the right to move to reopen/reactivate the Lawsuits for the purpose of litigating the medical and mental health claims in the Lawsuits.  If a motion to reopen/reactivate the Lawsuits is not filed on or before May 15, 2001, then the Systems Proposal shall be deemed accepted and approved by all parties.

124. Dr. Trupin, Dr. McPherson, and Dr. Peck shall serve as the Medical/Mental Health Experts under this Agreement.  In the event that any one or more of these individuals is unable or unwilling to serve as a Medical/Mental Health Expert, then the Plaintiffs, DPSC and DOJ jointly shall select a pediatrician (or a physician who is not a pediatrician, if all parties agree), psychiatrist, and/or psychologist to replace that individual or those individuals.  If the parties are unable to agree on the selection of the replacement Medical/Mental Health Expert, then the DPSC and the DOJ shall each nominate a replacement and shall solicit the participation of the Court in selecting the replacement from the individuals nominated by the DOJ and DPSC.  The reasonable fees and expenses of the Medical/Mental Health

Experts shall be shared equally by the State and the DOJ.

125. Each of the Medical/Mental Health Experts shall conduct only one compliance tour of each secure juvenile facility.   The purpose of these tours shall be to assess the State's substantial compliance with the terms of this Agreement and the Systems Proposal.   It is the parties' intent that the Medical/Mental Health Experts conduct their tours as a group and attempt to reach consensus on issues common to their fields of expertise.   Unless the parties agree, after consultation with the experts, to a different procedure, each site tour shall be conducted between 8:30 a.m. and 9:00 p.m. within a single three day period, and documents shall be requested only during normal business hours.   During these site tours, the Medical/Mental Health Experts shall have reasonable access to all facilities, staff and documents relating to the areas of their compliance tours. The State will make facility and Provider personnel available to all Medical/Mental Health Experts.   The Medical/Mental Health Experts shall have the right to conduct confidential interviews with juveniles.   The State shall have the right to have a non-attorney representative present during any interviews with staff, Provider personnel, or contractors.   The Medical/Mental Health Experts may make reasonable and timely requests for copies of documents either before, during, or after the tours and DPSC agrees to provide these documents to the experts within

a reasonable time frame. The experts will use their best
efforts to minimize the number of documents requested.

126. The Medical/Mental Health Experts shall conduct their
compliance tours of all of Louisiana's secure juvenile
facilities at times mutually agreed upon by the parties and
shall generate and submit written reports of their findings.
The Medical/Mental Health Experts will meet with the
Provider, warden and other staff of each facility at the
conclusion of each tour in order to discuss their findings.
All site tours shall be conducted and all reports shall be
submitted during the period between August 1, 2002 and
December 2, 2002. Medical/Mental Health Experts will submit
their reports as promptly as possible following each tour,
but in no event more than 60 days after each tour. These
reports shall be distributed only to counsel for the DOJ,
Plaintiffs, and the State, and to the Court Expert. Upon
receipt of the reports, the State shall have 15 days in
which it may respond to any findings or describe any
remedial action that it may contemplate. The reports shall
not be filed in the record of these proceedings or otherwise
publicly released unless Plaintiffs, acting collectively, or
DOJ deem it necessary to attach such reports to a motion to
reopen the Lawsuits, or unless the Court orders these
Lawsuits to be reopened/reactivated.

127. In addition to the Medical/Mental Health compliance tour of
each of the secure juvenile facilities described in ¶¶ 125

and 126, the parties agree that Dr. Trupin and Dr. Peck
shall visit the Jetson Correctional Center for Youth upon
the conclusion of the first year of this Agreement.   The
visit shall be scheduled at a time mutually agreed by Dr.
Trupin, Dr. Peck, the Provider, and the Court Expert.   The
purpose of the visit will be to provide Dr. Trupin and Dr.
Peck an opportunity to review the progress that has been
made in implementing the medical, dental and mental health
provisions during the first year of this Agreement.   The
parties anticipate that the visit will last no more than two
days, but Dr. Trupin, Dr. Peck and the Provider may extend
the length of the visit if they deem it appropriate.   No
written report of the visit will be prepared, but Dr. Trupin
and Dr. Peck will advise the State, the Provider,
Plaintiffs, DOJ, and the Court Expert of areas in which they
believe that the State and/or the Provider have not yet
achieved compliance with the medical, dental and mental
health provisions of this Agreement.   The exit interview
conducted by each expert will be tape recorded and the tapes
made available to the State, Plaintiffs, the DOJ, and the
Court Expert.   All documents and information obtained during
these technical assistance tours may be offered into
evidence if Plaintiffs or the DOJ move to re-open the
Lawsuits, subject to the entry of appropriate orders to
protect the confidentiality of juvenile records and subject

to any evidentiary objections to admissibility that may be
asserted by the State.   The exit interview tape recordings
may be used for impeachment purposes.

128. Compliance with the juvenile justice provisions of this
Agreement shall be monitored by one expert selected by the
DOJ and one expert selected by the State (the "Juvenile
Justice Experts").   The Juvenile Justice Experts shall
conduct only one compliance tour of each of Louisiana's four
secure facilities.   The purpose of these tours shall be to
assess the State's substantial compliance with the juvenile
justice provisions of this Agreement.   It is the parties'
intent that the Juvenile Justice Experts conduct their tours
together with the Court Expert and attempt to reach
consensus on juvenile justice issues.   Unless the parties
agree after consultation with the experts to a different
procedure, each site tour shall be conducted between 8:30
a.m. and 9:00 p.m. within a single three-day period, and
documents shall be requested only during normal business
hours.   During these site tours, the Juvenile Justice
Experts and two DOJ or Plaintiffs' attorneys shall have
reasonable access to all facilities and documents relating
to the areas of their compliance tours.   The State will make
facility and Provider personnel available to all Juvenile
Justice Experts.   One attorney for the State and one
attorney for the DOJ or Plaintiffs each shall be present as
observers only during any interviews with juveniles, staff,

Provider personnel or contractors.  The Juvenile Justice
Experts may make reasonable and timely requests for copies
of documents either before, during, or after the tours and
DPSC agrees to provide these documents to the experts within
a reasonable time frame.  The experts will use their best
efforts to minimize the number of documents requested and
will not request the production of documents already
produced in accordance with this Agreement.

129. The Juvenile Justice Experts shall conduct the compliance
     tours of each secure juvenile facility at times mutually
     agreed upon by the parties and shall generate and submit
     written reports of their findings.  One DOJ or Plaintiffs'
     attorney and one State attorney may accompany each of the
     Juvenile Justice Experts on the compliance tour, provided,
     however, that no more than two DOJ or Plaintiffs' attorneys
     and no more than 2 State attorneys would be present at the
     facility during the tour.  All site tours shall be conducted
     and all reports shall be submitted during the period between
     August 1, 2002 and December 2, 2002; provided, however, that
     juvenile justice tours shall not be conducted concurrently
     with the medical/mental health compliance tours.  These
     reports shall be distributed only to counsel for the DOJ,
     Plaintiffs, the State, and to the Court Expert.  Upon
     receipt of the reports, the State shall have 15 days in
     which it may respond to any findings or describe any
     remedial action that it may contemplate.  The reports shall

not be filed in the record of these proceedings or otherwise
publicly released unless Plaintiffs, acting collectively, or
DOJ deem it necessary to attach such reports to a motion to
reopen the Lawsuits, or unless the Court orders these
Lawsuits to be reopened/reactivated.

130. In addition to the Juvenile Justice compliance tour of each
of the secure juvenile facilities described in ¶¶ 128 and
129, the parties agree that Paul DeMuro, the State's
juvenile justice expert, and the Court Expert shall visit
each secure juvenile facility upon the conclusion of the
first year of this Agreement.  The visit shall be scheduled
at a time mutually agreed by the parties and the Court
Expert.  The purpose of the visit will be to provide Mr.
DeMuro and the State's expert an opportunity to review the
progress that has been made in implementing the juvenile
justice provisions during the first year of this Agreement.
The parties anticipate that visits to each facility will
last no more than two days, but Paul DeMuro and the State's
expert may agree to extend the length of the visits if they
deem it appropriate.  No written report of the visits will
be prepared by Paul DeMuro and the State's expert.  However,
each expert will advise the State, Plaintiffs, the DOJ, and
the Court Expert of areas in which he or she believes that
the State has not yet achieved compliance with the juvenile
justice provisions of this Agreement.  The exit interview
conducted by each expert will be tape recorded and the tapes

made available to the State, Plaintiffs, the DOJ and the
Court Expert.  All documents and information obtained during
these technical assistance tours may be offered into
evidence if Plaintiffs or the DOJ move to re-open the
Lawsuits, subject to the entry of appropriate orders to
protect the confidentiality of juvenile records and subject
to any evidentiary objections to admissibility that may be
asserted by the State.  The exit interview tape recordings
may be used for impeachment purposes.

131. If the DOJ or Plaintiffs have cause to believe that the
State's non-compliance with this Agreement threatens the
immediate health and safety of juveniles, then the DOJ or
Plaintiffs shall immediately notify the Court Expert and the
State of the specific provisions of this Agreement that they
believe have been violated and the facts upon which this
allegation is based.  The State shall have a reasonable
opportunity to investigate and respond to the allegations.
If the DOJ or Plaintiffs are not satisfied with the State's
response, then the parties commit to meet and attempt to
resolve the dispute informally with the assistance of the
Court Expert in an expeditious manner.  If the DOJ or
Plaintiffs still believe that the State's noncompliance
threatens the immediate health and safety of juveniles, then
the Plaintiffs, acting collectively, or DOJ shall have the
right to move the Court to reopen or reinstate this

litigation to the extent necessary for the Plaintiffs, acting collectively, or DOJ to investigate whether the State's noncompliance threatens the immediate health and safety of juveniles and to seek emergency judicial relief, if necessary, for the conditions that threaten the immediate health and safety of the juveniles.  If Plaintiffs, acting collectively, or DOJ seek emergency judicial relief, they have the burden to prove that the conditions violate the federal constitutional or federal statutory rights of the juveniles.

132. The parties consent and agree to entry of a final judgment dismissing with prejudice all allegations in the Lawsuits relating to juvenile justice, medical, mental health and dental issues at all of Louisiana's secure juvenile facilities at any time on or after January 21, 2003 unless the Plaintiffs, acting collectively, or DOJ, has moved for an order reopening and reactivating the Lawsuits prior to January 21, 2003.

133. Compliance with the terms of this Agreement and the Systems Proposal also shall be monitored by the Court Expert in *Williams v. McKeithen*.  The State shall bear all costs incurred by the Court Expert, including, but not limited to that expert's fees and expenses (e.g. for site visits, administrative costs, report writing, and telephone calls made for consultation).

134. In order to monitor compliance with this Agreement, the Court Expert shall have reasonable access to all facilities, residents, staff and documents.  The Court Expert shall have the right to conduct confidential interviews with staff and residents.

135. Until the termination of this Agreement, the State shall, at its own expense, provide the Court Expert, the DOJ and one of the law firms representing the Plaintiffs with the following documents for each of the secure juvenile facilities, on a quarterly basis:

1.    C-005-001 and C-005-003 reports, together with all attachments described in DPSC regulations;

2.    All Use of Force reports, with applicable accident and injury reports;

3.    All Chemical Agent reports;

4.    Comprehensive audits prepared by the Youth Program Compliance Division pursuant to ¶ 118(a) of this Agreement;

5.    Comprehensive audits prepared by the Provider pursuant to ¶ 80 of this Agreement;

6.    A list of correctional officers identified during the preceding quarter with three or more allegations within a two year period as provided in ¶ 32(c).

7.    The headquarters central PZT logs for the preceding quarter.

8.    Current medical, mental health, and dental staff

positions and vacancies at all secure juvenile
facilities.

The State will also provide the DOJ copies of all
of the PZT reports (including all attachments, videos,
and any other documents) which are selected by the
auditors for review under ¶ 121.

Each quarterly report shall be distributed not later
than thirty (30) days after the end of the quarter.  The
first quarterly report shall include only the information in
subparagraphs (a), (b), (c), (g), and (h) above.  The first
quarterly report shall cover the period from October 1, 2000
through December, 31, 2000 and shall be distributed not
later than January 31, 2001.  Subsequent reports will be
distributed in the same manner each quarter.  The State
shall continue to report certain incidents to Keith Nordyke
and the Court Expert in accordance with the practice
generally described in correspondence dated November 3,
1999.

136. Upon the effective date of this Agreement, the State shall
make the following documents available for inspection by
attorneys for the Plaintiffs during normal business hours,
subject to reasonable limitations and notices:

a.    All ARPs and grievances submitted by juveniles;

b.    All juvenile disciplinary reports;

c.    All PZT reports (including all attachments, videos, and
any other documents referenced in the PZT reports);

d.    Infirmary logs;

e.    Trip logs to hospitals;

f.    Juvenile Master case records and medical, dental and mental health records;

g.    Mechanical restraint logs;

h.    Recreation logs; and

i.    Chemical agent logs.

137. The State shall make reasonable efforts to promptly provide any document related to compliance with this Agreement reasonably requested by the Court Expert or by Plaintiffs or DOJ, but in any event shall provide such documents within ten business days of the requests.  This shall not include, however, documents or portions of documents that are subject to attorney client or work product privilege.  In producing documents to Plaintiffs or DOJ pursuant to this paragraph or paragraph 136, the State shall bear the cost of providing up to 2000 pages of copies of documents to the Plaintiffs collectively per year.  Any documents requested beyond this amount shall, at the option of the State, be made available for inspection and copying by the party, or shall be copied by the State at a cost of 5 cents per page to be paid by the requesting party.

138. For purposes of this paragraph, the substantive provisions of this Agreement shall be divided into six categories: (1) medical and dental, (2) mental health and rehabilitative services, (3) staffing and capacity, (4) juvenile justice

quality assurance, (5) access to courts, and (6) all other juvenile justice provisions (including protection from abuse and violence, direct care staff training, positive behavior management/discipline, classification, chemical agents, mechanical restraints, living conditions, and cell restriction).

If the Plaintiffs, acting collectively, or DOJ believe that the State has failed to substantially comply with one or more of these six categories during the term of this Agreement, then they shall so notify the State in writing. The parties shall conduct good-faith negotiations to resolve the dispute and may agree in writing to adopt a plan of correction or otherwise modify the Agreement. If the parties are unable to reach agreement within 30 days of the Plaintiffs' or DOJ informing the State of their allegations of non-compliance, then the Plaintiffs, acting collectively, or DOJ may file a motion with the Court to reopen the Lawsuits with respect to that category or categories. The State shall respond to the motion within 20 days. If the Court enters an order to reopen any one of these categories, then the provisions of that category are terminable at the discretion of the State.

Notwithstanding the foregoing, a motion to reopen this Agreement solely for the purpose of seeking emergency judicial relief under ¶ 131, above, will not, in and of itself, terminate the State's obligations under the

remaining provisions of the Agreement.

This Agreement shall, in any event, terminate and shall be of no further effect whatsoever after January 21, 2003, regardless of the State's compliance or non-compliance with the terms of this Agreement or the Systems Proposal, and regardless of whether the Lawsuits have or have not been reopened/reactivated.

139. The parties agree to meet and attempt resolution of any issues involved in the Lawsuits prior to any new litigation and prior to any new filings in the Lawsuits. The parties acknowledge that the Court has historically facilitated informal discussions between and among the parties in efforts to achieve agreement regarding controversies that demand resolution, and the State and the Plaintiffs will agree, to the extent possible, to seek the Court's assistance in facilitating informal resolution to such controversies.

140. This Agreement and the Systems Proposal shall not be construed to create an obligation to an individual juvenile, and failure to comply with this Agreement and the Systems Proposal shall not be deemed a breach of any civil duty to a juvenile.

141. Nordyke and Denlinger and Juvenile Justice Project of Louisiana ("JJPL") shall be permitted to interview juveniles in all secure facilities for purposes of monitoring this Agreement. The DPSC may impose reasonable limitations on

such interviews; however, attorney contacts with juveniles for purposes of monitoring the Agreement shall not be governed by DPSC Regulation C-01-004. The State shall pay reasonable attorneys fees and expenses to class counsel in monitoring this Agreement, as set forth below. Class counsel are Nordyke and Denlinger and JJPL. Nordyke and Denlinger shall submit detailed billing statements for all fees and expenses on a monthly basis. JJPL waives fees for monitoring unless and until the Lawsuits are reopened in accordance with this Agreement; provided, however, that JJPL may seek recovery of fees for time spent in connection with a successful motion to reopen, and JJPL reserves the right to seek recovery of attorney fees and expenses that are incurred after the Lawsuits are reopened. JJPL and the State shall enter a separate agreement to address reimbursement of expenses incurred by JJPL in monitoring this Agreement. The fees paid for monitoring this Agreement shall be as determined by the Court. Either party may seek relief from the Court, including but not limited to seeking the Court's assistance in facilitating informal resolution to disputes and/or filing appropriate motions to resolve any disputes concerning the payment of fees and expenses. Plaintiffs are not required to reopen or restore the Lawsuits to the Court's docket in order to seek such relief.

Class counsel reserve the right to seek recovery of

fees for other tasks (other than monitoring) in the event
the Lawsuits are reopened, provided, however, that the State
reserves the right to challenge their entitlement to any
such fees, and the reasonableness of such fees.

Class counsel will have 15 days from the granting of
the State's motion for final dismissal to submit for payment
their final invoice for any remaining fees and expenses.
Within 15 days of receipt of the final invoice, the State
shall pay all undisputed items.  If the State disputes any
item, then any party shall have 60 days from the granting of
that motion to seek relief from the Court.

This done and signed on the dates below written.

**FOR PRIVATE PLAINTIFFS**

Keith Nordyke Bar Roll 8556
June Denlinger Bar Roll 1823
Nordyke and Denlinger
Box 237
Baton Rouge, La. 70821
Telephone: 225-383-1601
Fax: 225-383-2725

David J. Utter
   Bar Roll 23236
Gabriella Celeste
   Bar Roll 25363
Juvenile Justice Project
   Of Louisiana
822 Camp St.
New Orleans, La. 70130
Telephone: 504-522-5437
Fax: 504-522-5430

**FOR THE DEPARTMENT OF JUSTICE**

Steven H. Rosenbaum, Chief
Robinsue Frohboese, Deputy Chief
Judith C. Preston
Iris Goldschmidt
Trial Attorneys
United States Department of Justice
Civil Rights Division
Special Litigation Section
P. O. Box 66400
Washington, D.C. 20035
Telephone: 202-514-6258
Fax: 202-514-6273

_8/29/00_
DATE

_8/30/00_
DATE

L. J. Hymel
United States Attorney for the
Middle District of Louisiana
777 Florida St.
Baton Rouge, La. 70802

_Aug. 31, 2000_
DATE


**FOR DEFENDANTS**

FOR THE STATE OF LOUISIANA AND ITS
OFFICES, AGENCIES, AND DEPARTMENTS

RICHARD P IEYOUB
Attorney General for the
State of Louisiana

BY: _Constance A. Koury_
    Constance A. Koury
    First Assistant Attorney General
    State of Louisiana
    22nd Floor, State Capitol
    Baton Rouge, La. 70804-9095
    Telephone: 225-342-7013

BY: _____
    Richard Curry Bar Roll 4671
    McGlinchey Stafford
    One American Place Suite 9000
    Baton Rouge, La. 70825
    Telephone: 225-383-9000
    Fax: 225-382-3725

_8/28/00_
DATE

# ATTACHMENT A

# ADMINISTRATION PROPOSAL FOR THE LOUISIANA OFFICE OF YOUTH CORRECTIONS

## Year One Implementation Jetson/JRDC

Louisiana State University Health Sciences Center
School of Medicine in New Orleans
Office of the Dean
Room 214
1542 Tulane Avenue
New Orleans, LA 70112-2822

Louisiana State University
Health Sciences Center
School of Medicine in New
Orleans, Louisiana

# Administration Proposal for the Louisiana Office of Youth Corrections

YEAR ONE IMPLEMENTATION

JETSON/JRDC

June 22, 2000

# Year One Implementation Jetson Facility Only

**I**    **The Health Care Service Delivery Model**

a) A comprehensive plan of evaluation and clinical care will be established for each person at the time of intake into the Department of Corrections (DOC) Juvenile Facilities (or initially when this program is implemented) based on professional standards of care and the needs of individual youth. The plan will include medical, mental health and dental services.

b) A secure computerized record will be established for each person for this purpose. The record will be available system-wide to persons responsible for providing or overseeing the care provided or for referrals to related health care institutions. This electronic record will include but not be limited to treatment plans, problem lists, immunization and health screening schedules, and decision support for delivery of timely and appropriate services. (Year One this system will be implemented at Jetson.)

c) An initial and ongoing assessment of the health care needs will be developed on a system wide basis. This assessment will direct the development of services within the system on a long-term basis. Year One the assessment will focus on the Jetson Facility.

d) An initial and ongoing assessment of the policies, procedures and outcomes relating to the provision of care will be developed on a system wide basis and will be updated as needed over the three year implementation period.

e) All persons will have timely and direct access to a qualified medical professional for emergency and routine care, (sick call). Standing orders will be established where indicated with the approval of the LSUHSC Director of the relevant service (Medical, Mental Health or Dental Health)

f) Telemedicine support will be provided for medical direction and consultation services when indicated for each facility on a 24 hr x 7-day basis including 24-hour call with service on demand. (These services will be provided at Jetson year one).

g) Generally, the assessment and treatment of those juvenile offenders with the most serious dental, health care, and mental health care needs will occur at Jetson, Bridge City, and Swanson facilities. This is secondary to the proximity of LSUHSC tertiary care facilities (LSUMC-NO, Earl K. Long, and LSUMC-S), coordination of care, increased professional staff and availability, and special treatment units.

**II**    **Administration**

a) All professional and other related services including all medical, mental health, nursing, social service, dental and allied health personnel will be provided by LSU HSC through a contract between LSUHSC, School of Medicine, in New Orleans, and the Louisiana Department of Corrections

b) LSU will make a good faith effort to retain health care personnel currently employed by DOC who will be transferring to LSU and who are deemed qualified and whose performance meets standards that LSU will establish and apply to all persons working in this program.

c) The contract will clearly delineate areas of authority and responsibility for the DOC and LSU.

d) LSU personnel working in DOC facilities will abide by correctional policies and procedures relating to security (see below)

e) LSU will be permitted to reallocate budget funds in the agreement with DOC as needed

to improve the quality or accessibility of services that it provides.

f) LSU will define scope of services initially, but cannot mandate expansion of scope of services beyond that envisioned by contract if such expansion would result in additional financial obligations to DPS&C.

## III    Table of organization

a) Program director  - A Program Director will be appointed by LSU HSC (SOM) with the approval of the Secretary for the Department of Corrections.   He/ she will be a psychiatrist preferably with Fellowship training in child/adolescent psychiatry and forensic psychiatry and with experience in assessment and treatment of juvenile offenders and will be an employee of LSU HSC. He/she will report to the Dean of the School of Medicine. The Program Director will oversee the entire Juvenile Justice Project including training, telemedicine/informatics services, professional services, and quality assurance. The Program Director will directly interact with external agencies important to the success of this program such as the Department of Corrections, the Office of the Attorney General, the judiciary, and other relevant state agencies.

b) LSU HSC will appoint directors of Professional services - Directors for Psychology Services, Mental Health, Adolescent Health Services, Nursing Services, Social Services and Dental Services. These Directors will have overall responsibility for coordinating care in their areas of professional expertise and for coordinating referrals to the LSU Hospitals. They will aid in the development of policies, procedures, and protocols in their area of specialty and coordinate the recruitment of qualified professionals in their field. They will develop professional on-site post-masters and post-graduate training programs in juvenile correctional care.

c) Director of Operations – the Director of Operations will have responsibility for the day to day operation of the health care program system-wide at the end of the three-year implementation (year one at Jetson only).  He/ she will be responsible for coordinating the consultation/referral services that will be provided by LSU Hospitals or others to Jetson year one. The DOO will ensure that all policies and procedures developed by the administration are carried out at Jetson year-one, and at each facility via the facility Health Care Director as each site is implemented.

d) Director of Health Services for Facility – a Director of Health Services will be designated at each of the five juvenile correctional facilities and will be directly accountable to the DOO for the Juvenile Justice Program at the end of the three year implementation. He/she will have overall responsibility for the administration and oversight of all-dental, mental health, and adolescent hea'th care at their facility.  At each facility, a director of mental health, dental, psychology, social work, health care, and nursing will be appointed, all directly accountable to the Director of Health Services. For the Year One implementation, the DOO will serve in this capacity for Jetson.

e) Directors of Telehealth, Informatics, Education/Training, and Quality Assurance for services within the LSUHSC Juvenile Justice Program are accountable to the Program Director of the Juvenile Justice Program.  The Training Director will administrate and oversee those training services provided by LSUHSC Juvenile Justice Program. Telehealth will oversee the implementation of the telemedicine; Informatics will oversee the implementation of computerized records, and documentation of information.

## Year One Implementation Jetson Facility Only

**IV    Policy, procedure and standards**

a) LSU has authority to implement policy and procedures that relate solely to the provision of health services by their staff;

b) LSU has the ability to recommend to DPS&C policy and procedures that relate to the provision of health services but that have concurrent operational interface with unit. (LSU can evaluate DPS&C compliance with recommendations and report accordingly.)

c) LSU may make recommendations to DPS&C relative to offender transfers, but may not order such transfers.(LSU may evaluate DPS&C timely compliance with recommendations.)

d) DPS&C retains authority to manage available bed space and to assign priority to classification factors in addition to medical/mental health issues, (see DPS&C Mission Statement.)

e) An interagency coordinating committee will be established to include representatives of the Department of Corrections, LSU Health Sciences Center, The Office of the Attorney General Office, the leadership of the Juvenile Justice Program, and a judicial representative appointed by the Supreme Court of Louisiana.

**V    Quality of Clinical Care**

a) A Director of Quality Assurance will oversee the implementation of the quality assurance mechanisms and development of policy. He/ she will chair the policy and procedure committee and quality assurance committees, and will report to the Director of the Juvenile Justice Program.

b) An effective system for overseeing the quality of care and access to services will be established that will be linked to the plan of care for each person.

c) A single Quality of Care Committee will be established for the facilities with representatives from the medical and other professional staff at each facility, under the leadership of the quality assurance monitor. The QA committee will report on a quarterly basis to the following persons or their designee with respect to the quality of care that is being provided and related matters: (1) the Wardens of each facility (2) the Secretary of the Department of Corrections (3) The Chancellor of LSU HSC, (4) the Attorney General of the state of Louisiana and (5) to the Program Director of the Juvenile Justice Project.

The QA committee will create and implement a written quality assurance program with clear performance indicators. The quality assurance program should include, at minimum, activities to monitor key system-wide policies and procedures established in this proposal. Consultants will be retained as needed to establish outcomes to be measured and to be incorporated in assessments, treatments and outcomes after discharge.

d) The quality assessment program will include review of documentation and quality of treatment and adequacy of facilities and equipment for evaluation and treatment.

e) Year one the Quality Assessment program will be developed and implemented at Jetson, as well as the establishment of reporting requirements and data collection system wide from all other institutions overseen by the QA committee.

LSU Health Sciences Center Juvenile Corrections Project Proposal
FINAL ADMINISTRATION DOCUMENT

Year One Implementation Jetson Facility Only

## VI    Telemedicine

a) The Telemedicine Program will establish high-speed video linkages between the five Juvenile Correctional facilities and five healthcare institutions, which will provide care and educational services to them (over the course of the three year implementation period). The five sites are the Medical Center of Louisiana at New Orleans, LSUMC Shreveport, E.A. Conway Hospital, Earl K. Long Hospital, and Children's Hospital of New Orleans. Year One services will be provided between the Jetson Facility and LSU-NO, Children's Hospital, and EKL Hospital.

b) Each healthcare institution will be able to provide its unique specialty medical and/ or mental health services to one or more of the Juvenile Corrections Facilities at the completion of the system-wide implementation, and will create a high quality network of accessible and integrated health care.

c) This network is built upon a Next Generation Internet infrastructure that can support the demand of multiple clinical, educational, and administrative conferences between any combination of sites simultaneously in both average and peak usage periods. In addition, excess capacity of bandwidth is built in to meet the anticipated short and long-term needs of Juvenile and Adult Corrections, as well as Community-based programs. Excess bandwidth used by the Medical Center will be done so on a cost-sharing basis.

d) The Juvenile Justice Telemedicine Program will permit the administration of high quality medical and mental health services to patients at all facilities at the end of the three-year implementation period. In addition, all facilities will have the ability to point and click video conference calls that will connect them to healthcare providers at the LSUMC affiliated facilities.

e) The Telemedicine Clinical Director and Nurse will coordinate scheduled clinics in conjunction with Technical staff. Each facility will contain high-resolution telemedicine systems with dual monitors, clinical quality patient cameras, document cameras for remote viewing of patient charts, and specialized attachments to permit remote physical examinations.

f) All costs are based on projected usage and the determined infrastructure necessary to provide service on demand. Personnel costs are included to reflect the staffing necessary to provide comprehensive and complex telecommunications services that are clinically relevant.

g) The Telemedicine Program Director will provide overall program management and oversight. A Clinical Director will manage day to day operations and telemedicine quality assurance. The Director will be supported by a Telemedicine Nurse who will manage clinical scheduling, medical records, and care plans. Additional coverage for psychiatric or medical consultations will be provided on a 24-hour basis by on call physicians at LSU HSC (Year one for the Jetson Facility).

h) Network managers will provide telecommunications expertise at the level of equipment installation, support, and training. A Telecommunications specialist will handle infrastructure-switching equipment. All Telecommunication costs are based on low bids obtained by the state Office of Telecommunications Management.

i) As a national leader in Telemedicine, we look forward to beginning this program, which will be a model solution for provision of care in this area

## Year One Implementation Jetson Facility Only

**VII    Clinical Information System**

a) LSUHSC will develop a computer based clinical information system to document medical and mental health care provided to the target population housed at the Jetson Facility year one.

b) Each clinical encounter from intake history and physical examinations, psychological screening, and psychiatric encounters will be entered on line. Creating a secure longitudinal medical and mental health record.

c) The clinical information system will permit access to health information on individual patients, as well as allow for tracking of individuals and groups of patients for the purposes of trend analysis, outcome measurement, continuous quality improvement, and epidemiological studies.

**VIII    Consultants**

Consultants will be utilized in Adolescent Health Care, Mental Health, and Assessment. These consultants are further discussed in each the Adolescent Health Care, Mental Health Care, and Juvenile Justice Training Proposals.

**IX    Staff Training -- Juvenile Justice Training Program**

a) A separate training proposal was submitted for juvenile correctional center employees. The overall mission of the Juvenile Justice Training Program is to educate those interacting within Juvenile Correctional Facilities and with Juvenile Offenders in the areas of knowledge necessary to work with this specific population, prepared by Debra DePrato, MD.

b) The Director of the Juvenile Justice Training Program will be directly accountable to the Juvenile Justice Program Director.  The Training Director would be responsible for the development and implementation of the training program system-wide. During year one curriculum development and on-site training at the Jetson Facility would occur.  The system-wide implementation of the training of all new employees and on-site training at each institution would proceed beginning year two.

# ATTACHMENT B

# YEAR ONE STAFFING

LSU School of Medicine in New Orleans
Juvenile Justice Program - Jetson Facility and LSUHSC Administration

*Program Year 1*
*Facility Year 1*

| MENTAL HEALTH STAFF | FTE's |
|---|---|
| Psychiatrist MD Urban | 1.50 |
| Director of JDC | 0.80 |
| Assistant Director of JDC | 0.75 |
| Neuropsychology Associate | 0.90 |
| Psychologist PhD Urban | 2.40 |
| Psychological Asst Urban | 7.20 |
| Social Worker Urban | 4.50 |
| Secretary | 0.90 |
| Administrative Coordinator | 0.90 |
| Program Evaluator | 0.90 |
| Data Entry Clerks | 1.50 |
| Medical Records Clerk | 5.50 |
| **Total** | **27.75** |

| MEDICAL STAFF | |
|---|---|
| Medical Director | 0.75 |
| Pediatrics/ Family Practice | 1.05 |
| Consultants | |
| Orthopedics | 0.05 |
| Surgery | 0.05 |
| OB/ GYN | 0.20 |
| Neurology | 0.10 |
| Cardiology | 0.05 |
| Endocrinology | 0.03 |
| Dermatology | 0.05 |
| Dx Center misc | 1.30 |
| Secretary | 0.90 |
| Evaluation Coordinator | 0.90 |
| **Total** | **5.40** |

| NURSING STAFF | |
|---|---|
| Nursing Coordinator | 0.90 |
| Registered Nurse | 12.75 |
| Licensed Practical Nurse | 9.00 |
| **Total** | **21.75** |

| ALLIED HEALTH STAFF | |
|---|---|
| Audiologist | 0.60 |
| Optometrist | 0.20 |
| XR tech | 1.00 |
| Medical Record Clerks | 2.00 |
| PA/ NP | 2.00 |
| Paramedic/ EMT | 2.70 |
| **Total** | **9.50** |

| DENTAL STAFF | |
|---|---|
| Dentist | 0.60 |
| Dental Assistant | 0.75 |
| Dental Hygienist | 0.60 |
| **Total** | **2.10** |

| Program/ Clinical Supervisors | |
|---|---|
| Program Director | 0.80 |
| Director of Operations | 1.00 |
| Director - Medical Services | |
| Director of Mental Health | 0.50 |
| Director Social Work Services | 1.00 |
| Director Program Development and Evaluation | 0.75 |
| Director Nursing Services | 1.00 |
| Evaluation Coordinator | 1.80 |
| Executive Secretary | 1.80 |
| Secretary | 1.00 |
| **Total** | **9.65** |

| BUSINESS STAFF | |
|---|---|
| Business Manager | 0.83 |
| Administrative Coordinator | 0.90 |
| Assistant Bus. Manager | 1.80 |
| Secretary | 0.90 |
| **Total** | **4.43** |

| Clinical Information Staff | |
|---|---|
| Data Base Administrator | 1.00 |
| Medical Informatician | 0.20 |
| Server Supporter | 1.00 |
| Client Supporter | 1.00 |
| Application developer | 2.00 |
| **Total** | **5.20** |

| **GRAND TOTAL** | **85.78** |

# ATTACHMENT C

# YEAR TWO STAFFING

LSU Health Sciences Center
LSU School of Medicine in New Orleans
Juvenile Justice Program- Jetson Facility and LSUHSC Administration    Document 10911    09/07/00    Page 115 of 165

*Program Year 2*
*Facility Year 2*

| | FTE's |
|---|---|
| Psychiatrist MD Urban | 2.00 |
| Health Director Supplement | 1.00 |
| Director Mental Health Tx | 1.00 |
| Director of JDC | 1.00 |
| Assistant Director of JDC | 1.00 |
| Neuropsychology Associate | 1.00 |
| Psychologist PhD Urban | 4.00 |
| Psychological Asst Urban | 12.00 |
| Social Worker Urban | 6.00 |
| Secretary | 1.00 |
| Administrative Coordinator | 1.00 |
| Program Evaluator | 1.00 |
| Data Entry Clerks | 2.00 |
| Medical Records Clerk | 8.00 |
| | |
| **Total** | **42.00** |

| | |
|---|---|
| Medical Director | 1.00 |
| Pediatrics/ Family Practice | 1.50 |
| Consultants | |
| Orthopedics | 0.05 |
| Surgery | 0.05 |
| OB/ GYN | 0.20 |
| Neurology | 0.10 |
| Cardiology | 0.05 |
| Endocrinology | 0.03 |
| Dermatology | 0.05 |
| Dx Center misc | 1.30 |
| Secretary | 0.90 |
| Evaluation Coordinator | 0.90 |
| Pediatric Residents | 0.00 |
| Total | 6.13 |

| | |
|---|---|
| Nursing Coordinator | 0.90 |
| Registered Nurse | 12.75 |
| Licensed Practical Nurse | 9.00 |
| Facility Dir of Nursing | 1.00 |
| Total | 23.65 |

| | |
|---|---|
| Audiologist | 0.60 |
| Optometrist | 0.20 |
| XR tech | 2.00 |
| Medical Record Clerks | 2.00 |
| PA/ NP | 2.00 |
| Paramedic/ EMT | 2.70 |
| | |
| Total | 9.50 |

| | |
|---|---|
| Dentist | 1.00 |
| Dental Assistant | 1.00 |
| Dental Hygienist | 1.00 |
| | |
| Total | 3.00 |

| | | |
|---|---|---|
| Program Director | JJP | 0.80 |
| Assistant Program Director | | 0.75 |
| Director of Operations | | 1.00 |
| Director - Medical Services | | |
| Director of Mental Health | | 0.50 |
| Director Social Work Services | | 1.00 |
| Director of Program Development and Evaluation | | 1.00 |
| Director Nursing Services | | 1.00 |
| Evaluation Coordinator | | 2.00 |
| Administrative Coordinator | | 1.00 |
| Executive Secretary | | 2.00 |
| Secretary | | 1.00 |
| Student Wokers | | 2.00 |
| Total | | 14.05 |

| | |
|---|---|
| Business Manager | 1.00 |
| Administrative Coordinator | 1.00 |
| Assistant Bus. Manager | 2.00 |
| Secretary | 1.00 |
| Total | 5.00 |

| | |
|---|---|
| Data Base Administrator | 1.00 |
| Medical Informatician | 0.20 |
| Server Supporter | 1.00 |
| Client Supporter | 1.00 |
| Application developer | 2.00 |
| | |
| Total | 5.20 |

| | |
|---|---|
| | 108.53 |

# ATTACHMENT D

## MEDICAL CARE SERVICES PROPOSAL
## FOR
## THE LOUISIANA OFFICE OF YOUTH CORRECTIONS
## FOR
## JETSON CORRECTIONAL CENTER FOR YOUTH
## (JCCY)

# MEDICAL CARE SERVICES PROPOSAL
# FOR
# THE LOUISIANA OFFICE OF YOUTH CORRECTIONS
# FOR
# JETSON CORRECTIONAL CENTER FOR YOUTH
# (JCCY)

Prepared by

Stewart T. Gordon, M.D.

Chief, Department of Pediatrics
Louisiana State University Health Sciences Center
Earl K. Long Medical Center
Baton Rouge, Louisiana

June 22, 2000

General Overview and Goals:

The overall plan of medical care for these offenders should include the following: comprehensive health screening and health assessment by qualified professionals (physicians, registered nurses, nurse practitioners, physician assistants, paramedics, licensed practical nurses) at intake, ongoing medical care of known conditions, annual exams to diagnose new conditions, access to an infirmary for evaluation of acute medical conditions, dental care, eye care, nutritional assessment, access to subspecialty care as indicated, access to hospitalization as indicated and access to emergency medical care.

Additionally, a plan for health education should be implemented for the offenders such that at the end of their stay they have a healthier lifestyle than prior to admission. Offenders with chronic medical conditions upon entering corrections will especially need ongoing education in regards to their disease and its management. The health education component must be a cooperative effort amongst medical, mental and correctional staff. Within one year of implementation, system wide, the medical director of the program should readily be able to observe a healthy environment— one in which youth have become active participants in their health care. It will be necessary to have an evaluative component (outcome based) for the medical care and health education delivered in these facilities, such that we are able to prove our interventions are both efficient and effective.

According to the "Health Care of Incarcerated Youth Report from the 1991 Tri-Regional Workshops," most of the offenders in juvenile correctional centers are generally healthy from a medical standpoint. Their mental health needs far outweigh their medical needs. The medical conditions of offenders prior to incarceration commonly include polysubstance abuse, sexually transmitted diseases, trauma, physical and sexual abuse, short stature, delayed puberty, poor dental health, poor immunization history, neuropsychiatry diagnoses (ADHD, depression, psychoses, personality disorders), allergies, asthma, seizure disorder and + PPD. The major health risk to offenders after incarceration tends to be trauma-related.

Being that Jetson (JCCY) is the point of entry for all offenders, performing all necessary screenings, assessments, work-ups, diagnostics, etc at this facility is prudent. The goal will be for this initial evaluation to be thoroughly completed prior to transfer, highly decreasing the need for duplication of services at the receiving facility. The completed medical record ideally will provide all necessary information such that no old information (PMHx, immunizations) will be missing. Reasonable and thorough efforts will be made during diagnostics, such that the gathering of this information is as complete as possible prior to transfer. It may be necessary for the offender's parent / guardian to deliver immunization records and/or their presence/availability during the intake/screening process. The parent / guardian presence could be accomplished via telephone, telehealth or in person.

System Guidelines:

1. JCCY will follow standards for the practice of medicine as set forth by the LSU Health Sciences Center

2. Where applicable, system wide relevant guidelines based upon referenced and agreed upon recommendations from the American Academy of Pediatrics will be developed and include, but not be limited to, the following:
   a) Recommendations for Preventive Pediatric Health Care (Appendix 1) –specifically focusing on those for 10-21 Years of age
   b) Guidelines for Health Supervision III (Appendix 2)
      i.    Health Supervision: 10 & 11 Years
      ii.   Health Supervision: 12 & 13 Years
      iii.  Health Supervision: 14 & 15 Years
      iv.   Health Supervision: 16 & 17 Years
      v.    Health Supervision: 18 & 19 Years
      vi.   Health Supervision: 20 & 21 Years
   g) Recommended Childhood Immunization Schedule (Appendix 3)
   h) Child's Guide to Pediatric Visits (Appendix 4 & 5)
      i.    Younger Adolescents: 11 to 15 years old
      ii.   Older Adolescents: 16 to 21 years old
   i) AAP Policy Statement-Health Care for Children and Adolescents in Detention Centers, Jails, Lock-Ups, and other Court-Sponsored Residential Facilities (RE9170) (Appendix 6)

Medical Staffing of Facilities:
   Administration:
   1. A statewide medical director will direct the medical component and this individual will be based at JCCY. His duties will include implementation of policies and procedures developed by LSUHSC that relate solely to the provision of health services (see Administration Report, Section IV). The medical director will spend approximately half of his time in direct patient care of offenders at JCCY and half of his time will be administrative, including regular site visits to the other four facilities.
   2. Special protocols will be developed by the Medical and Mental Health Directors. Some of these protocols will be developed jointly:
      a. Suicide Prevention
      b. Acute Drug Intoxication and Withdrawal
      c. Perinatal Care
      d. Sexual Assault
      e. Alcohol or Chemical Dependency
      f. Family Planning Services

g. Prosthesis and Aids for Living

3. Written policy and procedure will be developed designating the health care authority (physician) on-site responsible for health care services. The designated physicians will supervise all clinical judgements regarding health care, monitor appropriateness, timeliness, and responsiveness of care and treatment and review records for treatment of juveniles made by providers in the community.

4. Policy and procedure must be that clinical decisions and actions regarding health care services are the sole responsibility of the qualified medical health care professionals.

5. Information sharing between the Warden and Medical Director will occur on a regular basis in regards to offenders with significant medical or mental health needs. These discussions may include, but not be limited to, an offender's housing arrangements, program assignments, disciplinary measures, admissions or transfers to other facilities.

6. At least quarterly administrative meetings between the Medical Director and the Warden will be held.

7. Monthly meetings between JCCY's medical director and the Warden will occur.

8. A statistical report will be completed annually regarding the types of health care services provided and their frequency.

9. Health services meetings will occur monthly among clinical staff.

10. There will be no less than 3 days per year of continuing education of all qualified health care personnel (QHCP). Much of the ongoing education will be provided on-site and will not conflict with designated duties of the QHCP.

11. A comprehensive quality improvement program will be developed to monitor the quality of health care services provided. There will be chart review by physicians or quality improvement committee on a quarterly basis.

12. All health care personnel will be licensed, registered, credentialed and function as per the applicable laws of the State of Louisiana.

Overview:

Staffing:

The following staffing model for JCCY is recommended. The proposed model will provide on-site physicians, nurses, nurse practitioners (or physician assistants) and paramedics specific to the needs of JCCY. Access to quality medical care will be inherent to JCCY, decreasing the need for transportation of offenders with security escorts to local hospitals.

Sick Call:

Sick call needs will be met by on-site access to medical services. Sick call will be conducted by RN's or paramedics. Offenders requiring additional assessment or treatment will be triaged to a physician extender (nurse practitioner, physician assistant or paramedic). Physician extenders will have 24 hour phone access to on call physicians. Emergent conditions will be appropriately transported to pre-arranged area hospitals.

Physician On-Call Schedule:

A physician's on call schedule will provide for 24-hour access to one of the systems designated physicians. A system wide rotation will be implemented such that this call will be 24 hours, 7 days per week. If necessary, the nurse will contact the physician on call. All patients admitted to the infirmary will be seen daily by a physician.

Special Health Needs:

Offenders with special health needs (serious or chronic) will preferably be housed at JCCY, SCCY and BCCCY as these facilities are in close proximity to LSUHSC hospitals. Special arrangements will be made for offender's requiring higher levels of security than can be provided at JCCY, SCCY or BCCCY. Programs will be developed for offenders with special health needs (i.e.— Diabetes, Asthma, Sickle Cell disease, Seizure Disorder, Obesity, HIV, Tuberculosis, Alcohol or Chemical Dependency, Sexual Assault, Physical and Mental Disabilities).

Telemedicine:

There will be a system wide effort to maximize the use of telemedicine when appropriate. Telemedical support will be provided for medical direction and consultation services when indicated on a 24-hour 7-day per week basis. (See Administration Report, Section VI).

Graduate Medical Education:

Training of future medical personnel in the field of their choice is an important component of the Juvenile Correctional Program. An accredited residency program in Pediatrics requires training in adolescent medicine. Involvement of pediatricians in training is both cost-effective and an ideal method of recruiting professionals to the field of juvenile correctional medicine. This will further enhance the quality of the programs. Professional development tracks in the field of Adolescent Medicine / Correctional Medicine will be developed.

Pharmaceutical:

Written policy and defined procedures require, and actual practice evidences, that pharmaceutical services are sufficient to meet the needs of JCCY and are in accordance with all legal requirements. Written policy and procedure governing pharmaceutical services will be developed.

Present pharmaceutical services for medical and mental health needs will remain in place.

Jetson Correctional Center for Youth:

There are approximately 600 youth housed at JCCY. Of these, 104 offenders are in the Diagnostics Center (JRDC) in preparation for transfer to either JCCY or one of the other four facilities. The remaining 496 offenders represent 322 males and all female offenders in the system (174). They range in age from 10-21 years. Approximately 2000 new offenders pass through JCCY per year for diagnostics and placement (40 per week). A thorough medical evaluation will be performed and completed on every offender entering the correctional system. A plan of care will be developed for each offender before transfer to the receiving facility.

Medical Staffing Model:

1. Correctional Expert Consultant

   During the implementation and development of the medical staffing model, it will be necessary to retain the services of an expert in correctional medicine. He will be a consultant to the Director of Adolescent Health Services for a period of one year. He will make two site visits (3 days each) to JCCY (one before implementation and one during implementation) and will spend two weeks assisting in development of system wide medical health policies and protocols.

2. Medical Director

   This physicians will be hired and appointed to the Department of Pediatrics at LSUHSC / EKL. Oversight of his duties will be provided by the Director of Adolescent Health Services. The Medical Director for the System will be an Adolescent Medicine Trained Pediatrician.

3. Jetson Diagnostic Center / Infirmary Physicians

   Pediatricians with adolescent medicine experience will be hired and appointed to the LSUHSC / EKL Department of Pediatrics. They will be directly involved in the health assessment process of new offenders undergoing diagnostics at JCCY and provide health maintenance of the offenders housed at JCCY. Physician medical coverage will be on-site 40 hours per week. A call rotation will be developed such that 24-hour coverage is in place 7 days per week. These physicians will also participate in the ongoing education of offenders and JCCY

staff (nursing and corrections). Regularly scheduled continuity of care clinics will be established, but not be limited to, in the areas of General Pediatrics, Diabetes, Asthma / Allergy.

4.  Nurse Practitioners / Physician Assistants

    A Family Nurse Practitioner(FNP) will be assigned to the female unit to provide continuity of care to all female offenders. She will conduct all initial gynecological exams during diagnostics. Ongoing continuity of care will be provided on-site by this FNP. She will have access to telemedical consultation with an obstetrician / gynecologist physician at Earl K. Long Medical Center. She will conduct one half-day of gynecology clinic per week for the ongoing gynecological needs of the offenders. The FNP will also participate in the ongoing health education of the female offenders and correctional staff assigned to the female unit.

    An additional nurse practitioner(NP) or physician's assistant(PA) will be assigned to the male offenders. The NP / PA assigned to the male unit will provide patient care during the intake process (diagnostics) as well as continuity of care for the offenders housed at JCCY.

    All NP's / PA's will work under the supervision of the physicians assigned to JCCY.

5.  Paramedics

    A paramedic will work from 7P-7A, 5 days per week and 24-hour shifts on weekends and holidays at JCCY to assess, diagnose and treat offenders in need of emergent care. They will assess the need for transport to pre-arranged hospital emergency rooms or to the infirmary. They will work closely with RN nursing staff under the guidance of the systems Medical Director.

6.  Consultants

    Audiologist

    An audiologist will conduct a complete hearing evaluation on all offenders during the intake / diagnostics process. The audiologist will conduct annual exams as necessary on all offenders housed at JCCY. The

audiologist will be available telemedically to the other four facilities for consultation.

Obstetrician/Gynecologist

An OB/GYN physician will provide telemedical coverage to the FNP as well as on-site care to the female offender population. All offenders with obstetrical needs will be referred to the Earl K. Long Woman's Clinic.

Optometry

An Optometrist will provide baseline eye exams on all offenders during the intake process and ongoing optometry care to the youth housed at JCCY.

Pediatric Neurology

Pediatric Neurologists will be available on site for neurological consultation during the intake / diagnostic process. They will also be available telemedically for follow-up through the LSUHSC-N.O. Pediatric Neurology epilepsy clinic.

Dermatology

Dermatology consultative services will be provided as needed telemedically through LSUHSC-N.O.

Orthopedics

Orthopedic Surgery residents from Earl K. Long Medical Center will provide on-site consultative services during the intake / diagnostic process. They will also be available to conduct ongoing continuity of care to offenders with orthopedic conditions. Clinics conducted by residents will have telemedical access to orthopedic faculty physicians at Earl K. Long Medical Center.

Surgery

Surgical resident physicians from Earl K. Long Medical Center will provide on-site consultative services during the intake / diagnostic process. They will be available to conduct ongoing continuity of care to offenders with surgical conditions. Clinics conducted by residents will have telemedical access to surgical faculty physicians at Earl K. Long Medical Center.

Pediatric Cardiology

A pediatric cardiologist will be available telemedically from the Earl K. Long Pediatric Clinic to provide consultative services during the intake / diagnostic process and for ongoing cardiology consultations.

Pediatric Endocrinology

A pediatric endocrinologist will be available telemedically from Children's Hospital to provide consultative services during the intake / diagnostic process and for ongoing endocrinology consultations.

7. Pediatric Resident Education

The JCCY facility will provide an ideal environment for graduate medical education (GME) of pediatric and adolescent medicine specialist. Two rotations will be developed for education of these physicians:

    a) Adolescent / Behavioral Pediatrics Rotation

    b) General Pediatric Continuity of Care Clinic

A general pediatric continuity of care clinic will be established at JCCY under the supervision of the JCCY Medical Director and the Pediatric Residency Director at LSUHSC / Earl K. Long.

8. Evaluation Coordinator

This individual will be hired and appointed to the Department of Pediatrics at LSUHSC / EKLMC. The coordinator will publish outcome based evaluation components; evaluate offenders attitudes towards their medical health before, during and after incarceration; implement positive changes through education in the areas of preventive medicine specifically in the areas of high risk behaviors (HIV, STD's, HBV), obesity, heart disease, etc.

JCCY Medical Unit / Infirmary:

Offenders will have the medical component of their intake conducted in the JCCY Medical Unit / Infirmary. The specifications for the equipment and medical needs are found in the budget estimates. An exam room / clinic work area will need to be constructed for the female offenders in close proximity to their housing unit. This will be the primary working location of the Family Nurse Practitioner, the female offender's primary health care professional.

Offenders with designated medical conditions that require ongoing medical care will be placed in a single facility at JCCY (unless security restrictions dictate placement elsewhere) that will be designated as the medical facility for the juvenile correctional system and will have a capacity for up to 20 persons. Each of the designated beds below may be used for multiple purposes. Renovation and/or new construction of the present infirmary will need to occur to accommodate the medical needs as follows:

1. Designated beds for Female Offenders to include:

    a) Intermediate Care / Respite beds
    b) Psychiatric Crisis beds
    c) Acute Substance Intoxication Withdrawal beds
    d) General Pediatric beds
    e) Medical Isolation beds

2. Designated beds for Male Offenders to include:
    a) Intermediate Care / Respite beds
    b) Psychiatric Crisis beds
    c) Acute Substance Intoxication Withdrawal beds
    d) General Pediatric beds
    e) Medical Isolation beds

All offenders admitted to the infirmary will be seen daily by a physician and within 24 hours of admission. Physician coverage by phone will be available 24 hours per day. Offenders requiring potential emergency medical attention will be evaluated telemedically via the LSUHSC / Earl K. Long Medical Center Emergency Room. If necessary, transfer will occur.

Some conditions that will necessitate being placed in this unit are:
1. Asthma management— short term
2. Diabetes management— short term
3. Mild Dehydration— intravenous fluid capabilities
5. Post Hospitalization completion of IV antibiotics
6. Post Operative recovery period
7. Observation area for other non-emergent medical conditions
8. Acute Substance Intoxication Withdrawal (only treated at JCCY)
9. Psychiatric Crisis (i.e.–Suicidal and Homicidal offenders)

<u>Nurse Staffing Needs:</u>

There will be a Director of Nursing (DON) with adolescent and / or correctional medicine experience.

There will be a designated RN in charge of the Quality Assurance program and Infection Control program. The QA and Infection Control Nurse will also be assigned clinical duties.

For staffing of the facility, an eight-hour shift model was used. There will always be at least one RN with psychiatric experience on duty (24 hours per day) in all facilities. I used a factor of 1.7 nurses to staff an 8-hour shift. Being that nursing care will be the most vital link in the medical system, high staffing of RN's will

provide an efficient model to address each offender's medical and mental health needs

The possibility exists that once all programming is in place throughout the system, more nurse staffing will become necessary.

Staffing Model:

### Director of Nursing
JCCY will have a DON. She will be a Registered Nurse (RN) and will provide oversight for all nursing duties at the assigned facility. She will have correctional and / or adolescent nursing experience. The DON will be on-site 40 hours per week.

### Intake Nurses
Intake nurses will be RN's and will be responsible for conducting the intake assessments on the approximately 40 offenders / week that are processed at JCCY. They will be on-site approximately 40 hours per week.

### Sick Call
Registered Nurses will conduct sick call in all facilities as needed.

### Infirmary Nurses
RN's and LPN's will be assigned to the infirmary. The infirmary will be staffed 24-hours per day, 7 days per week with nurses that have skilled nursing experience. The staffing model used for the infirmaries is approximately as follows:

      7A—3P—2 RN's/ 1 LPN
      3P—11P—2 RN's / 1 LPN
      11P—7A—2 RN / 1 LPN

Additionally, one of the RN's on duty for the infirmary will be responsible for conducting segregation rounds.

### Medication Administration
This nursing duty will primarily be performed by LPN's in each of the five facilities. The staffing of this duty will be approximately as follows:

      7A—3P—2 LPN's
      3P—11P—2 LPN's
      11P—7A—1 LPN

Bibliography:

    Standards for Health Services in Juvenile Detention and Confinement Facilities.
National Commission on Correctional Health Care, 1999.

    Guidelines for Health Supervision III.  American Academy of Pediatrics, 1997.

    Sheahan, Paula M. (Ed.). (1991).  Health Care of Incarcerated Youth:  Report
from the 1991 Tri-Regional Workshops.  Washington, DC:  National Center
for Education in Maternal and Child Health.

# ATTACHMENT E

# MENTAL HEALTH SERVICES PROPOSAL
## FOR THE
# LOUISIANA OFFICE OF YOUTH CORRECTIONS

## Year One Implementation
## Jetson/JRDC

**Louisiana State University**
**Health Sciences Center**
**School of Medicine in New**
**Orleans, Louisiana**

Louisiana State University Health Sciences Center
School of Medicine in New Orleans
Office of the Dean
Room 214
1542 Tulane Avenue
New Orleans, LA 70112-2822

# Mental Health Services Proposal for the Louisiana Office of Youth Corrections

## YEAR ONE IMPLEMENTATION

## JETSON/JRDC

June 22, 2000

I.  JETSON DIAGNOSTIC CENTER (JDC) – ASSESSMENT PROPOSAL
    A.  Initial Mental Health Screening
    B.  Intake Mental Health Evaluation
        1.  Interview with the Youth
        2.  Psychological Screening
        3.  Assessment of Intelligence
        4.  Collateral Interview and Review of Records
        5.  Review of Records
    C.  Psychiatric Evaluation
    D.  Assessment and Recommendation Staffing
    E.  Issues Related to the Destination Facility
    F.  Jetson Diagnostic Center Personnel
    G.  Additional Issues

II. GENERAL POPULATION MENTAL HEALTH SERVICES
    A.  Overview of All Facilities
        1.  Goals
        2.  Structure
        3.  Treatment Planning
        4.  Comprehensive Mental Health Services
        5.  Transition Planning
        6.  Additional Issues
    B.  Mental Health Services Staffing
        1.  Jetson Mental Health Services
            a)  General Population
            b)  Residential Mental Health Treatment Unit for Female Offenders
            c)  Acute Care Psychiatric "bed".
        Needs
    C.  Mental Health Coverage
    D.  Administration
        1.  Structure
        2.  Policies and Procedures
        3.  System-wide Administrative Staffing Requirements
        4.  Consultants.
        Needs
    Bibliography

Case 3:71-cv-00006-FJP Document 1091 p 09/07/00 Page 132 of 165

## I.  JETSON DIAGNOSTIC CENTER (JDC) –MENTAL HEALTH ASSESSMENT

All juvenile offenders in the custody of the Department of Corrections receive medical, mental health, and dental screenings at the Jetson Diagnostic Center. After assessment is completed, these youth are transferred, if necessary, to a destination facility that serves their rehabilitation and/or treatment needs. Approximately 2,000 children are evaluated at the JDC each year.

The goal of the mental health assessment is to identify strengths as well as mental health treatment needs. With proper treatment of serious mental illness, offenders can better participate in correctional, school, and other programs. To this end, assessment will be designed to assist in treatment planning. Generally, the assessment process will be completed by thirty (30) days of admission. Protocols for assessment, specifically psychological components will be developed at the JDC, under the direction of the JDC Director of Psychology Services. Protocols will be used system-wide, with ongoing training of correctional facility mental health staff as new instruments are developed/utilized via telehealth, staff meetings, and the juvenile justice training program.

### A.  Initial Mental Health Screening

When a youth is admitted to JDC, he or she will undergo an initial mental health screening (protocol to be developed) to be performed immediately by trained nursing personnel, clinical social workers, or trained correctional officers. This screening is intended to identify any potential emergency situations among new arrivals to the facility. This screen will assess whether the youth is experiencing significant current psychiatric difficulties, suicidal ideation, or homicidal ideation.

If after initial mental health screening the youth responds positively to questions of suicidal or homicidal ideation or is observed as presenting such a risk, he or she will be referred to a Qualified Mental Health Professional (QMHP, i.e., social worker, psychological associate) within twenty-four (24) hours. Until that time, the youth will be placed in a "crisis bed". When clinically indicated, the QMHP will contact the on-call psychiatrist for crisis management.

### B.  Intake Mental Health Evaluation

Following the initial mental health screening, all youth will receive an intake mental health evaluation by a QMHP to be completed by the end of fourteen (14) calendar days of admission. This evaluation will generally be initiated the first business day following admission to JDC. Pertinent releases of

information and issues regarding confidentiality will be discussed at this time. The results of the assessment and all recommendations will become a part of the juvenile's health record. The Intake Mental Health Evaluation of seriously mentally ill offenders will include a DSM-IV diagnosis and clinical recommendations, including suggestions for treatment planning. This evaluation will consist of an 1) interview with the youth, 2) psychological screening, 3) assessment of intelligence, and 4) collateral interviews when possible and 5) review of all records available.

### 1. Interview with the Youth

The youth will undergo a structured interview regarding his or her history of psychiatric hospitalization and outpatient treatment, current psychotropic medications, suicidal ideation and history of suicidal behavior, drug usage, alcohol usage, sexual history, history of violence initiated as a result of interpersonal altercation where the goal is to injure the other person, history of victimization due to criminal violence and abuse, special education placement, history of cerebral trauma or seizures, and emotional response to incarceration (Metzner, 1997).

### 2. Psychological Screening

The youth will complete a psychological screening instrument either by computer or self-report (with assistance if reading and comprehension level is below the fourth grade). Initially, this measure will be the Massachusetts Youth Screening Instrument (MaYSI; Grisso & Barnum, 1998) though this may be changed in the future if another measure is deemed more appropriate or more useful. The MaYSI was developed to identify potential mental health needs of youth in the juvenile justice system. It consists of 52 yes/no questions and has been normed with juvenile offenders. The MaYSI has nine (9) subscales including alcohol/drug use, anger, anxiety, depressed mood, impulsivity, somatic complaints, suicide ideation, thought disturbance, and traumatic experiences.

*Should either the MaYSI or any of the other components of the intake mental health evaluation suggest that the youth is experiencing significant psychiatric symptoms, additional psychological testing will be performed when needed by a QMHP under the supervision of a licensed clinical psychologist or by a licensed clinical psychologist. This further testing will be tailored to address the specific areas of concern (e.g., psychosis, depression, anxiety, etc.) rather than a general assessment of psychopathology. The further testing could either be conducted at JDC or at the destination facility, whichever is more appropriate.*

### 3. Assessment of Intelligence and Adaptive Functioning

Assessment of intelligence will occur during the intake mental health evaluation. This assessment can be completed in one of two ways – 1) a group screening measure to identify persons with possible mental retardation to be followed by an individually administered intelligence test (e.g., Wechsler Intelligence Scale for Children – Third Edition) if the screen suggests possible mental retardation or 2) an abbreviated, individually administered intelligence test (e.g., Kaufman Brief Intelligence Test; Wechsler Abbreviated Scale of Intelligence) to be administered to all youth. The latter would allow a brief (usually 30 minutes per child), reliable, and valid measure of intelligence when screening for mental retardation or giftedness.

If an individual's intelligence is measured to be less than 70, adaptive behavior assessment will occur. The assessment of adaptive behaviors may occur with regard to communication, use of community resources, functional academics, home living, health and safety, leisure, self-care, self-direction, social, and work skills. Attempts will be made to contact the youth's family to evaluate areas of functioning and to determine strengths and weaknesses. However, contact with the family is not always possible. For these cases, teachers, direct care staff, unit social workers, or the youth may be interviewed with regard to the above. Proposed measures include the Vineland Adaptive Behavior Scales and the Adaptive Behavior Assessment System.

Measuring adaptive functioning is useful for purposes of treatment planning and skill development. To this end, if no family member is able to be contacted and if direct care or teaching staff does not have an adequate sample of the youth's behavior from which to rate his or her adaptive functioning, this component of the assessment will be completed by or under the supervision of clinical or school psychologists at the destination facility within 60 days of admission to that facility.

*(Assessment of academic achievement and learning disabilities will not be provided by mental health services).*

4. *Collateral Interview*

Collateral interviews will be conducted, when possible, via telephone, Telehealth, or in person with the youth's family, guardian, or other individuals familiar with the youth's functioning. Additionally, the evaluating professionals will consult with correctional officers during the assessment phase regarding any problem behaviors that may occur. These interviews may be conducted by QMHP's or clerical staff by using a structured interview questionnaire with follow up interview if necessary by QMHP's.

5. *Review of Records*

> As noted by statute, the court assigning the child to the Department of Corrections shall provide written findings indicating the need for placement within the Louisiana Office of Youth Corrections, along with all available legal, medical, and mental health, and school records, reports reflecting the social background of the youth, family status, mode of living, behavior tendencies, or any other records that provide pertinent information about the youth upon admission to JDC. Protocols for exchange of information between the JDC and State/DOC Educational services will be developed. (An important feature of a thorough assessment is a record review; an automatic court order is recommended, via agreement so that all relevant records can be obtained as quickly as possible.)

C.    Psychiatric Evaluation

If the youth has a history of recent treatment with psychotropic medication or if the offender's symptoms suggest he or she would benefit from a referral for possible medication management, he or she will be referred to a psychiatrist for a complete psychiatric evaluation, including a DSM-IV diagnosis and psychiatric recommendations. Following the psychiatric evaluation, other evaluations and diagnostic tests (i.e., medical tests, laboratory work, neurological evaluations, or emergency inpatient psychiatric hospitalization, etc.) will be recommended and conducted as needed. If the youth enters the facility taking psychotropic medications, the psychiatrist will conduct a medication evaluation within 24 hours or first business day, with a complete psychiatric evaluation within one (1) week of admission. Otherwise, the psychiatric evaluation, when indicated, will take place no later than two (2) weeks from referral.

D.    Assessment and Recommendation Staffing for Offenders with Serious Mental Health Needs

Generally no later than thirty (30) days from admission (following the completion of the assessment), the JDC Assessment and Recommendation Team (ART) will meet. This team will be composed of a placement specialist designated by the Department of Corrections, a member of the youth's mental health diagnostic team (e.g., social worker, psychological associate, psychologist), educational representative when indicated, the youth, and his or her parent or guardian (if possible). The child's family or guardian can participate either in person, via Telehealth or via telephone (unless considered to be detrimental to the youth's well being). The lead psychologist or his/her designee will be in charge the staffing. Other professionals familiar with the youth whose input is necessary for determining optimal treatment are invited to attend (e.g., medical, school, corrections personnel, etc.). At the time of the

ART staffing, all diagnostic mental health assessments should be in the offender's permanent medical record. The goal of the ART staffing is to make final recommendations regarding all treatment needs of those offenders identified with serious mental health needs. (Treatment will be implemented at destination site, by treatment team)

E.    **Issues Related to the Destination Facility**

The intake mental health assessment and the psychiatric evaluation (if applicable) will accompany those offenders with serious mental health needs to the destination facility via their permanent health record. Unless contraindicated at the current time, the treatment recommendations outlined in the JDC intake mental health evaluation should be followed with the treatment plan more fully developed if necessary to address any other indicated issues at the destination facility. The treatment plan can be amended by the receiving treatment team at any time, but must be reviewed initially. *As stated earlier, further psychological testing and/or adaptive behavior testing may occur at the destination site; at a minimum, guidelines set by the JDC for psychological testing will be followed. (Year one- Treatment Plans will be implemented at Jetson only by LSUHSC)*

F.    **Jetson Diagnostic Center Personnel**

In order to adequately screen and evaluate the 2,000 youth admitted to the JDC, a number of staff are needed. These include a director of the JDC, adequate child and adolescent psychiatric time, Board Certified psychologists with specialized training in child and adolescent psychology, and one with additional licensure in neuropsychology. All must be licensed in order to provide supervision. One will serve as the Assistant Director of the JDC and as Training director for the development of a clinical psychology postdoctoral fellowship. Support staff are required, such as data entry clerks, staff for program evaluation (Masters Level in Human Service Field), secretarial support and transcriptions services are necessary due to the number of assessment reports. A post-doctoral training program will be developed at the JDC in year 2-3 for specialized post-graduate experience in juvenile correctional psychology. Corrections will provide officers to transport youth to all mental health appointments in a timely manner.

G.    **Additional Issues**

1. It will be necessary that adequate office space, storage rooms, office supplies, and space for assessment be provided. Furthermore, a waiting area for youth is necessary. It is recommended this area should be equipped with a television and VCR so that psychoeducation, hygiene, and other instructional videos can be shown to the youth while they wait for appointments.
2. The MaYSI should be developed into a computer-administered test that can

be automatically scored once the youth completes the measure.

3. Psychological assessment tests, forms, and supplies need to be purchased. Approximate cost is $15.00 per offender assessed.

4. Cooperation with the Department of Corrections to ensure that youth will generally be admitted between the hours of 8:00 a.m. and 12:00 p.m., Monday through Friday (excluding holidays) is required. Provisions will be made for transport teams to the various correctional centers and for emergencies.

5. Liaison with judges, parish detention centers and field officers will be developed as possible so that all court/detention/probation records accompany youth upon their arrival to JDC.

6. Psychometric test scoring programs for all youth coming through the JDC: psychopharmacology software programs are required.

7. Computers and a networked printer will be provided via the Telehealth proposal.

## II.    GENERAL POPULATION MENTAL HEALTH SERVICES

### A.    Overview of All Facilities (To Be Implemented by end of Year Two)

TARGET POPULATION: Offenders with Serious Mental Health Needs

1. **GOALS** of mental health services for the Juvenile Correctional Facilities:

- To reduce the disabling effects of serious mental illness so that each offender's ability to effectively participate in correctional programs is maximized.
- To help keep the correctional facility safe for offenders, volunteers, staff, and visitors.
- To develop, with the collaboration of Corrections, an agency-wide behavior management and skill development system focusing on consequence-based rewards and demerits, implemented on a corrections-wide basis, with all mental health staff and correctional employees trained in this system via the Juvenile Justice Training Program.

2. *Structure*

Conceptually, each juvenile correctional facility will have a "community mental health center". Treatment of seriously mentally ill youth will utilize the intake assessment and recommendations provided by the JDC. Treatments provided will include when indicated intake screenings, psychiatric evaluation, evaluation and management of psychiatric medications, crisis intervention services, residential treatment, stabilization of acute psychiatric illness, brief psychotherapy, case management, specialized behavioral management, family therapy, group therapy, treatment team planning, consultation services, and

discharge planning (emphasizing coordination with outpatient services and family reintegration). Family meetings will occur via telehealth when the family cannot attend in person whenever possible (provided the family will participate). Telehealth will also be used for intrafacility conferencing when a youth is transferred, consultation between professional staff, and discharge planning with the family. Any of the above services may be rendered via Telehealth when appropriate/possible.

Consultation services will be provided upon request to correctional officers, supervisors, wardens, and education staff with regard to any offender in the facility experiencing difficulties or whom staff has concerns regarding the mental health needs of the youth.

Weekly mental health rounds of all juvenile offenders placed in segregated housing will occur. Offenders placed in segregated housing who are under the care of mental health team will be seen within 24 hours.

Generally those offenders with the most serious mental health needs will be treated at Jetson, Bridge City, and Swanson due to the proximity of tertiary care facilities, increased professional staff availability, and special treatment units unless contraindicated for security reasons.

3.    *Treatment Planning (@Jetson only Year One)*

Upon transfer of the offender with serious mental health needs, the initial mental health screening and contact with family will be performed by the youth's social worker for all youth recommended for mental health treatment services by the JDC, and for youth receiving mental health services who are transferred from another facility. This will occur in order to assess whether any difficulties have arisen during the transfer and to establish open lines of communication between the destination facility and the family/youth. Additionally, the youth with mental illness will meet a member of his/her treatment team with 24 hours of arrival at the facility.

Youth with mental health treatment plans will be under the direct care of the mental health treatment team (i.e., such as the psychiatrist, psychologist, social worker, psychological associate, correctional officers, etc.) at each facility. This team will be responsible for implementing the treatment plans of youth with serious mental illness and will meet initially to assess the efficacy of the plan and make revisions as indicated. Once the seriously mentally ill youth is stabilized in the general population, treatment plans will be reviewed every three (3) months. If youth should experience a crisis or other change in status, the crisis intervention protocols for seriously mentally ill will be

followed.

Once a month, the seriously mentally ill youth's social worker will communicate any special concerns to the correctional officers and teachers.    Relevant information regarding youth's progress and any adverse medication side effects that may be occurring will be sought by the youth's social worker.    The social worker, in turn, will communicate with the psychiatrist when reviewing treatment progress to assess the efficacy of treatment and make revisions where indicated, and be available for consultations regarding the youth.    It is the responsibility of the youth's social worker to gather and disseminate relevant mental health information.

4.    *Comprehensive Mental Health Services (at the end of year 2)*

Essential mental health services will include access to acute care services, access to residential services, access to crisis and respite services, and 24-hour mental health coverage by qualified mental health professionals, and an on-call psychiatrist. The above services should greatly decrease the need for acute psychiatric hospitalization, but in the rare case it is needed, it will be the responsibility of the Department of Corrections to obtain in a timely manner  (Pharmaceuticals will be provided by the Department of Corrections.)

System-wide protocols for youth with serious mental health needs will be developed to ensure a consistent response to mental health crises, including suicide prevention, seclusion and restraints, and self-mutilation, by the end of year one.

Trainees (e.g., child psychiatry and forensic psychiatry fellows, clinical psychology interns, post doctoral psychology fellows, post masters social workers and social work interns) from Louisiana State University Health Sciences Centers in New Orleans and Shreveport and Earl K. Long Hospital in Baton Rouge will be included in the mental health services divisions, residential treatment units, and diagnostic reception center whenever possible.  These individuals would receive supervision from the recognized supervisor within their discipline.

5.    *Transition Planning*

The social workers of the offenders in need of mental heath treatment after discharge from the correctional facility will contact the social worker at each facility at least forty-five (45) days prior to the child's release date.  At each facility a social worker will be responsible for assisting  these seriously mentally ill youth in transition from

correctional facilities back to the community. The social worker will compile the mental health and medical record for mentally ill youth and will communicate the special needs of the youth with mental illness so that a successful transition into the community is accomplished. The social worker will specifically work with the guardians in the placement to which the child is going, ensuring transfer of information, and that services are in place. The social worker will maintain contact as needed for up to thirty (30) days after release.

6.  *Additional Issues*

    a) The Department of Corrections will provide appropriate bed space for the offender with acute psychiatric needs one (1) male "bed" designated and one (1) female "bed" designated). The Department of Corrections will provide adequate correctional officer staffing so that the youth will be observed every minute by the trained correctional officer, and accompanied at all times by the trained correctional officer. (at Jetson only Year One)

    b) The Department of Corrections will provide for a twelve (12) bed residential mental health unit for female offenders at Jetson Correctional Center for Youth. The Department of Corrections will provide adequate correctional officer coverage for this unit (a minimum of two (2) trained correctional officers present on the unit at all times). (By the end of Year Two)

    c) The Department of Corrections will expand current residential mental health unit at Swanson Correctional Center for Youth to the full capacity of sixty-two (62) beds and provide adequate correctional officer staffing (a minimum of six (6) trained correctional officers present on the unit, two (2) in each area, at all times.) (Year One)

    d) The Department of Corrections will provide an eight to ten (8-10) bed residential unit at Swanson Correctional Center for Youth for those offenders with both serious mental illness and moderate to severe developmental disability. The Department of Corrections will also provide adequate correctional officer coverage ( a minimum of three (3) trained correctional officers present at all times.) (By the end of Year Two)

    e) "Crisis beds" will be designated at each facility. These beds are for seriously mentally ill youth that are clinically determined to be considered dangerous to self or others. A specially trained correctional officer will observe the youth every minute and document observation. Admission to and discharge from the infirmary crisis and respite beds are by MD orders only. (Jetson only Year One)

    f) "Respite beds" will be designated at each facility for those offenders in need of immediate supervision and intervention secondary to serious mental health needs, although not at a level of danger to self or others. (Jetson only Year Two)

g) Laboratory services should be available on a routine and emergency basis in all facilities.

h) Psychological assessment tests, forms, and supplies should be provided. The average cost per child evaluated is approximately $15.

i) At each facility, it will be necessary that there be adequate office space, storage rooms for charts, and adequate space for individual and group therapy.

j) Computers with Internet access, network printers and software will be provided in all facilities via the Telehealth proposal budget.

k) Office equipment and supplies are required at each facility.

## B.    Mental Health Services Staffing

Adequate mental health staffing will include a variety of mental health personnel including BC/BE child and adolescent psychiatrist, child psychologists, clinical social workers, psychological assistants, psychiatric nursing staff, and correctional officers with special training in mental health issues. Nurses trained in mental health will be designated at each facility through the Health Care Proposal. Correctional officers will be selected who will work closely in collaboration with the mental health staff on the specialized units. They will accompany offenders to all mental health appointments and be available should security needs arise.

### 1. *Jetson Mental Health Services*
(This does not include the diagnostic and reception center.)

#### A. *General Population*

Jetson has approximately 174 female offenders, and 322 male offenders, for a total of 496 youth in its general population. Our goal is to add treatment programming for all youth with serious mental health needs, including special treatment programming for female offenders with serious mental health needs .

In order to provide adequate psychiatric care for the seriously mentally ill youth housed in Jetson's general population, child psychiatric time will be required. A clinical psychologist's expertise is necessary for additional psychological evaluations based on new/exacerbated behavior/psychiatric difficulties, and in the creation of an individualized behavior management protocol and to conduct therapy/supervision. Psychological assistants are necessary to administer psychological testing, to assist in developing individualized behavior management protocols, and to conduct therapy. Psychiatric nursing is necessary to provide mental health nursing care covered in health care proposal. This individual would also serve as a liaison to other nursing staff in order to improve care of mentally ill youth across disciplines. Master's level social workers will be necessary to provide

treatment and case management services, at least one of whom should be a licensed clinical social worker who will function in a supervisory capacity of those unlicensed social workers.

B. *Residential Mental Health Treatment Unit for Female Offenders* (By end of year two and dependent on physical facility availability)

Development of a Residential Mental Health Program (RMHP) serving a total of twelve (12) female youth is proposed. This would be a similar program to that which currently exists at the Swanson Correctional Center, a psychiatric residential setting for seriously mentally ill youth who cannot be managed in the general population and are in need of or more intensive diagnositc and treatment services.

In order to provide services for this population it is estimated that child and adolescent psychiatric time, psychology time, additional psychiatric nursing (not provided by the health care proposal), social worker, psychological assistant and psychiatric aides or correctional officers (a minimum of two trained officers present at all times) and clerical services are required.

C. *Acute Care Psychiatric "bed" (Year One)*

The designation of an additional " acute care bed", the site of which should be acceptable to the Medical Director of the Mental Health Services necessary for the short-term stabilization of female offenders with acute psychiatric illness; who can be treated adequately in the correctional setting. These services would be for youth who are for example acutely psychotic, manic or depressed. These individuals require acute treatment as they are potentially dangerous to themselves and or others as a result of an acute mental illness. Additional staffing for this service would include a psychiatric aide (or trained correctional officer) to observe the youth every minute.

*Needs*

1). Physical plant and programming issues need to be addressed concerning females.
2). Programs will be developed to address gender-specific issues for seriously mentally ill female offenders.
3). Designation of acute care "bed" with adequate staff available at all times.
4) In those instances, where the acute care treatment is not adequate, it will be DOC's responsibility to obtain hospital services in a timely manner.

C.  **Mental Health Coverage (Year one- Jetson/JRDC only)**

It will be necessary to provide 24-hour mental health coverage for crisis

situations. During normal working hours, coverage will occur by an on call QMHP staff designated at each facility with psychiatric back up in person, via telephone, or via telehealth for each facility.

During holidays, weekends, and after hours, the RN on site will be initially consulted. If necessary the RN will contact the on call psychiatrist available by telephone. Should the youth require a face to face contact, the QMHP on call will go to the correctional facility, evaluate the youth, and contact the on-call psychiatrist via telephone. One (1) QMHP would be designated "on call" evenings, holidays, and weekends at each facility. One (1) psychiatrist would be designated "on call" for Jetson & JRDC. A psychiatrist or emergency room physician would be available via telehealth if deemed necessary by the RN and MD on call.

D.   Administration

1.   Structure (At Jetson by end of Year One)(At all facilities by end of Year Two)

Administratively each juvenile correctional facility will have a medical director of psychiatric services, a director of social work services, and a director of psychology services. One of these professionals will be appointed to administrate and coordinate mental health care at that individual facility. This person will be accountable to the Director of Health Care of that facility. By the end of year two, each of the juvenile correctional facilities will have a Director of Health Care (directly responsible to the Director of Operations for the Juvenile Justice Program) and will oversee the provision of pediatric, dental, and mental health care at their facility. Year one, the Director of Operations will serve as the Director of Health Care at Jetson/JRDC..

The Medical Director of Psychiatric Services at each facility would supervise all clinical judgments regarding psychiatric and mental health care at each individual facility, implement clinical policies and monitor overall mental health treatment. The Director of Mental Health Care at each individual facility (Ph.D., BCSW, or MD) would be responsible for programmatic concerns including mental health center employee management and all day to day clinical activities. He/she would also be responsible for ensuring that all mental health policies are carried out at that facility.

LSUHSC has the ability to recommend to the Department of Public Safety and Corrections (DPS&C) policy and procedures that relate to the provision of health services but that have concurrent operational interface with the unit. (LSUHSC can evaluate DPS&C compliance with recommendations and report accordingly.)

LSUHSC may make recommendations to DPS&C relative to offender

transfers, but may not order such transfers. (LSUHSC may evaluate DPS&C for timely compliance with recommendations.) DPS&C *must* document reason if youth is not transferred.

LSUHSC Directors of Mental Health, Social Work, Psychology, Nursing, Dental, and Adolescent Health Services, Training/Research and Psychology will be directly responsible to the Program Director of the LSUHSC Juvenile Justice Program. The LSUHSC Directors will recruit and hire all employees within their disciplines, develop training programs, such as the social work post-masters child forensic fellowship, and the post-doctoral psychology fellowship. He/She will lead the development of protocols in their discipline, and the dissemination of that information to all directors of their field at each institution. He/She will be professionally responsible for the directors at each facility in their field.

2. **Policies and Procedures/ Quality Assurance for Offenders with Serious Mental Health Needs (By End of Year One)**

Policies and procedures for the provision of mental health services and documentation of those services will be developed for use by LSUHSC staff in all facilities as well as site specific policies when indicated. These policies and procedures will be updated annually and will include:

   a. Crisis intervention protocols including suicide and violence prevention
   b. acute drug/alcohol intoxication and withdrawal (to be developed in collaboration with Pediatrics)
   c. sexual assault (to be developed in collaboration with Pediatrics)
   d. seclusion and restraints of mentally ill youth
   e. psychopharmacology – management of psychotropic medications

It must be the policy and procedure of each facility that clinical decisions and actions regarding mental health care services be the sole responsibility of the qualified mental health care professional.

Review panels will be established to ensure adequate documentation of mental health encounters. This will include policies on confidentiality, sharing of information, availability and use of records, transfer of records, and retention of records.

A QA Program and committee will be established to monitor the quality of mental health services provided. Review panels will be established to ensure adequate documentation of all mental health encounters. The quality assurance committee on a quarterly basis and will conduct chart reviews.

A Director/Coordinator of Quality Assurance will be appointed who will be directly accountable to the Program Director. The QA Director will chair the Quality Assurance and Policy and Procedure Committees.

### 3. System-wide Administrative Staffing Requirements

Administrative staff will be responsible clinically and administratively at Jetson/JRDC Year One. A core administrative staff is required to oversee the quality of provision of mental health services to Juvenile Corrections. A board-certified/board-eligible child and forensic psychiatrist with specialized training in the assessment and treatment of behavior disorders will function in the role of the Director of Mental Health Services. He/she will be responsible for the professional standards for psychiatric health care across facilities.

A Ph.D.-level licensed clinical psychologist with special training in child, and adolescent, will function as the Director of Psychological Services at JRDC. He/she will be responsible for psychological assessment protocols, system-wide procedures in psychological services, and the development of training in psychology related fields. He/she will also be responsible for development of professional standards for psychological services across facilities and coordination of all intake data.

A licensed clinical social worker experienced in the assessment and treatment of juvenile offenders, will function as the Director of Social Work, and will be responsible for the development of social work practice standards. He/she will develop a framework of therapeutic services for the treatment of juvenile offenders, develop social work training programs, and serve as a liaison to community treatment providers, probation services and education.

A registered nurse experienced in both psychiatric and medical health care, will function as the Director of Nursing. He/she will be responsible for the coordination of nursing services and will develop professional standards for nursing services in the juvenile correctional system for both psychiatric and medical health care. He/she will be responsible for training of correctional officers to assist with nursing, health and mental health of specialized units. He/she will serve as a liaison to nursing staff at all facilities utilized by Juvenile Corrections. He/she will directly interact with nurses at all facilities in order to ensure the quality of all nursing services.

A Director/Coordinator of Quality Assurance will assist in the formation of quality assurance panels, review panels, protocols and other administrative issues, as well as chairing QA and PP committees, and to ensure that all quality assurance data is being gathered. This person will have special expertise in administration of public health care.

A psychiatrist board eligible in child/adolescent and forensic psychiatry, with experience in the evaluation and treatment of juvenile offenders, correctional psychiatry and acute crisis services, and treatment for the

severely/acutely mentally ill. He/she will function as the Director of Operations, responsible for the day to day operation of the health care program system-wide by the end of year two. He/She will be responsible for coordinating the consultation/referral services that will be provided by LSU hospitals or others, and for ensuring that all policies and procedures developed by the administration are carried out by each facility via the facility Health Care Director.

The Director of the LSUHSC Juvenile Justice Program , will be a, M.D., forensic, child and adolescent psychiatrist with experience in Program administration and development, and assessment and treatment of juvenile offenders. The Program Director will be directly accountable to the Dean of the LSUMC in New Orleans. The, LSUHSC Juvenile Justice Program will be administered via the LSUHSC, School of Meddicine in New Orleans, Office of the Dean.

4. Consultants (see biographical sketches)

Several expert consultants will aid in the design and implementation of services or this project. The project consultants include 1) a mental health law attorney, who has special expertise in the administration of forensic mental health systems. 2) A clinical psychologist with special expertise in assessment and treatment delivery systems in correctional mental health, and 3) An assessment and outcomes expert to aid in the development of data systems and outcome measures. These consultants will provide direct consultation to the Director for the Juvenile Justice Program, and designees in these areas.

*Needs*
a) Administrative support is required to aid 'the mental health and QA Directors in their responsibilities.
b) Consideration for travel (i.e., vehicle allowance, mileage reimbursement), lodging, and meals is necessary to carry out their duties.
c) Budgetary consideration will be given for office needs.
d) A policies and procedures manual for mental health services will be developed and updated annually.

## Bibliography:

Cohen, F and Dvoskin, J: Inmates with Mental Disorders: A Guide to Law and Practice. Mental Psychiatric Disability Law Report 16:462-70, 1992.

Grisso, T. & Barnum, R. The Massachusetts Youth Screening Inventory (MaYSI). Unpublished manuscript.

Harrison, P & Oakland, T. (2000). Adaptive Behavior Assessment System

(ABAS). San Antonio, Texas: The Psychological Corporation.

Kaufman, A.S. & Kaufman, N. L. (1990).  Kaufman Brief Intelligence Test (K-BIT). American Guidance Service.

Metzer JL. An introduction to correctional psychiatry: Part III. J Am Acad Psychiatry Law 26; 1:107-115, 1998.

Metzner JL, Miller RD, Kleinsasser D. Mental health screening and evaluation within prisons. Bull Am Acad Psychiatry Law 22; 3:451-457, 1994.

Metzner JL.   An introduction to correctional psychiatry: Part I. J Am Acad Psychiatry Law 25; 3:375-381, 1997.

Metzner JL. An introduction to correctional psychiatry: Part II. J Am Acad Psychiatry Law 25; 4:571-579, 1997.

Metzner JL. Guidelines for psychiatric services in prisons. Crim Behav Ment Health 3:252-67, 1993.

Rosenbaum SH. Civil Rights Issues in Juvenile Detention and Correctional Systems.  Corrections Today, 148-156, 1999.

National Commission on Correctional Health Care: Standards for Health Services in juvenile detention and confinement facilities. Chicago, IL: National Commission on Correctional Health Care, 1996.

Sparrow, S., Balla, D., & Cicchetti, D. (1984).  Vineland Adaptive Behavior Scales. Circle Pines, Minnesota:  American Guidance Service.

Steadman HJ, Holohean EJ, Dvoskin J. Estimating mental health needs and service utilization among prison inmates. Bull Am Acad Psychiatry Law 19:297-307, 1991.

The Psychological Corporation (1999).  Wechsler Abbreviated Scale of Intelligence (WASI).  San Antonio, Texas: Authors.

# ATTACHMENT F

## DENTAL CARE SERVICES PROPOSAL
## FOR
## THE LOUISIANA OFFICE OF YOUTH CORRECTIONS
## FOR
## JETSON CORRECTIONAL CENTER FOR YOUTH (JCCY)

# DENTAL CARE SERVICES PROPOSAL
## FOR
# THE LOUISIANA OFFICE OF YOUTH CORRECTIONS
## FOR
# JETSON CORRECTIONAL CENTER FOR YOUTH (JCCY)

Prepared by

Timothy J. Delcambre, DDS, MHA
Department of General Dentistry
LSU School of Dentistry

LSU Health Sciences Center

June 22, 2000

<u>Dental Care Services</u>

I.    The following will be provided to all offenders:  (By end of Year Two)

    1.    Proper Diagnosis:  thorough screening and examination
    2.    Prevention:  through education of the offenders in basic oral hygiene instruction.  The placement of sealants and proper fluoride treatment when clinically indicated.
    3.    Emergency Dental Treatment: through Oral Surgery (extraction of non-restorable and/or infected teeth), Endodontics (root canal therapy on infected restorable teeth), Periodontics (gum therapy for gingival infections).

II.    Initial Evaluation – to take place at the intake center (JRDC) (By end of Year One)

    1.    Screening for
        a)    Oral pain
        b)    Oral infection
            1)    dental: periapical (abscesses)
            2)    periodontal/gingival
        c)    caries (decay)
        d)    gingival health
        e)    present oral hygiene habits

        Screening will need the following radiographic needs when clinically indicated.

        1.    a panoramic radiograph
        2.    a bilateral bitewing x-rays (interproximal cavity-finding) series
        3.    periapical dental radiographs as needed

    2.    Full Dental Examination (radiographs obtained from screening exam)

        a)    Extraoral Exam for:
            1)    Temporomandibular Joint Dysfunction (TMJ)
            2)    Lymphadenopathy
            3)    Symmetry

        b)    Intraoral Exam for:
            1)    soft-tissue pathology
            2)    occlusion
            3)    caries (decay) detection
            4)    gingival exam

        c)    Treatment Plan:  To address primarily oral infections and function through
            -    Oral Surgery
            -    Endodontics
            -    Prevention
            -    Periodontics
            -    Operative Dentistry
    3.    Prevention Program to be initiated based on the clinical needs of each child

    4.    Emergency Dental Treatment to care for acute infections.

III.    Definitive Dental Treatment – to take place at any facility with necessary resources (LSUHSC will provide treatment at Jetson/JRDC Year one)

If the offender is to remain at JCCY, the Definitive Dental Treatment will be given by the dental staff there by the end of year one.

If the offender is to be transferred to another juvenile facility, then the dental record with radiographs will follow that offender in the medical chart.

Definitive Dental Treatment with further Prevention Therapy can be followed upon by the dental personnel at the other facility.

Purpose – to control dental infection and regain function through the following:

   a) Oral Surgery
     1) removal of all non-restorable, infected teeth
     2) incision and drainage of abscesses
   b) Endodontics
     1) to treat with root canals, teeth that are infected but restorable
   c) Periodontics
     1) Scaling and root planning (deep cleaning) of teeth
     2) Gingival treatment of Necrotizing Ulcerative Gingivitis (NUG) of Juvenile Periodontitis.
   d) Operative Dentistry (When clinically necessary for functioning)
     1) restoration of posterior (back) teeth with:
       a) amalgam
       b) stainless steel crowns
       c) needed liners/bases, and pins
     2) restoration of anterior (front) teeth with:
       a) composite (tooth colored filling)
       b) needed liners/bases

**ATTACHMENT G**

**PROPOSAL**

**JUVENILE JUSTICE TRAINING PROGRAM**

DEBRA K. DEPRATO, M.D.
JUNE 30, 2000
LOUISIANA STATE UNIVERSTITY
HEALTH SCIENCES CENTER
OFFICE OF THE DEAN
1542 TULANE AVENUE
NEW ORLEANS, LOUISIANA
70112

# PROPOSAL

## JUVENILE JUSTICE TRAINING PROGRAM

# Juvenile Justice Training Program

---

## PURPOSE

---

The overall purpose of the Juvenile Justice Training Program is aimed toward constitutional requirements as defined by national standards of care regarding juveniles offenders detained in juvenile correctional facilities, especially those of protection from harm, by providing training to all employees and staff responsible for and/or involved with the juvenile correctional facilities.

---

## MISSION

---

The overall mission of the Juvenile Justice Training Program is to educate those interacting within the Juvenile Correctional Facilities and with juvenile offenders in the areas of knowledge necessary to effectively work with this specific population.

Special training is necessary to work within the juvenile correctional setting. Children in juvenile correctional facilities are often diagnosed with mental illness, medical illness, or developmental disabilities. Many have substance abuse disorders, are victims or perpetrators of abuse/sexual abuse, are behaviorally disordered, are at risk to harm others or self, and many often require crisis interventions. In addition, children in Louisiana's juvenile correctional facilities range in age from 10 to 21, requiring staff to understand working with children and adolescents, such as reasonable expectations for their developmental level. Children in close confinement can be at risk of harm from serious offenders, gang members, sex offenders, and those few staff who abuse their positions of power. It is essential that staff understand these realities and the special dangers they present. Finally, knowledge of the proper use of seclusion and restraint in the mentally disordered youth are also necessary.

In order to continue the positive cultural change that has begun by the current administration, it is imperative that all staff at every level of the organization have a consistent and practical understanding of fundamental principles.

Skills required in juvenile correctional staff depend on the particular job of the individual; however all staff require training in the special needs of children as noted in the areas above. Thus, adequate supervision and training of all staff is necessary. Particularly noted is the importance of individualized treatment, the need for specific types of skills training, and collaboration between correctional staff, mental health staff, educational staff, medical staff, and administration. Also important is a systematic way of handling problems, and interaction with other systems and the child's family especially upon admission and discharge.

Supervisors and Administrators should be trained in the roles of professional staff, maintaining adequate supervision of children and staff, methods of decreasing staff turnover, promoting improved communications/liaisons among all staff, development of evidence staff is learning and using new knowledge.

2

## GOALS AND OBJECTIVES

The basic goals of training include safety, core clinical issues, and oversight.

Goals of Training:

1. Each staff member will understand the joint mission and philosophy of the LSUHSC Juvenile Justice Training Program and the Office of Youth Development.

2. Each staff member will understand the basic normal development of children and adolescents.

3. Each staff member will have a basic understanding of the special needs of children in regards to medical and mental health needs.

4. Each staff member will have a basic understanding of positive behavioral change in children in the juvenile correctional system.

5. Each staff member will understand the rights and responsibilities of each youth in the juvenile correctional system.

6. Each staff member will be aware of the responsibilities of other staff member working within the juvenile correctional system.

7. Each staff member will exhibit a practical working knowledge of the specific skills necessary to perform their particular job with efficiency, efficacy, and professionalism.


Objectives of Training:

1. Each staff member will be able to cite the basic concepts of positive behavioral change for children.

2. Each staff member will be able to demonstrate through role-playing the ability to use their learned skills in the performance of their duties.

3. Each staff member will be able to identify basic signs of mental illness, medical disorders, and developmental disorders.

4. Each staff member will demonstrate via testing knowledge retained via training.

3

## TRAINING AUDIENCE

All staff of juvenile correctional facilities must receive specialized training in order to work within this setting. Correctional work is an area of specialized knowledge and skill, and particularly so for juvenile corrections. This type of work is extremely stressful at times for both staff and youth requiring an adequate level of training, supervision, and support to meet the goal of protection from harm for both staff and children. This area of knowledge is rapidly growing, both legally and clinically, and the need for all staff to receive current information and skills as becomes available is crucial.

**Target Audiences:**

1. Administrators/Supervisors

2. Project Zero Tolerance Investigators

3. Clinicians

4. Educators

5. Correctional Officers

6. Ancillary Staff

7. Advocates

8. Volunteers

(Training for Judges and Attorneys who directly work with juvenile delinquents would be especially beneficial, as well. Education regarding appropriateness of sentencing, special needs populations, delineating those children who actually pose a risk to the community versus those who could remain on probation, the use of diversion programs, etc. would add to the overall benefit of the juvenile correctional system as it directly relates to the judiciary.)

## TYPES OF TRAINING

1. CORE TRAINING: Eventually, this will comprise the pre-service training package for all employees newly hired to the juvenile correctional facilities. During Year 2 of this contract, all existing department or institutional employees will receive this block of training, until all existing employees have been trained. This will ensure that all staff share a collective and consistent vision of the shared mission and philosophy.

2. PRE-SERVICE TRAINING: All newly hired correctional officers must complete this 20 hour block as part of their mandatory pre-service training, prior to beginning work.

4

3.  INSERVICE TRAINING/CONTINUING EDUCATION: All staff must receive continuing education, which shall include core instruction for all staff and elective training modules, which may be selected by the staff member and/or mandated according to the person's specific job duties.

Pre-Service Training will be offered bimonthly at a central location. In addition, specific annual training of twenty hours per year would be required for certain types of employee. All staff completing the basic training and annual training hours would receive certificates of training from LSU Health Sciences Center.

1.  Year Two (Initial Core Training of All Current Employees):

As start up, all staff currently employed by juvenile correction facilities will require the core training of 20 hours, approximately 1500 employees, divided among four correctional facilities. Continuing Education credits will be provided for clinical staff, i.e., social workers, psychologists, physicians.

2.  Core Training for New Correctional Officers Year Two:

The core basic curricula will be offered at the Training Academy on the schedule for new correctional officers, approximately twice per month.

3.  Annual Update Training subsequent to Year One (see above)- To Begin Year 2

Twenty hours of continuing education will be provided for all specialized staff and correctional officers in their area of specialty and core information. This will be provided on site and via telehealth.

4.  Semiannual Site Visits:

Site visits would occur on a semiannual basis beginning after training is initiated order to assess the ability of the staff to utilize the knowledge from the training, to conduct training needs assessment through individual conferences, focus groups, and administration surveys, and to gather other information for future trainings in each specialty area.

5.  Documentation of Training:

Each juvenile facility's administration will be responsible for documentation of all employees' completion of required training. LSUHSC will offer a certificate of completion of the core basic training, and annual training.

6.  Access to Literature and Reference Materials:

It is recommended that each facility have basic current reference books as an adjunct to training which should be supplied on a yearly basis by the Department of Public Safety and Corrections such as the 1) Physician's Desk Reference, 2) The Louisiana Children's Code, 3) Child Social Work Reference, Child Psychiatric Text, and 4) Pediatric Reference Material., 5) Medical Dictionary.

7. <u>Consultative Services</u>

As per request of Corrections, the JJTP will provide consultative services in reviewing all training currently provided by DPS and C to juvenile correctional officers to determine appropriateness, relevance, and priority and make recommendations to the Assistant Secretary.

SAMPLE CURRICULUMS (Curriculum will be determined and developed during year one implemenation; as well as based upon settlement agreement)

<u>SAMPLE CORE TRAINING FOR ALL STAFF:</u>

I.   Basic Constitutional and Legal Rights of Juvenile Offenders

II.  Overall Mission and Philosophy of LSUHSC JJTP

III. Normal Child and Adolescent Development (**currently contracted out to LSU Shreveport**)

IV.  Communication Skill Training

V.   Behavioral Management Training

VI.  Crisis Prevention and Intervention

VII. Recognition and Treatment of Common Medical and Mental Health Disorders

VIII. Basic Medication Management of Disorders:  Indications and Side Effects

IX.  Documentation and Record Keeping

X.   Special Needs of Female Offenders

XI.  Indicators and Interventions of Risk of Self to Harm and Others

XII. Child Abuse:  Legal Responsibilities and Clinical Indicators

XIII. Roles and Responsibilities of Staff in Juvenile Correctional Facilities

**SPECIALTY AREAS:** (Sample Curriculum))

<u>ADMINISTRATIVE:</u>

I.   Core Legal Responsibilities as settlement requires

II.  Implementation of Legal Responsibilities

III. Techniques for Self Monitoring

IV. Review Committees, Development of Unified Policies and Procedures Regarding Medical and Mental Health Reviews

V.  Operationalizing the Issues

VI. Screening/Hiring Methods

VII. Staffing/Supervisory Methods

VIII.  Medical and Mental Health Disorders within the Juvenile Correctional Population

IX. External  Systems Interacting with Juvenile Corrections

X.  Medical Records and Information, Documentation, Record Keeping

XI. Promotion of Change within a System

XII. Use of Telehealth Services

CLINICAL STAFF: (Sample Curriculum)

I.   Legal and Ethical Responsibilities in Juvenile Corrections

II.  Juvenile Corrections Health Care Standards

III. Child and Adolescent Development

IV. Mental Disorders Commonly found in Juvenile Offenders

V.  Female Juvenile Offenders:  Special Needs

VI. Assessment and Diagnosis of Juvenile Offenders

VII. Use of Medications and Side Effects

VIII. Assessment for Risk of Self-Injury/ Harm to Self and Others

IX. Proper Use of Seclusion and Restraint in the Mentally Disordered Child

X.  Assessment and Interventions of Child Abuse:  Physical, Sexual, and Emotional

XI. Successful Treatment Models for Juvenile Offenders

XII. Discharge Planning and Community Liaisons Relating to Medicine and Mental Health Needs of Juveniles Being Released.

XIII. Ethical Issues in Juvenile Correctional Health Care

XIV. Use of Telehealth in Assessment and Treatment of Juvenile Offenders

XV. Roles and Responsibilities of Clinical Staff

XVI. Interactions with the Court Regarding Medical and Mental Health Issues, and Report Writing

XVII. Team Building and Generalization of Treatment to the Correctional Community

CORRECTIONAL STAFF: (Sample Curriculum)

I.   Juvenile Court System, Legal Process, and Juvenile Rights in Secure Detention

II.  Child and Adolescent Development and Expectations

III. Effective Interactions with Behavior-Disordered Youth

IV.  Violent Youth

V.   Assessing and Dealing with Issues of Harm to Self and Others

VI.  Proper Use of Seclusion and Restraint in the Mentally Disordered Child

VII. Documentation and Note Taking

VIII. Working as a Team

PROJECT ZERO TOLERANCE INVESTIGATORS (Sample Curriculum)

I.   Child Abuse Reporting Laws

II.  Rights of Juvenile Offenders

III. Responsibilities of Staff

IV.  Recognition of Child Abuse:  Sexual,  Physical, and Emotional

V.   Child Abuse Assessments

VI.  Confidentiality and Privacy Issues

VII. Interviewing a Child

VIII. Collection of Collateral Data and Evidence

IX.  Understanding the Physical and Mental Health Assessment

X.   Formulating an Opinion

XI. Report-Writing

XII. Potential Conflicts or Bias

IX. Case Example (working session)

(Curriculum will be fully developed based on settlement agreement, and funding)

---

## TRAINING TECHNIQUES

All new correctional officer training will occur on monthly basis at minimum at the Training Academy. All other new staff training will occur every 90 days at an agreed upon site.

New Staff Training involves didactic material, interactive and small groups involving teams, and crisis prevention techniques.

Annual Training would occur at each site and via teleHealth videoconferencing. As different sites develop specialized programs, site trainings can be tailored to meet the individual needs of the site.

To provide ongoing support for these training initiatives, LSUHSC will provide brief videotapes to be shown weekly/monthly to all staff via shift briefings.

Core and annual training topics and emphasis may be adjusted over time based on the needs of staff.

At this time, normal child and adolescent development is contracted out, and not covered in costs.

Training of Judges and Attorneys, if performed, would be in conjunction with the ongoing LSU Judicial College Programs. (Not covered in costs)

---

## INFRASTRUCTURE

The Juvenile Justice Training Program would be housed administratively in the Dean's Office at the LSUHSC in New Orleans, Louisiana, with the Director of the JJTP administratively accountable to the Program Director of the Juvenile Justice Program who is directly accountable to the Dean of the School of Medicine in New Orleans. The program will be administered in the Dean's Office of the LSU Health Sciences Center in New Orleans.

The Juvenile Justice Training Program Staff Infrastructure would include a core of LSU professionals, support staff, and a contract staff to provide more specialized needs. Through the Dean's office, the JJTP, can contract with Medical School personnel, to provide training.

9

## IMPLEMENTATION

The implementation of this project will begin with the approved-signed contract for the training proposal, and the appointment of the Director of the JJTP. The initial one year period will include the hiring of staff and development of training curricula. Core training will first be provided to correctional officers and correctional supervisors/administrators, as a priority. Training of correctional officers will be provided at each individual. During Year 2, all new and current staff will be trained in the core curriculum. Staff other than correctional officers can be trained off site in group sessions. After all correctional officers, administrators, and supervisors have been trained, the proposed order of personnel training is:

Educators

Advocates

Clinicians

Ancillary Staff/Volunteers

During Year 1, a curriculum will be developed for Project Zero Tolerance. Investigator Training will occur at the end of Year 1.

Year 2, will encompass training of all current and new employees.

Time Line After Contract is Executed:

1 – 4 months: Hire full-time LSU Core Staff

6 – 9 months: Development of Training Modules

9-12 months : Recruit and Hire for Specialized Services

9-12 months: Train PZD Investigators; Crisis Prevention Training at Jetson

Year 1 will include training of Project Zero Tolerance Investigations.

Year 2 will include training of all staff and new hires in the core curriculum.

Training will be implemented via different groups of staff for Correctional Officers at each individual facility as follows; During year 2:

Jetson

Bridge City

Tallulah

Swanson

All other staff will be trained in group sessions at a central location.

---

## COSTS

---

*Equipment Costs*: **(Detailed Budget Attached)**

1.  Copier

2.  6 Computers

3.  1 Network Printer

4.  Software

5.  Office Furniture/Equipment

*Staffing Costs*: (For full implementation beyond Year 2)

1.  Core Staff

    a.  Director/Child and Forensic Psychiatrist- .5 FTE

    b.  Assistant Director/Child/Research Psychologist 1 FTE

    c.  Curriculum Development/Trainers - 2 FTE

    d.  Program Evaluator 1 FTE

    e.  Administrative Assistant 1 FTE

    f.  Assistant Business Administrator .5 FTE

2.  Part-time Contracts for Specialized Services/Consultations

    a.  Health Law Attorney

    b.  Crisis Specialist

    c.  Child Psychopharmacologist

    d.  Pediatrician

    e.  Child Trained Social Workers/Counselors

    f.  Law Enforcement/Investigator

11

g.  Public Health Administrator

3.  Program Consultants (Legal, Clinical, and Outcomes Experts)

4.  Books/Reference Material, for each facility

5.  Travel Expenses

6.  Operating Expenses such as Telephones/Long Distance; Postage; Printing Training Manuals, A/V Equipment for Training

7.  Office Supplies

8.  Administrative Services, such as purchasing, computer training for employees, hiring of new employees, credit costs for courses offering credit, CU costs for all of the professions receiving professional credit training.

9.  Office Space

---

## BIBLIOGRAPHY

Alexander J, Austin J. Handbook for Evaluating Objective Prison Classification Systems. National Council on Crime and Delinquency, 1992. National Institute of Corrections. US Department of Justice. Publication #010675.

Cohen F. Legal issues in the mentally disordered inmate, in F Tracy (editor): Sourcebook on the Mentally Disordered Prisoner. Washington, DC: National Institute of Corrections, 1985, pp. 31-90.

Metzer JL. An introduction to correctional psychiatry: Part III. J Am Acad Psychiatry Law 26; 1:107-115, 1998.

Metzner JL, Miller RD, Kleinsasser D. Mental health screening and evaluation within prisons. Bull Am Acad Psychiatry Law 22; 3:451-457, 1994.

Metzner JL.  An introduction to correctional psychiatry: Part I. J Am Acad Psychiatry Law 25; 3:375-381, 1997.

Metzner JL. An introduction to correctional psychiatry: Part II. J Am Acad Psychiatry Law 25; 4:571-579, 1997.

Metzner JL. Guidelines for psychiatric services in prisons. Crim Behav Ment Health 3:252-67, 1993.

National Commission on Correctional Health Care: Standards for Health Services in Jails. Chicago, IL: National Commission on Correctional Health Care, 1996.

National Commission on Correctional Health Care: Standards for Health Services in Prisons. Chicago, IL: National Commission on Correctional Health Care, 1992.

Proceedings of a National Forum on Creating Jail Mental Health Services for Tomorrow's Health Care Systems, Nov 9-10, 1994. National Institute of Corrections. US Department of Justice. Publication #012934.

Profiles of Correctional Substance Abuse Treatment Programs: Women and Youthful Violent Offenders. NIC Information Center, Jan 1994. National Institute of Corrections, US Department of Justice. Publication #011369

Roth LH. Correctional psychiatry, in WJ Curran, AL McGarry, SA Shah (editors): Forensic Psychiatry and Psychology: Perspectives and Standards for Interdisciplinary Practice. Philadelphia PA: FA Davis Co, 1986, pp. 429-68.

Steadman HJ, Holohean EJ, Dvoskin J. Estimating mental health needs and service utilization among prison inmates. Bull Am Acad Psychiatry Law 19:297-307, 1991.

---

## REFERENCES:

Beyond the Walls, Improving Conditions of Confinement for Youth in Custody,  US Department of Justice, Office of Juvenile Justice and Delinquency Prevention, January 1998.

Desktop Guide to Good Juvenile Detention Practice; Research Report, US Department of Justice, Office of Juvenile Justice and Delinquency Prevention, October 1996.

Juvenile Detention Training Needs Assessment, Research Report; US Department of Justice, Office of Juvenile Justice and Delinquency Prevention, April 1996.